**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| SHI INTERNATIONAL CORP., | § | |
| | § | |
| Plaintiff, | § | |
| | § | Civil Action No. 4:23-CV-200-SDJ |
| v. | § | |
| | § | |
| SECURUS TECHNOLOGIES, LLC, | § | |
| | § | |
| Defendant. | § | JURY TRIAL DEMANDED |

## SECURUS' FIRST AMENDED COUNTERCLAIM

Counter-Plaintiff Securus Technologies, LLC ("Securus") hereby files this Amended Counterclaim against SHI International Corp. ("SHI").   Securus would respectfully show the Court as follows:

### I.      PARTIES

1.      Counter-Plaintiff Securus Technologies, LLC is a Delaware limited liability corporation with a principal place of business in Texas.

2.      Counter-Defendant SHI International Corp. is a New Jersey corporation, with a principal place of business located at 290 Davidson Ave., Somerset, NJ 08873.   SHI has already appeared through counsel.

### II.      JURISDICTION AND VENUE

3.      This Court has supplemental jurisdiction over these Counterclaims pursuant to 28 U.S.C. § 1367 because they are related to the claims brought by SHI and form part of the same case or controversy for which the Court already has already exercised subject-matter jurisdiction.

## III.     RELEVANT FACTS

### A.     Background Information Regarding the Parties

4.     Securus is a technology communications firm serving department of corrections facilities and incarcerated individuals across the country.

5.     SHI is a privately owned provider of IT infrastructure, end user computing, cybersecurity, and IT optimization products and services.

6.     Over the years, Securus and SHI have worked on numerous projects together. Those projects included installation of communication services infrastructure and technology in various correctional facilities.

7.     As part of that work SHI supplied Securus with both survey and installation services as well as serving as an equipment vendor for numerous various locations throughout the U.S., including, but not limited to, locations in Texas, Florida, Arizona, Idaho, Ohio, Missouri, Georgia, Colorado, California, and Kentucky.   SHI supplied these services through dozens of contracts, "Statements of Work" ("SOWs"), executed between the parties between 2021 and 2022.

### B.     The TDCJ SOWs

8.     Securus solicited and obtained a contract with the Texas Department of Criminal Justice ("TDCJ") to install, operate, and maintain a tablet solution for approved incarcerated individuals.

9.     The project was governed by a Solicitation, Offer and Award issued by TDCJ and agreed to by Securus (the "TDCJ Contract").   The TDCJ Contract specified the scope of work, terms and conditions, pricing, and other aspects of the project (referred to as the "TDCJ Project").

10.     As part of the TDCJ Project, Securus was required to deliver a "turnkey solution" that was compatible with all the correctional facilities covered by the TDCJ Contract.

11.     Because correctional facilities are built with a significant amount of steel and concrete, providing wireless services with the tablets can be challenging.

**C.     Securus Contracts with SHI to Provide the Installation**

12.     To provide the installation of the tablets and wireless services for the TDCJ Project in accordance with the terms of the TDCJ Contract, Securus turned to SHI.

13.     SHI represented that it had the skill, expertise, and resources to perform the installations.

14.     After extensive negotiation, Securus and SHI entered into a series of SOWs that set out the scope of work and services to be provided by SHI to Securus for the TDCJ Project.   One exemplar SOW is attached hereto as Exhibit A.   The SOWs formed the basis of the parties' contractual relationship for the work to be performed by SHI.

15.     Each SOW covered a particular region and sometimes facilities.   Each of the SOWs specified the overall work to be performed.[1]

---

**2   Executive Summary**

Securus Technologies ("Customer") has engaged SHI Services ("SHI") to complete structured cabling including conduit, installation of APs, installation of fiber optic cables, installation of electrical outlets, Installation of network racks, and installation of network equipment for the Region 5 of their TDCJ project.

---

*See* Exhibit A at 3.

16.     Each SOW then provided very specific details for the actual individual installations, including the equipment that SHI would be providing. For example, here is a small excerpt (the full details generally run over 20 pages long):

---

[1]  The SOW attached as Exhibit A is labeled "TDCJ—Region 5 Cabling Statement of Work for Securus Technologies" and was executed in February 2022.   The provisions cited in this Counterclaim from that SOW are identical to the other SOWs at issue although some SOWs have numbered the paragraphs differently.

> **Structured Cabling Installation up to 300 ft. one hundred ninety-four (388) to Securus Installation Standards document (Appendix C)**
> - **Install one hundred ninety-four (194) cable run(s) from IDF to customer provided AP locations**
>   - Label cable(s) at both ends
>   - Ensure that all cables are neatly dressed, and Velcro ties are used when necessary
>   - Terminate cables using industry standard methods and best practices
>     - Terminations will be completed following standards listed in Appendix C
>   - Test cable(s) for continuity
>   - Install Firestop
> - **Install (194) Spare CAT6 cable runs from IDF to customer provided AP locations in Dorm areas. (2) CAT6 for each Dorm.**
>   - Label cable(s) at both ends
>   - Ensure that all cables are neatly dressed, and Velcro ties are used when necessary
>   - Terminate cables using industry standard methods and best practices
>     - Terminations will be completed following standards listed in Appendix C
>   - Test cable(s) for continuity
>   - Install Firestop

*Id*. at 4.

### D.    Key Provisions of the SOWs

17.    Three provisions in the SOWs are relevant in this dispute. <u>First</u>, the SOWs specifically incorporated the terms of the TDCJ Contract.    The specific SOW provision (Section 12 included in each SOW, and reproduced in the excerpt below) provides as follows:

> ## 12 Terms and Conditions
> The Customer and The Texas Department of Criminal Justice, an agency of the State of Texas (the "Department") have entered into a Contract, dated August 19th, 2021 (the "Master Contract"), for the provision by the Customer of certain IT solutions, including the goods and services that the Customer is engaging SHI to perform under this SOW.  The Customer has furnished a true, complete and correct copy of the Master Contract to SHI.

*See* Exhibit A at 31.    Given that SHI was doing the installation in connection with the TDCJ Project, it only made sense—and the parties understood—that SHI was bound by the terms of the TDCJ Contract.

18.    <u>Second</u>, while the SOWs provided that SHI would be paid on a "time and materials cost" basis, SHI also agreed to specific price caps for each SOW.    *See* Exhibit A at § 3 "Projection Description" ("SHI shall provide the following services to Customer on a time and materials cost

basis[.]"); *see also* Exhibit A at § 11 "Price and Payment Information" ("The total cost of this project is not to exceed $2,271,958[.]").

19.     The specific cap in each SOW was based on SHI's projection of what it believed that the specific TDCJ Project work would cost.   *See* Exhibit A at § 11 (detailing estimated hours and work, which matches to the specified price cap).

20.     The language of each SOW, however, made it clear that SHI was agreeing to a fixed limit cost for the project and that the cost limit could not be changed except under specific circumstances.   Here is one such excerpt from a SOW specifying the price cap:

> **The total cost of this project is not to exceed $2,271,958, unless otherwise agreed to by both parties via the Change Control Process as described previously.**

*See* Exhibit A at 30.

21.     Notably, the price caps were a material term of the SOWs to Securus and were subject of the negotiations between the parties.   Securus did not typically enter into "time and material" contracts and thus having a price cap for each SOW was of paramount importance to Securus.   SHI readily agreed to the price caps in part because the caps were based on what it estimated the work would actually cost.

22.     Third, as mentioned above, the SOWs provided for a specific "Change Control Process," which restricted modifications and changes to the SOWs except as specifically agreed. *See* Exhibit A at § 9 "Change Control Process."

23.     The specific provision setting out the Change Control Process in each SOW states in part as follows:

> Under the Change Control Process, a written "Change Request" will be the vehicle for communicating any desired changes to the project. It will describe the proposed change; the reason for the change and the effect the change may have on the Project. The Project Manager of the requesting party will submit a written Change Request to the Project Manager for the other parties.
>
> SHI and Customer will review the change request. All parties must sign the approval portion of the Change Request to authorize the implementation of any change that affects the Project's scope, schedule or price. Furthermore, any such changes that affect the scope of this SOW, schedule or price will require that an amendment to the SOW be executed between the parties.

*Id.*

24.     As set out above, the Change Control Process "applied to both new components and to enhancements of existing components." *Id.*   Further, while the SOW provides that "a written 'Change Request' will be the vehicle for communicating any desired changes to the project[,]" the SOW also explicitly provides "any such changes that affect the scope of [the] SOW, schedule or price will require that an amendment to the SOW be executed between the parties." *Id*. (emphasis added).

25.     Thus, "price" changes to the SOWs required a formal amendment be made to the SOW by and between the parties.

**E.     The Change Control Process**

26.     As expected, the parties engaged in the Change Control Process for the SOWs in order to make necessary changes to the tasks required for installation on multiple occasions.    And, as set out in Section 9 of the SOWs, SHI submitted a series of written "Change Requests" to Securus to effectuate those changes.

27.     Because the parties were familiar with each other, SHI knew that all Change Requests went through a certain approval process at Securus.    That process, which was known by and familiar to SHI, first involved submitting a Change Request to a specific Securus employee in procurement (the "Procurement Manager").

28.     The Procurement Manager did not have the authority at Securus to approve any specific Change Request and SHI knew this.   Instead, the Procurement Manager would review the Change Request from the procurement side and then pass it off to Securus' legal department for legal approval and review.

29.     SHI also knew that, upon receiving legal approval, the Change Request would then be submitted to operations for approval and, ultimately, to Securus' financial department for further approval.   The various departments would often stamp or designate the Change Request as "approved." SHI was fully aware of this process and knew that Procurement was simply the first step for any Change Request approval.

30.     Having obtained the requisite approvals, the Change Request would be finally approved by the appropriate officer at Securus.

31.     SHI knew about Securus' approval process first because it had a similar approval process on its part with respect to any Change Request.   In addition, SHI knew that lower-level employees at Securus did not have the authority to approve Change Requests.   Furthermore, for months, SHI complied with the outlined process in making Change Requests.

32.     What is more, SHI's own internal documents demonstrate its awareness of the Securus approval process.     For example, in a PowerPoint presentation that SHI made to Securus as part of its regular monthly status reports, SHI acknowledged the approval process at Securus (see red box on right):



**F.    SHI's Performance Issues**

33.    Unfortunately, SHI's initial performance was not consistent with what it had promised Securus.    SHI's lack of performance caused significant delays in the completion of the TDCJ Project, and numerous other projects outside of the TDCJ contract.    The delays by SHI, in turn, put significant pressure on Securus with respect to its obligations under the TDCJ Contract.

34.    Due to SHI's delays and lack of competency, or to ensure that Securus would award its business, SHI greatly underestimated the budget necessary for it to complete each project and failed to account for many factors involved in carrying out such projects.    Ultimately, Securus was forced to begin to undertake actions to move some of the installation work set out in the SOWs to other vendors.

35.    Complicating matters was the fact that SHI billed for its work and materials during this time period improperly, and in a manner that Securus was not able to process or effectively track.    Securus alerted SHI of its deficient billing practices on numerous occasions.    To date, SHI has failed to provide accurate invoices.    Instead, in late 2022, SHI submitted thousands of individual invoices for thousands of specific items and work across multiple facilities, including many duplicate and untimely invoices.    Securus could not track or process these invoices and instead requested on multiple occasions that SHI provide a single invoice on a monthly basis for each installation site.    But SHI refused to provide such invoices.

36.    SHI's invoicing issues led to delays in payment as the invoices were rejected. Soon, there was a significant backlog of unapproved SHI invoices stemming from SHI's invoicing methodology and refusal to provide installation site invoices.

**G.     SHI's Work Greatly Exceeds the SOW Price Caps**

37.     Notably, SHI contracted much of its work to another sub-contractor vendor. Upon information and belief, that vendor – selected by SHI – was not competent to perform all of the work and incurred very significant time and labor charges.

38.     As a result, SHI itself incurred charges that significantly exceeded the price caps in the SOWs.    In fact, by October of 2022, SHI's internal charges on the TDCJ Project had exceeded the price caps by many millions of dollars.

39.     However, SHI did not fully reveal this fact to Securus, nor did SHI reveal that it was continuing to incur costs in excess of the caps in the expectation that it would eventually seek to have the caps lifted or changed.    And because Securus was unable to process and track SHI's individual invoices due to SHI's obfuscation of the bills, Securus was not and could not be aware of the situation. In effect, SHI's refusal to alter its obscure billing methodology concealed SHI's snowballing costs.

40.     Thus, even as Securus sought to move work away from SHI, SHI continued to incur charges that greatly exceeded the agreed upon SOW price caps and SHI's billing methodology operated to prevent Securus from understanding the scope and nature of Securus' misconduct.

**H.     SHI Sets Out to Deceptively Remove the SOW Price Caps**

41.     The ballooning charges created a problem for SHI, and rather than continue to perform the work as required under the SOWs and comply with the price caps in its billing, SHI secretly set out to undo the caps.

42.     To that end, claiming that it had not been paid, SHI put Securus on a "credit hold" even though the SOWs do not give SHI the right to impose such a "credit hold." SHI then used that improper and baseless "credit hold" to justify freezing its work efforts on the TDCJ Project, demanding payment on the jumble of invoices and swelling charges incurred by Securus.

Because SHI was far behind the SOW completion schedule, this increased the already heightened pressure on Securus.

43.     To advance and leverage this cloud of pressure and confusion, SHI next sent a series of six Change Requests to Securus on October 21, 2022. These Change Requests did two things: (a) they removed some sites from the SOWs (this represented work being moved from SHI to other vendors due to the fact that SHI could not properly or timely perform the work), but also (b) unilaterally *removed all of the price caps on the remaining SOWs* (referred to as the "Unauthorized Change Requests").

44.     While the former had been discussed, the latter had neither been discussed nor approved by those with authority at Securus. There was no indication, much less agreement by Securus, that it had or would agree to removing the price caps and nothing in the course of dealing between the parties evidenced any intent or desire by Securus to do so.

45.     In fact, Securus would not and did not agree to remove the price caps on the SOWs. To the contrary, Securus was relying on those price caps for purposes of assuring that the TDCJ Project would come in at an acceptable and approved amount overall.   After all, the caps served to ensure from Securus' perspective, that even if SHI had incurred more costs in completing a project those amounts would not and could not be passed on to Securus.

46.     Adding to the unusual nature of the Unauthorized Change Requests, is that they were sent by Lisa Gauger at SHI to a low-level Securus employee (David Brennan).   Normally (and consistent with the agreement between the parties), as set out above, Ms. Gauger would send change requests to the Procurement Manager, along with others at Securus.   Over the life of the SOWs, Ms. Gauger had communicated with the Procurement Manager and others because she—and SHI—knew the approval process within Securus required various levels of approval, starting with procurement.

47.     But on this occasion, Ms. Gauger sent SHI's Unauthorized Change Requests solely to the lower level Securus employee (Mr. Brennan) and no one else; every other Securus employee was excluded by Ms. Gauger.    Notably, Mr. Brennan was not in procurement. Instead, he was a lower-level employee with the title "Senior Manager, Contract Operations."

48.     As such, and as known by SHI, Mr. Brennan did not have the authority under Securus' policies to approve any change request, much less one that would fundamentally alter the *pricing* of the SOWs so as to benefit SHI by tens of millions of dollars.

49.     Ms. Gauger knew that Mr. Brennan did not have the authority to approve the Unauthorized Change Requests. She knew this based on her prior dealings with Securus in the change request process and SHI's understanding of the Securus approval process.

50.     Ms. Gauger and SHI also knew that the SOWs required the "Project Manager of the requesting party [to] submit a written Change Request to the Project Manager for the other parties." *See* Exhibit A at § 9 "Change Control Process". Ms. Gauger and SHI knew that Mr. Brennan was not the Project Manager for the TDCJ Project and lacked any commensurate authority to change or modify any contractual terms.

51.     Further, Ms. Gauger and SHI also knew that the SOWs specifically required that "any such changes that affect the scope of [the] SOW, schedule or ***price*** will require that an amendment be executed between the parties." *Id.* (emphasis added). SHI knew that the Unauthorized Change Requests monumentally and fundamentally affected the price of the SOWs (because they removed the price caps) and thus required a written amendment between the parties rather than a simple change request.

52.     Further, the SOWs make it clear (and SHI was aware) that the Project Manager and Customer Contact (a required position serving as "the point of contact") did not have the authority to effectuate a price change. Section 8 of the SOWs specifically states that, while the Customer

Contact could act for the Customer in all aspects of the project, "any changes that affect the scope of this SOW, schedule or price will require that an amendment to the SOW be executed between the parties." *Id.* at Section 8, "Customer Responsibilities," at paragraph 3.   Considering the nature and implications of the Unauthorized Change Requests, SHI was fully aware they were "changes that affect the scope of this SOW, schedule or price" that "require that an amendment to the SOW be executed between the parties."

53.    Yet SHI did not propose an amendment to the SOWs and there were no discussions between the parties involving any such amendment.    In fact, SHI knew that Securus would reject such an amendment, particularly given that SHI knew not only that the amounts it would be billing Securus were above the contractual price caps but excessively so.   SHI was fully aware that Securus had contracted for the price caps, that SHI had gone well above those caps, and that Securus would firmly reject modifying the caps.

54.    Worse, at the time the Unauthorized Change Requests were sent to Mr. Brennan, SHI already had breached the terms of the SOWs by exceeding the SOW price caps by some $7 million.   SHI, however, had downplayed how far over the caps was and had certainly never communicated to Securus its intent to completely lift the caps across multiple SOWs.

55.    In fact, a few weeks before, SHI had made a presentation to Securus on the status of the project and reported that most of the individual projects were on budget or just slightly over budget.   SHI instead obscured its invoicing and reporting while it, upon information and belief, decided internally to seek to undo the price caps to get itself out from under its own overspending.

56.    Instead, SHI sent Unauthorized Change Requests to a low-level employee under the guise of removing sites from its scope of work but that also allowed SHI to bill and collect millions of dollars of invoices that it otherwise would not have been allowed to bill or collect

because they exceeded the price caps in the SOWs.   This fact was intentionally omitted from SHI's presentation to Securus.

57.    Mr. Brennan electronically docusigned the Unauthorized Change Requests by himself.   They were not sent to any other person or department for review or approval.   SHI did not follow the requirements of the SOWs for effectuating a price change and Mr. Brennan did not follow Securus' mandatory approval process for any such request.

58.    As a result, and regardless of whether Mr. Brennan knew what he was docusigning, he did not have actual or apparent authority to execute the Unauthorized Change Requests.

59.    SHI's disregard for the protocols in the SOWs contributed to Mr. Brennan's belief that he was signing off on some basic overtime for SHI, which he was allowed to do.    He did not believe he was approving change requests that removed all of the billing caps on the SOW. He knew he had no such authority to approve a change request with SHI, much less one that removed the billing caps and exposed Securus to tens of millions of dollars in additional charges.

60.    Further, any such price changes, particularly ones this significant, would have required a written amendment to the SOWs and approval by a Securus executive, such as the CEO. *See* Exhibit A at 29 (Section 9 "Change Control Process.").   SHI was fully aware of Securus' approval authority parameters and that any such approval would have required written amendment signed by a Securus executive with sufficient authority.

61.    Thus, SHI knew that Mr. Brennan did not have either apparent or actual authority to authorize the Unauthorized Change Requests, particularly for something as financially significant as removing the contractual caps in the SOW. They also knew that Securus would never approve such a change.

62.    Further, SHI did not follow the "Change Control Process" outlined in the SOWs. Changes for a specific project required "Change Requests."   But "any such changes that affect

the scope of [a] SOW, schedule or *price* will require that an amendment to the SOW be executed between the parties." *See* Exhibit A at Section 9 "Change Control Process."

63.     SHI knew that such a monumental alteration of the SOWs (the removal of all billing caps, which in turn would have increased the cost of the TDCJ Project by more than $20 million) is something that would have been carefully negotiated by top level executives at SHI and Securus. SHI also knew that any such change would by the terms of the SOWS require amending the SOWs, not merely submitting form change requests.

64.     SHI was fully aware that the individuals at Securus who did have the authority to approve the matters addressed in Unauthorized Change Requests would have never agreed to remove the SOW price caps and certainly would not have even considered the issue had they known that SHI had incurred internal charges well in excess of the SOW price caps.

65.     Not only did Mr. Brennan not have actual authority to approve the Unauthorized Change Request and remove the price caps, Securus took no action to give him apparent authority that SHI was aware he did not – at any point in the relationship between the parties – ever have.

66.     Securus never said or undertook any action on its behalf to make SHI think or believe that Mr. Brennan could approve the Change Requests.

67.     In fact, all actions taken by Securus with respect to SHI indicated and demonstrated that Mr. Brennan did not have such authority.

68.     Further, SHI's own actions and conduct showed that they never believed that Mr. Brennan had the requisite authority to approve the Unauthorized Change Requests or that Securus had in fact agreed to the Unauthorized Change Requests.

69.     Internally at Securus, Mr. Brennan's actions confirmed that he did not think he had the authority to approve the Unauthorized Change Requests that removed the dollar caps in the SOWs. He never provided the Unauthorized Change Requests that he otherwise docusigned to

anyone with Securus. Nor did he inform anyone what he had done. Securus made no internal changes as a result of the Unauthorized Change Requests.    No financial projection or budget was changed based on or because of the Unauthorized Change Requests.

**I.      After Surreptitiously Obtaining Change Requests, SHI Submits Thousands of Invoices**

70.     After Mr. Brennan docusigned the Unauthorized Change Requests, SHI immediately submitted a torrent of several thousand individual invoices. Securus did not know the Unauthorized Change Requests had been docusigned but, with SHI's improper credit hold adding pressure and SHI's consistent refusal to provide billing transparency, Securus was forced to stop requesting that SHI prepare its invoices by site on a monthly basis and simply began processing and paying SHI's invoices in November 2022.

71.     Because Securus was not aware that the SOW pricing caps had supposedly been removed and because SHI did not submit the invoices by project, Securus could not track the invoices to determine if SHI was at or near the billing caps for any particular SOWs, nor did Securus have any reason to think that it would be responsible for amounts over the caps.

72.     However, at a certain point, Securus questioned SHI whether its invoicing was accurate due to the quantity and dollar amount of the invoices. It was only then that SHI informed Securus that SHI believed the billing caps for each of the SOWs had been removed by the Unauthorized Change Requests sent solely to and docusigned by Mr. Brennan alone.

73.     Securus promptly stopped paying SHI's invoices.

74.     By then, SHI had improperly collected more than $15 million in invoice payments that were otherwise prohibited by the SOW billing caps. Had Securus not been pressured by SHI's "credit hold" and been aware that SHI was submitting invoices far above the billing caps set out in the SOWs, it would not have paid these amounts.

75.     No valid or enforceable amendment to any SOW was ever executed that removed the pricing caps on the SOWs.

76.     Securus has since terminated SHI.

### IV.   CAUSES OF ACTION

### Count I - Breach of Contract

77.     Securus re-incorporates all prior paragraphs as if set forth fully herein.

78.     The SOWs and properly approved and properly authorized change requests constitute valid and enforceable contracts between Securus and SHI.

79.     Under the SOWs, "any changes that affect the scope of [a] SOW, schedule *or price* will require that an amendment to the SOW be executed between the parties." *See* SOWs, Section 9 "Change Control Process" (emphasis added).

80.     SHI sought to affect the price of the SOWs by removing the price caps in the SOWs but did not follow the proper process set out in the SOWs. Instead, SHI sought to deceptively alter the SOWs through the Unauthorized Change Requests.

81.     SHI's actions and the Unauthorized Change Requests constitute breaches of the SOWs.

82.     Moreover, despite having SOWs and contracts covering locations in more than ten U.S. states, including SOWs covering the six TDCJ regions in Texas, SHI failed to provide accurate proper services and equipment invoices as required under the SOWs.   For example, SHI failed to provide invoices detailing the relevant date of the labor or services, or indicating the relevant SOW, region, location, and/or hours of labor.   To date, SHI still has never provided invoices as required by the SOWs and contracts executed between the parties.

83.     SHI's breaches of the SOWs caused Securus damages because it inadvertently and mistakenly paid amounts to SHI that it was not obligated to pay under the SOWs.

84.     Further, the Unauthorized Change Requests are not valid amendments or modifications to the SOWs and SHI's breach of the SOWs in seeking the Unauthorized Change Requests renders them void.

85.     In addition, Securus is entitled to the reasonable attorney's fees it has incurred in connection with prosecuting its claim for breach of contract under Chapter 38 of the Texas Civil Practice and Remedies Code and pursuant to the TDCJ Contract, which was incorporated into the SOWs.

### Count II - Money Had and Received

86.     Securus re-incorporates all prior paragraphs as if set forth fully herein.

87.     In the alternative to its claim for breach of contract, Securus alleges that SHI obtained money from Securus, which in equity and good conscience belongs to Securus.   Had SHI not undertaken the actions that it did, Securus would not have erroneously paid SHI sums above the SOW price caps.

88.     SHI's conduct included (a) improperly obtaining the Unauthorized Change Request, (b) knowingly submitting invoices that exceeded the billing caps in the SOW, (c) refusing to provide invoices in the manner requested; (d) enforcing a "credit hold" unauthorized by the SOWs; and (e) threatening to stop work to force Securus to make payments, some of which were improper and unauthorized. As a result of SHI's conduct, Securus mistakenly overpaid amounts to SHI that in equity and good conscience belong to Securus.

89.     Through this and other unjust conduct, SHI has received money which rightfully belongs to Securus but was paid to SHI under a mistake of fact (*i.e.*, that the amounts Securus paid were properly owed).

90.     Accordingly, it is unjust and inequitable for SHI to obtain and retain such funds, and the justice of the circumstances here evidence that SHI has received money which rightfully belongs to Securus.

91.     Under principles of equity, all such funds should be returned to Securus.

92.     Securus has been damaged by SHI's conduct in an amount to be proven at trial.

**Count III – Restitution / Unjust Enrichment**

93.     Securus re-incorporates all prior paragraphs as if set forth fully herein.

94.     In the alternative to its claim for breach of contract, SHI alleges that it is entitled to restitution for amounts by which SHI has been unjustly enriched by way of Securus' overpayments obtained as a result of SHI's misconduct and/or inequitable behavior resulting in purported amendments and change requests that are invalid, unenforceable, mistaken, or void for other reasons, including fraud, duress, or the taking of undue advantage.

95.      The overpayments wrongfully obtained by SHI for amounts in excess of the billing caps in the SOWs were obtained by SHI by, among other things:    (i) improperly obtaining the Unauthorized Change Requests; (ii) knowing that the Unauthorized Change Requests were not agreed to and that Mr. Brennan did not have the authority to approve or sign them, but nonetheless submitting invoices for payment that far exceeded the billing caps in the SOWs; (iii) using duress to obtain payment by imposing an improper credit hold and threatening to delay the project if SHI was not paid; and (iv) concealing that its invoices far exceeded the SOW billing caps.

96.     In obtaining and retaining these amounts mistakenly paid by Securus, SHI has been unjustly enriched beyond the amounts provided for in the actual and properly authorized contracts between the parties and restitution of those amounts to Securus is appropriate.

97.     Securus has been damaged in an amount to be proven at trial, including all amounts it paid SHI in excess of the billing caps set out in the SOWs.

**Count IV - Declaratory Relief**

98.     Securus re-incorporates all prior paragraphs as if set forth fully herein.

99.     Pursuant to 28 U.S.C. § 2201, a dispute exists between the parties over the proper interpretation of the SOWs (including the Change Control Process) and the resultant validity and enforceability of any changes to any agreement between the parties that were not executed in the proper manner and by those with the proper authority.   The controversy is real and substantial and involves a genuine conflict and is not merely a theoretical dispute and include at least three disputes: (a) whether SHI ever provided proper and accurate monthly invoices to Securus in connection to each and every SOW or contract executed by the parties, (b) whether changes to any SOW between the parties executed without written amendment are valid and enforceable; (c) whether any such amendment had to be executed by someone with a corporate officer vested with authority to do so; and (c) that any agreements or purported to be executed outside the Change Control Process or by someone without authority to do so are invalid.

100.    Accordingly, pursuant to 28 U.S.C. § 2201, the Court should declare the parties' rights as follows:

     a.   Pursuant to all SOWs and contacts with SHI, Securus is entitled to accurate invoices detailing the invoice date, equipment or services rendered invoices (including hours and date of work), relevant SOW, region, location;

     b.   Any changes to any SOW between the parties executed without written amendment are invalid and unenforceable;

     c.   Any such amendment to any SOW between the parties must have been executed by a corporate officer vested with the authority to do so in order to be valid and enforceable as to the parties; and

     d.   Securus is not liable or responsible for paying any further amounts over any limit of the relevant SOW or contract and any such amounts already overpaid by Securus are properly due and owed to Securus and shall be returned by SHI;

e. Securus is not liable or responsible for paying any amounts invoiced by SHI that arise out of or were incurred by way of changes to any SOW between the parties that is invalid or unenforceable, and any amounts already paid by Securus on any such invoices are improperly held by SHI.

## V. JURY DEMAND

101. Pursuant to Federal Rule of Civil Procedure 38(b), Counter-Plaintiff Securus Technologies, LLC demands a trial by jury of all issues properly triable to a jury in this case.

## PRAYER

WHEREFORE, Defendant and Counter-Plaintiff Securus Technologies, LLC respectfully requests that, after trial or other final hearing on the merits, the Court: (1) enter a take-nothing judgment in Defendant's favor and against Plaintiff SHI International Corp.; and (2) grant Defendant such other and further relief to which it may be justly entitled, in law or in equity.

Securus further requests that the Court: (1) enter a final judgment on Securus' claims in favor of Securus and against SHI for Securus' actual damages, attorney's fees, pre- and post-judgment interests, costs, and the declarations of the parties' rights sought herein; and (2) grant Securus such other and further relief to which it may show itself entitled, in law or in equity.

Dated: July 10, 2023

Respectfully submitted,

*/s/ Jeffrey M. Tillotson*
Jeffrey M. Tillotson (*lead counsel*)
Texas Bar No. 20039200
jtillotson@tillotsonlaw.com
Joseph A. Irrobali
Texas Bar No. 24092564
airrobali@tillotsonlaw.com
1201 Main Street, Suite 1300
Dallas, Texas 75202
(214) 382-3041 Telephone
(214) 292-6564 Facsimile
**TILLOTSON, JOHNSON & PATTON**

*Attorney for Defendant and Counter-Plaintiff Securus Technologies, LLC*

## <u>CERTIFICATE OF SERVICE</u>

On July 10, 2023, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court.   I hereby certify that I have served Plaintiffs' counsel of record electronically or by another manner authorized by Rule 5(b)(2) of the Federal Rules of Civil Procedure:

Jamil N. Alibhai
State Bar No. 00793248
jalibhai@munsch.com

Jordan R. Curry
State Bar No. 24116242
jcurry@munsch.com
Isabelle Hutchinson
State Bar No. 24116551
ihutchinson@munsch.com

Munsch Hardt Kopf & Harr, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75201
Telephone: (214) 855-7500
Facsimile: (214) 855-7584

John Cornwell
State Bar No. 24050450
jcornwell@munsch.com

Munsch Hardt Kopf & Harr, P.C.
700 Milam Street, Suite 800
Houston, Texas 77002
Telephone: (713) 222-1470
Facsimile: (713) 222-1475

*/s/ Jeffrey M. Tillotson*
Jeffrey M. Tillotson