**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| **SHI INTERNATIONAL CORP.,** | § | |
| | § | |
| **Plaintiff,** | § | **Cause No. 4:23-CV-200-SDJ** |
| | § | |
| **v.** | § | |
| | § | |
| **SECURUS TECHNOLOGIES, LLC,** | § | **JURY TRIAL DEMANDED** |
| | § | |
| **Defendant.** | § | |

# SHI INTERNATIONAL CORP.'S MOTION FOR PARTIAL SUMMARY JUDGMENT

**ORAL HEARING REQUESTED**

# TABLE OF CONTENTS


Table of Authorities ........ iii

I. Introduction ........ 1

II. Statement of the Issues ........ 1

III. Statement of Undisputed Material Facts ........ 2

A. SHI and Securus ........ 2

B. SOWs and Change Requests ........ 3

C. Saxon introduced Brennan to the TDCJ Project as the Senior Manager of Contractor Operations and Performance. ........ 7

D. Saxon and BenMoshe told SHI that Brennan had authority to approve Change Requests. .. 9

E. The October Change Requests ........ 11

F. SHI files suit against Securus. ........ 14

G. Securus has no evidence of damages as a result of SHI's alleged breach of contract. ........ 14

IV. Summary of the Argument ........ 17

V. Legal Standard ........ 18

VI. Arguments and Authorities ........ 19

A. The Court should grant SHI summary judgment on Securus's breach of contract claim because the October Change Requests are valid and enforceable and Securus is unable to prove it suffered damages ........ 19

1. The October Change Requests are valid and enforceable. ........ 19

a. Brennan had actual express authority because Securus executives told Brennan he had authority to approve Change Requests. ........ 20

b. Brennan had actual implied authority because his actual express authority to complete the project led him to believe he could sign the October Change Requests. ........ 23

c. Brennan had apparent authority to execute the October Change Requests because Securus told SHI Brennan had authority to sign Change Requests. ........ 24

2. Securus is unable to show that it suffered damages ........ 26

3. The Court should also dismiss Securus's quasi-contractual claims because (1) the SOWs are valid agreements and (2) Securus cannot prove damages........................................27

B. SHI is entitled to partial summary judgment on its breach of contract claims because (1) the SOWs and subsequent Change Requests are valid agreements; (2) SHI performed under the agreements; and (3) Securus breached the agreements by refusing to pay. ....... 28

1. Securus is bound by the SOWs and subsequent Change Requests................................28

2. SHI performed its obligations pursuant to the SOWs...................................................29

3. Securus breached its obligations because it refuses to pay SHI for services and materials provided under the SOWs. .........................................................................................29

VII. Conclusion and Relief Requested........................................................................... 31

Index of Exhibits

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Allamon v. Acuity Spec. Prods. Inc*,
877 F. Supp. 2d 498 (E.D. Tex. 2012), *aff'd*, 534 Fed. Appx. 248 (5th Cir. 2013)................20

*Autoficio, LLC v. Cimble Corp.*,
No. 4:17-CV-00404-KPJ, 2020 WL 3209014 (E.D. Tex. June 15, 2020)..................21, 23, 24

*Byers v. Dallas Morning News, Inc.*,
209 F.3d 419 (5th Cir. 2000) ..................................................................................18

*Collin Cnty. v. Sungard Public Sector, Inc.*,
No. 4:14-cv-364, 2015 WL 5853169 (E.D. Tex. Sept. 29, 2015)...........................................28

*Craig v. B. Riley, FBR, Inc.*,
No. 3:19-CV-0058-G, 2020 WL 6889018 (N.D. Tex. Nov. 23, 2020) ............................23, 24

*De Francheschi v. BAC Home Loans Servicing, L.P.*,
No. 3:09-CV-1667–K, 2011 WL 1456849 (N.D. Tex. Apr. 14, 2011), *aff'd sub nom. De Franceschi v. BAC Home Loans Servicing, L.P.*, 477 Fed. Appx. 200 (5th Cir. 2012) ..........20

*U.S. ex rel. Farmer v. City of Houston*,
523 F.3d 333 (5th Cir. 2008) ..................................................................................27

*Fortune Prod. Co. v. Conoco, Inc.*,
52 S.W.3d 671 (Tex. 2000)......................................................................................28

*Hamilton v. Segue Software Inc.*,
232 F.3d 473 (5th Cir. 2000) ..................................................................................18

*Johnson v. Palmer Admins. Servs., Inc.*,
No. 6:22-CV-00121-JCB-KNM, 2022 WL 17546957 (E.D. Tex. Oct. 20, 2022) ............20, 23

*Mahmoud v. De Moss Owners Ass'n, Inc.*,
865 F.3d 322 (5th Cir. 2017) ..................................................................................31

*In re Mun. Bond Reporting Antitrust Litig.*,
672 F.2d 436 (5th Cir. 1982) ..................................................................................18

*NationsBank, N.A. v. Dilling*,
922 S.W.2d 950 (Tex. 1996)....................................................................................25

*Matter of Osborne*,
951 F.3d 691 (5th Cir. 2020) ..................................................................................20

*PanAmerican Operating v. Maud Smith Estate*,
409 S.W.3d 168 (Tex. App.—El Paso 2013, pet. denied) ......................................................25

*Pasant v. Jackson Nat. Life Ins. Co.*,
52 F.3d 94 (5th Cir. 1995) ....................20

*Pickett v. IceCold2, LLC*,
No. 4:17-CV-00666, 2019 WL 1063369 (E.D. Tex. Mar. 6, 2019) ....................18

*Pierce v. Fondren Orthopedic Grp., LLC*,
No. H-18-1686, 2018 WL 6200049 (S.D. Tex. Nov. 28, 2018) ....................21

*Protect Env't. Servs., Inc., v. Norco, Corp.*,
403 S.W.3d 532 (Tex. App.—El Paso 2013, pet. denied) ....................25

*Matter of Russell*,
941 F.3d 199 (5th Cir. 2019) ....................25, 26

*Sealy Oil Mill & Mfg. Co. v. Bishop Mfg. Co.*,
235 S.W. 850 (Tex. Comm'n. App. 1921)....................25

*Shepherd v. City of Shreveport*,
920 F.3d 278 (5th Cir. 2019) ....................18

*Smith Int'l, Inc. v. Egle Grp., LLC*,
490 F.3d 380 (5th Cir. 2007) ....................19

*Sport Supply Group, Inc. v. Columbia Casualty Co.*,
335 F.3d 453 (5th Cir. 2003) ....................26

*Thomas Reg'l Directory, Inc. v. Dragon Prods., Ltd.*,
196 S.W.3d 424 (Tex. App.—Beaumont 2006, pet. denied)....................26

**Other Authorities**

E.D. TEX. L.R. CV-56(c)....................19

FED. R. CIV. P. 37(c)(1)....................27

FED. R. CIV. P. 54(d)(2) ....................31

FED. R. CIV. P. 56(g) ....................31

Plaintiff SHI International Corp. ("SHI") files this Motion for Partial Summary Judgment on Securus Technologies, LLC's ("Securus") breach of contract and quasi-contractual counterclaims and SHI's affirmative breach of contract claims.

## I. INTRODUCTION

Securus's counterclaim turns on whether David Brennan (Securus's Senior Manager of Contractor Operations and Performance) had authority to sign the October Change Requests. Texas law is dispositive on this issue: because Securus told SHI (and Brennan) that Brennan had authority over Change Requests, Securus's breach of contract counterclaim fails. Securus's emails to SHI evidence this authorization: "To close the loop, **yes David is the right person to approve any changes on the SOW**."[1] This single email is dispositive, especially when considered in light of Securus's internal statements about Brennan's role and authority. Moreover, SHI is entitled to summary judgment on its affirmative breach of contract claims because: (1) the SOWs are valid agreements between the parties; (2) SHI performed under these agreements; and (3) Securus has repeatedly breached these agreements. Granting summary judgment will significantly narrow the issues for trial; the primary remaining issue will be SHI's damages.

## II. STATEMENT OF THE ISSUES

(1) Securus's breach of contract counterclaim fails because Securus executives gave Brennan *actual authority* to execute the October Change Requests when Securus executives told Brennan he had authority to approve Change Requests.

(2) Securus's breach of contract counterclaim fails because Securus executives gave Brennan *apparent authority* to execute the October Change Requests when Securus executives told SHI that Brennan should approve all Change Requests.

(3) Securus's breach of contract counterclaim fails because Securus has no evidence of any alleged damages.

[1] Ex. 1, August 11, 2022 Email from Hezi BenMoshe "SHI / Securus - Hodge - AP needed" [SHI-212205] (*see* Ex. 2, Cole Decl. ¶ 5(a)) (emphasis added).

(4) Securus's unjust enrichment and money had and received counterclaims fail because valid contracts exist and Securus has no evidence of damages.

(5) SHI is entitled to summary judgment on its breach of contract claims because: (a) the SOWs were valid and enforceable; (b) SHI performed under the SOWs; and (c) Securus breached the SOWs when it failed to pay SHI.

## III. STATEMENT OF UNDISPUTED MATERIAL FACTS

### A. SHI and Securus

SHI is a technology company that helps its clients select, deploy, and manage IT solutions, including network and data storage equipment, telecommunications, hardware, software, cloud-based applications and services, and cyber-security services.[2] Securus provides telephone, messaging, and video conferencing services to its clients, almost exclusively to prison facilities.[3] Securus's parent company is Aventiv Technologies ("Aventiv"), which is a part of Platinum Equity's investment portfolio.[4]

Thirteen key individuals from SHI and Securus are relevant to this motion.[5] Among the Securus/Aventiv employees, Greg Saxon held the highest-ranking position as Aventiv's Vice President of Operations.[6] Reporting to Greg Saxon was Hezi BenMoshe, Aventiv's Director of Procurement, who oversaw David Brennan, Securus's Senior Manager of Contractor Operations and Performance.[7] Jerimy Thompson served as one of Securus's Project Managers.[8] Other relevant

---

[2] SHI's Second Am. Compl. (Dkt. #31) ¶¶ 1, 3.

[3] Securus's First Am. Counterclaim (Dkt. #18) ¶ 4.

[4] Ex. 3, SHI's Second Am. Disclosures at 9 (*see* Ex. 4, Alibhai Decl. ¶ 4(a)).

[5] Some of these individuals may no longer serve in the same role or currently work at either company; therefore, SHI identifies the roles each individual held as it relates to this dispute.

[6] Ex. 5, Dougherty Tr. at 21:1-6.

[7] *Id*. at 89:14-24.

[8] Ex. 6, BenMoshe Tr. at 53:6-11.

Securus employees included Sean McCallister, Director-Supply Chain, and Ryan Edwards, Category Manager.[9]

SHI's key players operated within two organizational teams: Project Management Operations ("PMO") and Sales. On the PMO team, Ryan Huffine served as SHI's Vice President of Services.[10] Huffine's direct reports were: (1) Jessica Cole, Managing Director of Advanced Solutions Group ("ASG")-Project Management Office; (2) Dustin Fargason, ASG PMO Manager; (3) Lisa Gauger, Senior Project Manager; and (4) Alejandra Angel, Project Manager.[11] On the Sales team, Klark Sweitzer held the position of Vice President of Enterprise Regional Sales, overseeing the efforts of Kristin Cooper, the Enterprise Sales Executive.[12]

**B. SOWs and Change Requests**

In January 2021, Securus entered into a contract with the Texas Department Criminal Justice ("TDCJ") under which Securus would install, operate, and maintain "a tablet solution" for inmates.[13] The tablets provided services such as music, books, movies, and education resources for eligible inmates.[14] After a months-long bidding process, Securus engaged SHI through eleven Statements of Work ("SOWs") under which SHI provided materials and services to Securus on the TDCJ project ("TDCJ Project") and other nationwide projects.[15] Certain provisions of the

---

[9] Ex. 7, Securus's Third Am. Disclosures at 10, 13 (*see* Ex. 4, Alibhai Decl. ¶ 4(b)).

[10] Ex. 3, SHI's Second Am. Disclosures at 3.

[11] *Id*. at 1-2.

[12] *Id*. at 3-4.

[13] Ex. 8, TDCJ Master Contract § B.1.1. [SHI-091115] (*see* Ex. 5, Dougherty Tr. at 22:19-23:4).

[14] *Id*.

[15] Ex. 9, Region 2 SOW [SHI-008421] (*see* Ex. 10, Pareti Tr. at 93:17-94:11); Ex. 11, Region 3 SOW [SHI-013051] (*see* Ex. 2, Cole Decl. ¶ 5(b)); Ex. 12, Region 4 SOW [SHI-013026] (*see* Ex. 10, Pareti Tr. at 135:25-138:4); Ex. 13, Region 5 SOW [SHI-009372] (*see* Ex. 10, Pareti Tr. at 107:22-108:14); Ex. 14, Region 6 SOW [SHI-011528] (*see* Ex. 10, Pareti Tr. at 116:11-22); Ex. 15, TDCJ Site Survey [SHI-092349] (*see* Ex. 10, Pareti Tr. at 52:4-53:16); Ex. 16, Conex SOW

SOWs are relevant to this dispute. First is the "Price and Payment Information" section, which varied in amounts across the SOWs but contained nearly-identical contract language.[16]

## 10 Price and Payment Information

SHI proposes to deliver the services described previously for the rates set forth below. This is an estimate of the time required to complete the objective. There is no guarantee it can or will be implemented within this timeframe:

| Resource | Rates | Total Hours | Total Estimated Fee |
|---|---|---|---|
| Cable/Networking Technician | $ 106.00 | 20597 | $ 2,183,282.00 |
| Electrician | $ 175.00 | 300 | $ 52,500.00 |
| Project Manager | $ 115.00 | 921 | $ 105,915.00 |
| Lift and Mini-Excavator | | | $ 157,500.00 |
| Total Services | | | $ 2,499,197.00 |
| Material Cost | | | $ 1,549,885.96 |

**Reference Appendix E for Site level breakdown.

*Materials will be invoiced separately.

The SOW is valid for 60 days from 12/22/2021, and must be consumed within 12 months of SOW execution.

**The total cost of this project is not to exceed $2,499,197.00, unless otherwise agreed to by both parties via the Change Control Process as described previously.**

SHI will invoice for these services based on hours consumed on a monthly basis or at completion of a project, whichever comes first.

Any additional work that is required outside the scope of this SOW requires written approval by SHI and Customer as described in the Change Control Process described previously in this document and will be billed at a rate mutually agreed upon by SHI and Customer.

The cited section provides: (1) "This is an estimate of the time required to complete the objective"; (2) "Materials will be invoiced separately"; (3) the not to exceed amount may be adjusted by

[SHI-014108] (*see* Ex. 17, Clear Tr. at 134:1-5); Ex. 18, Keagan SOW [SHI-004177] (*see* Ex. 10, Pareti Tr. at 68:2-20); Ex. 19, Duncan SOW [SHI-008162] (*see* Ex. 10, Pareti Tr. at 80:7-81:1); Ex. 20, Lewis SOW [SHI-008141] (*see* Ex. 10, Pareti Tr. at 84:6-85:6); Ex. 21, Polunsky SOW [SHI-008104] (*see* Ex. 10, Pareti Tr. at 90:2-90:21).

[16] Ex. 9, Region 2 SOW at 32. All of the SOWs (except Ex. 18, Keagan SOW) excluded materials from the "not to exceed" estimate.

agreement via the "Change Control Process"; and (4) "SHI will invoice for these services based on hours consumed on a monthly basis or at completion of a project, whichever comes first."[17]

The SOWs also provided that "[a]ll invoices are due and payable within 30 calendar days of the invoices date."[18] Ultimately, SHI extended the payment terms to 60 days for all hardware purchases.[19] Yet, despite Securus's extended deadline to pay invoices, Securus repeatedly made late payments as early as January 2022.[20]

Another important provision in the SOWs—identical in each of the 13 SOWs—is the Change Control Process: [21]

> **8 Change Control Process**
>
> The "Change Control Process" is that process which shall govern changes to the scope of the Project during the life of the Project. The Change Control Process will apply to new components and to enhancements of existing components. The Change Control Process will commence at the start of the Project and will continue throughout the Project's duration.
>
> Under the Change Control Process, a written "Change Request" will be the vehicle for communicating any desired changes to the project. It will describe the proposed change; the reason for the change and the effect the change may have on the Project. The Project Manager of the requesting party will submit a written Change Request to the Project Manager for the other parties.
>
> SHI and Customer will review the change request. All parties must sign the approval portion of the Change Request to authorize the implementation of any change that affects the Project's scope, schedule or price. Furthermore, any such changes that affect the scope of this SOW, schedule or price will require that an amendment to the SOW be executed between the parties.

---

[17] *Id.*

[18] *Id.*

[19] Ex. 22, Feb. 4, 2022 Email from Kristin Cooper, "Updated Accounting Terms" [SECURUS006908] (*see* Ex. 4, Alibhai Decl. ¶ 4(c)).

[20] Ex. 72, Jan. 10, 2022, Email from Mary Clear, "SHI Past Dues for SECURUS Technologies 1002122" [SECURUS066417] (*see* Ex. 17, Clear Tr. at 140:1-8); Ex. 73, Jan. 7, 2022 Spreadsheet Showing $979,987.96 Outstanding [SECURUS066416] (*see* Ex. 17, Clear Tr. at 141:1-9); Ex. 74, July 20, 2022 Email from Sean McAllister, "SHI Overdue Invoices" [SECURUS066651] ("Millions in invoices that are passed due (>60 days). How quickly can we pay these invoices?") (*see* Ex. 17, Clear Tr. 146:1-21); Ex. 75. Aug. 15, 2022 Email from Philip Ninan, "SHI install work invoices" [SECURUS066665] (demonstrating $10M outstanding) (*see* Ex. 17, Clear Tr. at 154:21-155:1).

[21] Ex. 9, Region 2 SOW at 32.

Each SOW underwent the Change Control Process affecting their scope and cost estimates between three to five times. In total, there were 28 Change Requests executed between the parties.[22] The signatories for the Change Requests varied: Thompson signed two Change Requests;[23] most of the Change Requests were signed by Saxon;[24] and the Change Requests signed

[22] Ex. 23, Keagan Change Request [SHI-049398] (*see* Ex. 5, Dougherty Tr. at 179:14-180:1); Ex. 24, Duncan Change Request [SHI-010570] (*see* Ex. 5, Dougherty Tr. at 180:2-16); Ex. 25, Lewis Change Request No. 1 [SHI-014666] (*see* Ex. 2, Cole Decl. ¶ 5(c)); Ex. 26, Polunsky Change Request No. 1 [SHI-079358] (*see* Ex. 2, Cole Decl. ¶ 5(d)); Ex. 27, Polunsky Change Request No. 2 [SHI-214998] (*see* Ex. 2, Cole Decl. ¶ 5(e)); Ex. 28, Polunsky Change Request No. 3 [SHI-357946] (*see* Ex. 2, Cole Decl. ¶5(f)); Ex. 29, Polunsky Change Request No. 4 [SHI-078767] (*see* Ex. 2, Cole Decl. ¶ 5(g)); Ex. 30, Region 2 Change Request No. 1 [SECURUS065606] (*see* Ex. 4, Alibhai Decl. ¶ 4(d)); Ex. 31, Region 2 Change Request No. 3 [SHI-118033] (*see* Ex. 2, Cole Decl. ¶ 5(h)); Ex. 32, Region 2 Change Request No. 2 [SHI-071995] (*see* Ex. 2, Cole Decl. ¶5(i)); Ex. 33, Region 2 Change Request No. 4 [SHI-355645] (*see* Ex. 2, Cole Decl. ¶ 5(j)); Ex. 34, Region 5 Change Request No. 3 [SHI-118036] (*see* Ex. 2, Cole Decl. ¶ 5(k)); Ex. 35., Region 5 Change Request No. 1 [SHI-128641] (*see* Ex. 2, Cole Decl. ¶ 5(l)); Ex. 36, Region 5 Change Request No. 2 [SHI-128648] (*see* Ex. 2, Cole Decl. ¶ 5(m)); Ex. 37, Region 5 Change Request No. 5 [SHI-355675] (*see* Ex. 2, Cole Decl. ¶5(n)); Ex. 38, Region 5 Change Request No. 4 [SHI-128507] (*see* Ex. 2, Cole Decl. ¶ 5(o)); Ex. 39, Region 6 Change Request No. 1 [SHI-128604] (*see* Ex. 2, Cole Decl. ¶ 5(p)); Ex. 40, Region 6 Change Request No. 3 [SHI-355651] (*see* Ex. 6, BenMoshe Tr. at 143:8-23); Ex. 41, Region 6 Change Request No. 2 [SHI-128501] (*see* Ex. 2, Cole Decl. ¶ 5(q)); Ex. 42, Region 4 Change Request No. 1 [SHI-071998] (*see* Ex. 2, Cole Decl. ¶ 5(r)); Ex. 43, Region 4 Change Request No. 4 [SHI-355657] (*see* Ex. 6, BenMoshe Tr. at 147:2-7); Ex. 44, Region 4 Change Request No. 2 [SHI-357923] (*see* Ex. 2, Cole Decl. ¶ 5(s)); Ex. 45, Region 3 Change Request No. 4 [SHI-357920] (*see* Ex. 2, Cole Decl. ¶ 5(t)); Ex. 46, Region 3 Change Request No. 3 [SHI-215012] (*see* Ex. 2, Cole Decl. ¶ 5(u)); Ex. 47, Region 3 Change Request No. 1 [SHI-071986] (*see* Ex. 2, Cole Decl. ¶ 5(v)); Ex. 48, Region 3 Change Request No. 2 [SHI-072001] (*see* Ex. 2, Cole Decl. ¶ 5(w)); Ex. 49, Region 3 Change Request No. 5 [SHI-355669] (*see* Ex. 2, Cole Decl. ¶ 5(x)); Ex. 50, Conex Change Request No. 1 [SHI-014591] (*see* Ex. 2, Cole Decl. ¶ 5(y)).

[23] Ex. 23, Keagan Change Request; Ex. 24, Duncan Change Request.

[24] Ex. 25, Lewis Change Request No. 1; Ex. 26, Polunsky Change Request No. 1; Ex. 27, Polunsky Change Request No. 2; Ex. 28, Polunsky Change Request No. 3; Ex. 30, Region 2 Change Request No. 1; Ex. 31, Region 2 Change Request No. 3; Ex. 32, Region 2 Change Request No. 2; Ex. 34, Region 5 Change Request No. 3; Ex. 35, Region 5 Change Request No. 1; Ex. 36, Region 5 Change Request No. 2; Ex. 38, Region 5 Change Request No. 4; Ex. 39, Region 6 Change Request No. 1; Ex. 41, Region 6 Change Request No. 2; Ex. 42, Region 4 Change Request No. 1; Ex. 44, Region 4 Change Request No. 2; Ex. 45, Region 3 Change Request No. 4; Ex. 46, Region 3 Change Request No. 3; Ex. 47, Region 3 Change Request No. 1; Ex. 48, Region 3 Change Request No. 2; Ex. 50, Conex Change Request No. 1.

on October 26, 2022 were executed by Brennan ("October Change Requests").[25] Securus only challenges the October Change Requests and only insofar as they removed the NTEs.[26]

Under the SOWs and Change Requests, SHI was assigned 51 sites within TDCJ.[27] However, due to mutually-agreed scope changes, SHI completed 23 sites: Duncan, Lewis, Polunsky, Hutchins, East Texas, Powledge, Hodge, Estes, Cole, Coffield, Telford, Michael, Skyview, Keagan, Gist, Dominguez, Garza West, Dalhart, Formby, Daniel, Jordan, Luther, and Hilltop.[28] SHI billed approximately $73,980,430.01 to Securus for the work it completed on the TDCJ Project.[29] Securus has failed to pay $22,422,811.41 of this amount.[30]

## C. Saxon introduced Brennan to the TDCJ Project as the Senior Manager of Contractor Operations and Performance.

Brennan's employment with Securus commenced around June 2022. On June 14, 2022, Saxon emailed Brennan stating: "A few things as you make the move into my organization—these are just some top of mind priorities. … You now 'own' contract labor so it is yours to make into

[25] Ex. 29, Polunsky Change Request No. 4; Ex. 33, Region 2 Change Request No. 4; Ex. 49, Region 3 Change Request No. 5; Ex. 43, Region 4 Change Request No. 4; Ex. 37, Region 5 Change Request No. 5; Ex. 40, Region 6 Change Request No. 3.

[26] Securus's First Am. Counterclaim ¶¶ 75, 81.

[27] *See supra* nn. 15, 22.

[28] Ex. 51, David Brennan's TDCJ Vendor and Labor Tracker [SECURUS065625] (*see* Ex. 4, Alibhai Decl. ¶ 4(e)).

[29] Ex. 52, SHI spreadsheet showing unpaid-paid invoices [SHI-425694] (*see* Ex. 53, Binosa Decl. ¶ 5).

[30] *Id.*

what you see as best fit."[31] Later that same day, Saxon emailed Securus employees explaining Brennan's new role overseeing and managing contract labor performance, like SHI's:[32]

> We have also created a new role on my team – ***Sr. Manager, Contractor Operations & Performance***. As noted earlier, never in our company's history have we had more complexity or sheer volume of work being performed by contractors on our behalf and they are critical to the success of our plans for installation. **David Brennan** will be taking on the role of Sr. Manager, Contractor Operations and Performance and will play a critical role in our ability to continuously assess contractor performance and adherence to statements of work in the field. David's focus will be on contract labor performance and delivery to plan as well as working closely with the program teams and procurement to drive accurate statements of work and keep a tight control on what labor we have where and how much more we can take on.

Brennan's responsibilities included approving SHI invoices.[33] A week later, Brennan sent an email to three of his superiors—BenMoshe, McCallister, and Edwards—informing them that he was the person at Securus required to approve all SHI Change Requests moving forward:[34]

> **From:** David Brennan
> **Sent:** Wednesday, June 22, 2022 2:39 PM CDT
> **To:** Sean McAllister; Hezi Benmoshe; Ryan Edwards
> **Subject:** SHI Change Orders
>
> Just an FYI,
> All change orders from SHI will need my approval before moving forward .
>
> **David Brennan**
> SR Manager, Contractor Operation & Performance
> DIRECT: (518) 269-6093
> david.brennan@securustechnologies.com
> **aventiv.com**
> Aventive Technologies Empowers Rehabilitative Justice
>
> Securus Technologies | Securus Monitoring | JPay | AllPaid

[31] Ex. 54, June 14, 2022 Email from Greg Saxon, "Priorities" [SECURUS063660] (*see* Ex. 4, Alibhai Decl. ¶ 4(f)).

[32] Ex. 55, June 14, 2022 Email from Greg Saxon, "Organizational Announcement – Value Chain Operations" [SECURUS172756] (*see* Ex. 4, Alibhai Decl. ¶ 4(g)).

[33] Ex. 17, Clear Tr. at 36:17-20.

[34] Ex. 57, June 22. 2022 Email from David Brennan, "SHI Change Orders" [SECURUS062449] (*see* Ex. 4, Alibhai Decl. ¶ 4(i)).

No internal response to expressed disagreement with Brennan's June 22 email.[35]

On June 28, 2022, Saxon introduced Brennan to the SHI team over email and told Brennan to "please work closely with TDCJ team and SHI to get all sites working ASAP!"[36] And Saxon continued to reinforce to Brennan that he was in charge of the TDCJ Project: [37]

> **From:** Greg Saxon
> **Sent:** Monday, September 26, 2022 9:31 AM CDT
> **To:** David Brennan
> **Subject:**
>
> Also, I'd like for you to hyper focus on TDCJ…we will chat more of what that looks like, but as far as I'm concerned, you have the helm there

**D. Saxon and BenMoshe told SHI that Brennan had authority to approve Change Requests.**

On August 1, 2022, SHI employees (Cooper, Sweitzer, and Angel) hosted Securus employees (Saxon, BenMoshe, Edwards, McCallister, and Brennan) at SHI headquarters for a mid-year business review.[38] At this meeting, Saxon announced that Brennan should authorize Change Requests: "Greg Saxon told all of us in the room that David Brennan had authorization to sign off on these change requests."[39]

---

[35] *See id.*

[36] Ex. 58, June 28, 2022 Email from Greg Saxon, "SHI TDCJ Resource Allocation – Notes 6/16/22" [SHI-127607] (*see* Ex. 2, Cole Decl. ¶ 5(aa)).

[37] Ex. 59, September 26, 2022 Teams message from Greg Saxon [SECURUS178931] (*see* Ex. 4, Alibhai Decl. ¶ 4(j)); *see also* Ex. 56, June 21, 2022 Email from Greg Saxon, "Securus – SHI KY CRs" [SECURUS011993] (*see* Ex. 4, Alibhai Decl. ¶ 4(h)).

[38] Ex. 60, Aug. 1, 2022 meeting invite via email from Kristin Cooper [SHI-117142] (*see* Ex. 6, BenMoshe Tr. at 104:11-105:8).

[39] Ex. 61, Cooper Tr. at 37:6-16 & 83:20-84:5.

On August 10, 2022, Cole emailed BenMoshe and Saxon confirming what she heard about the meeting: Brennan should approve Change Requests.[40]

> **From:** Jessica Cole <Jessica_Cole@SHI.com>
> **Sent:** Wednesday, August 10, 2022 8:08 PM
> **To:** Hezi Benmoshe <Hezi.Benmoshe@securustechnologies.com>; Greg Saxon <Greg.Saxon@securustechnologies.com>
> **Cc:** Dustin Fargason <Dustin_Fargason@SHI.com>; Klark Sweitzer <Klark_Sweitzer@SHI.com>; Henry Egan <Henry_Egan@SHI.com>; David Brennan <david.brennan@securustechnologies.com>
> **Subject:** RE: SHI / Securus - Hodge - AP needed
>
> **CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.
>
> Thanks Hezi, I'll let the team know that we're waiting on guidance.
>
> I believe David had been designated as the approver, but wanted to validate before messaging. Alternatively, we can seek approval from you, David and Greg if that would be helpful.
>
> Jess

BenMoshe forwarded Cole's message to Brennan informing Brennan he was authorized to approve Change Requests:[41]

> **From:** Hezi Benmoshe
> **Sent:** Wednesday, August 10, 2022 7:44 PM CDT
> **To:** David Brennan
> **Subject:** FW: SHI / Securus - Hodge - AP needed
>
> Did you approve this work for them ? not sure I understand what she mean , yes moving forward the approval should come from you but I don't think you knew about it before

BenMoshe then responded to Cole's email confirming that Brennan **"is the right person to approve any changes on the SOW"**:[42]

---

[40] Ex. 62, Cole Tr. at 135:9-25; Ex. 63, Aug. 10, 2022 Email from Jessica Cole, "SHI/Securus – Hodge – AP needed" [SHI-078005] (*see* Ex. 2, Cole Decl. ¶ 5(z)).

[41] Ex. 64, Aug. 10, 2022 Email from Hezi BenMoshe, "SHI/Securus—Hodge—AP needed" [SECURUS063176] (*see* Ex. 4, Alibhai Decl. ¶ 4(k)).

[42] Ex. 1, Aug. 11, 2022 Email from Hezi BenMoshe, "SHI / Securus—Hodge—AP needed" (emphasis added).

**From:** Hezi Benmoshe <Hezi.Benmoshe@securustechnologies.com>
**Sent:** Thursday, August 11, 2022 7:10 PM
**To:** Jessica Cole <Jessica_Cole@SHI.com>; Greg Saxon <Greg.Saxon@securustechnologies.com>
**Cc:** Dustin Fargason <Dustin_Fargason@SHI.com>; Klark Sweitzer <Klark_Sweitzer@SHI.com>; Henry Egan <Henry_Egan@SHI.com>; David Brennan <david.brennan@securustechnologies.com>
**Subject:** RE: SHI / Securus - Hodge - AP needed

External Sender: Use caution with links/attachments.

Hello ,
To close the loop on the below , yes David is the right person to approve any changes on the SOW
Thank you
Hezi

## E. The October Change Requests

As the project progressed through the fall of 2022, the budget needed to be increased.[43] On October 19, 2022, Fargason spoke to Brennan by phone and followed up with an email presenting two options to move forward with the project: (1) prioritize speed and execution and remove the do-not-exceed amounts or (2) prioritize the budget and manage the project through a series of change requests.[44]

[43] *See* Ex. 6, BenMoshe Tr. at 88:16-20.

[44] Ex. 65, Oct. 19, 2022 Email from Dustin Fargason, "Securus – Budget update – feedback needed by 10/28" [SHI-078420] (*see* Ex. 66, Fargason Tr. at 267:23-268:8).

**From:** Dustin Fargason
**Sent:** Wednesday, October 19, 2022 5:20 PM CDT
**To:** David Brennan
**CC:** Jessica Cole
**Subject:** Securus - Budget update - feedback needed by 10/28
**Attachments:** Securus - TDCJ All - Invoice breakout 10.14.22.xlsx

Hey David –

Here is the invoicing breakdown by site/region.

I'll work with Lisa to generate a CR to adjust our budget and deployment strategy to finish the remaining sites in TCDJ.

I think we have a couple paths forward and are looking for your input on which way you'd like to go.

- If we want to prioritize speed and execution, then I'd suggest we continue with T&M, remove the do not exceed and provide monthly spend / SOW for visibility.
- If we want to prioritize budget, then we can put an estimate together by SOW based upon average monthly spend / approx speed to get an estimate and manage through a series of CR. The risk would be if CR's aren't executed quickly, we may need to pause / suspend work.

We'd like your feedback on how you'd like to proceed no later than Friday 10/28/22. Please let us know your thoughts & we look forward to working through next steps with you.

Brennan chose option 1: removing the not-to-exceed ("NTE") amounts.[45] On October 21, 2022, Gauger emailed Brennan attaching the proposed Change Requests.[46] Brennan signed and returned the October Change Requests.[47] The October Change Requests modified the SOWs by removing the NTEs and also removing certain sites from the scope of the SOWs:[48]

[45] Ex. 76, Oct. 21, 2022 Email from Lisa Gauger, "Securus – SHI CRs: Bill as Actuals & Sites Removed" [SECURUS013296] (*see* Ex. 62, Cole Tr. at 151:14-19).

[46] *Id.*; Ex. 67, October 21, 2022 Email from Lisa Gauger, "Please DocuSign:Securus _SHI_SOW_Polunsky Unit Cabling_CR04_BillAsActuals" [SECURUS110658] (*see* Ex. 4, Alibhai Decl. ¶ 4(l)).

[47] *See supra* n. 25.

[48] Ex. 37, Region 5 Change Request No. 5.

| Change Request Description |
|---|
| As a result of the approved expansion of labor and scope to include both overtime and work outside the standard maintenance window, SHI and Securus Technologies agree to modify the budget of the existing SOW to bill as actuals. This CR allows the project billing to exceed the 'not to exceed' amount listed in section 11.<br>SHI will provide monthly billing summaries to Securus through the handover or completion or the project, whichever comes first.<br>SHI and Securus Technologies also agree to modify the existing SOW for the TDCJ - Region 5 Cabling project to remove LINDSEY(CCA), MONTFORD / W TX Hospital, and WALLACE / San Angelo WC from scope. |
| **Impact of Change (Scope, Schedule, Cost)** |
| Scope and budget will bill as actuals. |
| **Price Change** |
| Time & Materials: Billed as consumed |

SHI and Securus complied with the Change Requests. SHI stopped work on the sites removed from the scope of the SOWs (Pack, Hughes, Montford, Lindsey, and Wallace);[49] Securus transferred those sites to itself and other subcontractors;[50] and SHI continued to provide services and materials to the remaining uncompleted sites.[51]

---

[49] Ex. 29, Polunsky Change Request No. 4; Ex. 33, Region 2 Change Request No. 4; Ex. 49, Region 3 Change Request No. 5; Ex. 43, Region 4 Change Request No. 4; Ex. 37, Region 5 Change Request No. 5; Ex. 40, Region 6 Change Request No. 3; Ex. 71, Nov.15, 2022 Email from Jerimy Thompson, "Completion % and resources week of 11/21" [SECURUS065266] (*see* Ex. 4, Alibhai Decl. ¶ 4(n)); Ex. 6, BenMoshe Tr. at 158:18-22.

[50] Ex. 71, Nov. 15, 2022 Email from Jerimy Thompson, "Completion % and resources week of 11/21"; Ex. 6, BenMoshe Tr. at 158:18-22.

[51] Ex. 71, Nov. 15, 2022 Email from Jerimy Thompson, "Completion % and resources week of 11/21."

On February 6, 2023, Securus terminated all TDCJ SOWs effective immediately and directed SHI to cease all work in connection with the TDCJ Project.[52] The termination notice did not identify any breach or event of default.[53]

**F. SHI files suit against Securus.**

SHI filed suit against Securus on March 10, 2023.[54] In SHI's Second Amended Complaint, SHI brings breach of contract claims under (1) the SOWs and Change Requests comprising the TDCJ Project and (2) Quotes and Purchase Orders for materials and equipment.[55] Securus asserts a breach of contract counterclaim challenging the "Unauthorized Change Requests."[56] In addition to the "Unauthorized Change Requests," Securus alleges that "SHI failed to provide accurate proper services and equipment invoices as required under the SOWs."[57]

SHI has moved to dismiss Securus's declaratory action.[58] Securus has moved to dismiss SHI's quasi-contractual claims.[59] Both motions remain pending before the Court.

**G. Securus has no evidence of damages as a result of SHI's alleged breach of contract.**

As part of its breach of contract claims, Securus alleges that "SHI's breaches of the SOWs caused Securus damages because it inadvertently and mistakenly paid amounts to SHI that it was

---

[52] Ex. 68, Securus Termination Letter to SHI [SHI-078526] (*see* Ex. 5, Dougherty Tr. at 176:17-21).

[53] *See id.*

[54] SHI's Orig. Compl. (Dkt. #1).

[55] SHI's Second Am. Compl. ¶¶ 18-24, 32-39. This Motion seeks summary judgment on Counts I and III.

[56] Securus First Am. Counterclaim ¶¶ 77-85.

[57] *Id.* ¶ 82.

[58] SHI's Mtn. to Dismiss Securus's Counterclaim (Dkt. #22).

[59] Securus's Mtn. to Dismiss SHI's Claims (Dkt. #35).

not obligated to pay under the SOWs."[60] Discovery revealed Securus did not perform an independent investigation or determination of its alleged damages and, instead, relied upon its retained expert, Jeffrey Mordaunt.

When asked via interrogatories to quantify its damages, Securus states, "Securus directs SHI to its November 20, 2023 Expert Witness Report of Jeffrey M. Mordaunt. Mr. Mordaunt's report analyzes and describes the amounts that Securus overpaid SHI."[61] This response was reinforced by Securus's corporate representatives. Alex Dougherty, Securus's Chief Operating Officer and the corporate representative designated by Securus to testify as to Securus's alleged damages, testified that the only information Securus has with respect to its alleged damages is contained in Mordaunt's expert report.[62] Likewise, Mary Clear, Securus's Vice President and Corporate Controller, testified that Securus has not reached a conclusion on the amounts of damages it is owed and would refer to Mordaunt's "report as far as any amounts for overpayments."[63] Clear further testified that Securus cannot (and has not) determined a dollar amount for any alleged overpayment:[64]

---

[60] Securus's First Am. Counterclaim ¶ 83.

[61] Ex. 69, Securus's Response to SHI's First Set of Interrogatories, No. 1 (*see* Ex. 4, Alibhai Decl. ¶ 4(m)).

[62] *See* Ex. 5, Dougherty Tr. 207:1-6 ("Q. Interrogatory No. 1 asks for identification by invoices by invoice number that Securus disputes and the amount disputed for each invoice. The answer directs us to a November 2023 expert witness report of Mr. Mordaunt, correct? A. Correct."); *see also* 208:7-10 ("Q. The information that Securus has regarding the answer to Interrogatory No. 1 is the answer here about the expert report, correct? A. That's correct.").

[63] Ex. 17, Clear Tr. 16:8-11 ("Q. And did you reach a conclusion as to the amount that was overpaid? A. No. And I would refer to -- to his report as far as any amounts for overpayments.").

[64] *Id*. at 17:9-20 (emphasis added) & 139:8-18 ("Q. Other than Mr. Mordaunt's report, Securus has not determined how much it allegedly overpaid, correct? A. Securus has relied on an expert to determine how much we've overpaid. Q. And so other than that, other than Mr. Mordaunt's report that you looked at, there's no other calculation that Securus has done regarding alleged overpayments? A. There's not an -- an exact calculation, no, other than the expert report.").

| | |
|---|---|
| SHI Attorney: | And so just to make sure that I understand your testimony, as the controller, you have no independent opinion as to the amount overpaid by Securus? |
| Clear: | Not the exact dollar amount, no. |
| SHI Attorney: | You just have the opinion that there was an overpayment? |
| Clear: | Yes. |
| SHI Attorney: | **But you can't tell the jury what that amount is, correct?** |
| Clear: | **I would refer to the expert report as far as the amount of the overpayment.** |

Similarly, Securus's disclosures regarding its alleged damages refer to Mordaunt's report and his overpayment calculation.[65]

However, Mordaunt, Securus's retained expert and the only purported source of evidence with respect to Securus's alleged damages, cannot calculate the alleged amount of overpayment.[66] Mordaunt testified that his overpayment calculation—that Securus overpaid SHI by $6,474,575 or $5,652,334—is incorrect.[67] Mordaunt admits that he calculated the overpayment by including invoices for materials, which he knows should be excluded from the NTE amount pursuant to the SOWs.[68] Mordaunt also admits that his pre-tax calculation employed the wrong tax formula—another error in the ultimate overpayment calculation.[69] As a result, Mordaunt admits that "[b]ased

[65] Ex. 7, Securus's Third Am. Disclosures at 16-17.

[66] SHI's Supplemental Motion to Limit the Testimony and Opinions of Mordaunt (Dkt. #85) at 9-10. Mordaunt's testimony is the subject of three pending motions to limit. *See* SHI's Motion to Limit the Testimony and Opinions of Mordaunt (Dkt. #50); SHI's Motion to Limit the Testimony and Opinions of Mordaunt as a Rebuttal Expert (Dkt. #52).

[67] Ex. 70, Mordaunt Tr. 123:4-15 & 126:4-23.

[68] *Id*. at 37:24-38:15 ("Q. Why are you excluding materials? A. Materials, the SOW is the only not-to-exceed amount applied to service … Q. Not materials, correct? A. Correct."), 48:8-49:3, 50:14-51:9, 52:1-19, 103:1-104:9.

[69] *Id*. at 66:24-67:19, 68:5-69:1, 69:17-25 & 88:12-89:5.

on what you have shown me today consistent with the methodology that I used, I would agree that those numbers would come down."[70] However, Mordaunt was not able to testify as to what the new damages calculation would be.[71]

Despite learning about these errors in his reports, Mordaunt did not supplement or revise his report (as he said he needed to)[72] prior to the Court's deadline to complete discovery. As a result, SHI has moved to limit his testimony.[73]

## IV. SUMMARY OF THE ARGUMENT

Granting SHI's summary judgment on Securus's breach of contract counterclaim is proper because: (1) the October Change Requests are valid and enforceable and (2) Securus cannot show that it suffered damages. Securus contests Brennan's authority to execute the October Change Requests; however, the undisputed summary judgment evidence shows Securus executives gave Brennan actual express authority to execute change requests. And this actual express authority extended to Brennan's implied authority to sign the October Change Requests. Alternatively, Brennan had apparent authority because SHI believed (because Securus told it so) he had authority to execute the October Change Requests. Moreover, Securus cannot show it has suffered damages, either based on its allegation that Securus overpaid SHI or resulting from SHI's alleged "inaccurate

---

[70] *Id*. at 124:10-16.

[71] *Id*. at 123:20-24 ("Q. And so what is the correct amount for total overpayment under scenario 1? … A. I don't have a different amount that what is in this report."), 127:24-128:16 ("Q. Now, with respect to any adjustments you would make to scenario 1 or scenario 2, you can't tell me what that number would be today? A. I cannot tell you what that number would be today[.]").

[72] *Id.* at 62:6-16 ("A. Based on the quick and dirty filtering that I just did, I would not disagree that the numbers don't match. … I mean, if I need to amend something I would amend something after my deposition."); *see also id*. at 87:18-22 ("Q. And that formula is incorrect? A. Based on the quick and dirty that we did today, I would look at it and revise it if it is incorrect, but it appeared to be perhaps incorrect.").

[73] *See supra* n. 66.

invoices." Because a valid contract exists, Securus's quasi-contractual claims fail as a matter of law.

SHI is entitled to summary judgment on its breach of contract claims because: (1) the SOWs were valid agreements; (2) SHI performed under the SOWs by providing services and materials to dozens of sites; and (3) Securus breached the SOWs by failing to both timely pay and pay SHI for materials and services SHI provided to Securus.

## V. LEGAL STANDARD

"Summary judgment is appropriate only when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"[74] If the moving party presents a motion for summary judgment that is properly supported by evidence, "the burden shifts to the nonmoving party to show with 'significant probative evidence' that there exists a genuine issue of material fact."[75]

The nonmoving party "must respond to the motion for summary judgment by setting forth particular facts indicating that there is a genuine issue for trial."[76] To defeat a motion for summary judgment, the nonmovant must present "significant probative evidence demonstrating the existence of a triable issue of fact."[77] Thus, "[m]ere denials of material facts, unsworn allegations, or arguments and assertions in briefs or legal memoranda will not suffice to carry this burden."[78]

---

[74] *Shepherd v. City of Shreveport*, 920 F.3d 278, 282-83 (5th Cir. 2019) (quoting FED. R. CIV. P. 56(a)).

[75] *Hamilton v. Segue Software Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (citing *Conkling v. Turner*, 18 F.3d 1285, 1295 (5th Cir. 1994)).

[76] *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986)).

[77] *In re Mun. Bond Reporting Antitrust Litig.*, 672 F.2d 436, 440 (5th Cir. 1982) (citations omitted).

[78] *Pickett v. IceCold2, LLC*, No. 4:17-CV-00666, 2019 WL 1063369, at *2 (E.D. Tex. Mar. 6, 2019).

Further, as noted in the Court's Local Rules, in ruling on motions for summary judgment, the Court "will assume that the facts as claimed and supported by admissible evidence by the moving party are admitted to exist without controversy, except to the extent that such facts are controverted in the responsive brief filed in opposition to the motion, as supported by summary judgment evidence."[79]

## VI. ARGUMENTS AND AUTHORITIES

### A. The Court should grant SHI summary judgment on Securus's breach of contract claim because the October Change Requests are valid and enforceable and Securus is unable to prove it suffered damages.

To prevail on a breach of contract claim, Securus must show: "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach."[80] Securus's breach of contract counterclaim fails for two reasons. First, Brennan had actual or apparent authority to execute the October Change Requests; thus, the October Change Requests were binding on Securus and removed the NTE language from the SOWs. Second, Securus is unable to show it suffered damages as a result of overpayment or alleged "inaccurate invoices."

#### 1. The October Change Requests are valid and enforceable.

Securus contends that the October Change Requests are unauthorized and that SHI breached the SOWs because Brennan allegedly lacked authority to bind Securus.[81] Neither the law nor the facts support this position.

---

[79] E.D. TEX. L.R. CV-56(c).

[80] *Smith Int'l, Inc. v. Egle Grp., LLC*, 490 F.3d 380, 387 (5th Cir. 2007) (quoting *Valero Mktg. & Supply Co. v. Kalama Int'l*, 51 S.W.3d 345, 351 (Tex. App.—Hous. [1st Dist.] 2001, no pet.).

[81] Securus's First Am. Counterclaim ¶¶ 58, 81.

Authority to bind the principal may be (1) actual express, (2) actual implied, or (3) apparent.[82] Actual express authority exists "where the principal has made it clear to the agent that he wants the act under scrutiny to be done."[83] On the other hand, actual implied authority arises "where there is no proof of express authority, but in some manner the agent was authorized; in other words, there is circumstantial proof of actual authority."[84] Actual authority focuses on the relationship and communications between the principal and the agent.[85]

Apparent authority exists "when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations to the agent, that the principal wishes the agent so to act."[86] Unlike actual authority, apparent authority focuses on the relationship and communications between principal and the third party.[87]

**a. Brennan had actual express authority because Securus executives told Brennan he had authority to approve Change Requests.**

To prove actual authority, "there must be evidence that either (1) the principal intentionally conferred authority on another to act as its agent, or (2) the principal intentionally, or by want of

[82] *De Francheschi v. BAC Home Loans Servicing, L.P.*, No. 3:09-CV-1667–K, 2011 WL 1456849, at *3 (N.D. Tex. Apr. 14, 2011), *aff'd sub nom. De Franceschi v. BAC Home Loans Servicing, L.P.*, 477 Fed. Appx. 200 (5th Cir. 2012).

[83] *Pasant v. Jackson Nat. Life Ins. Co.*, 52 F.3d 94, 97 (5th Cir. 1995) (quoting *City of San Antonio v. Aguilar*, 670 S.W.2d 681, 683 (Tex. App.—San Antonio 1984, writ dism'd)).

[84] *Id*. (quoting *Aguilar*, 670 S.W.2d at 683-84); *see also Johnson v. Palmer Admins. Servs., Inc.*, No. 6:22-CV-00121-JCB-KNM, 2022 WL 17546957, at *4 (E.D. Tex. Oct. 20, 2022), *report and recommendation adopted*, No. 6:22-CV-00121-JCB-KNM, 2022 WL 16919786 (E.D. Tex. Nov. 14, 2022) (holding facts were sufficient "to allow the Court to infer that implied actual authority exists.")

[85] *See Allamon v. Acuity Spec. Prods. Inc*, 877 F. Supp. 2d 498, 511 (E.D. Tex. 2012), *aff'd*, 534 Fed. Appx. 248 (5th Cir. 2013).

[86] *Matter of Osborne*, 951 F.3d 691, 704 (5th Cir. 2020) (holding an agency relationship existed as both an actual and apparent agent) (quoting RESTATEMENT (3D) OF AGENCY § 2.03 (2006)).

[87] *See Allamon*, 877 F. Supp. 2d at 511.

due care, allowed another to believe that it possessed authority to act as the principal's agent."[88] Actual authority is created through written or spoken words or conduct of the principal communicated to the agent.[89] Securus communicated Brennan's actual authority to execute Change Requests through (1) writings, (2) oral communications, and (3) its conduct.

Emails between the principal and the third party where the agent is copied demonstrate evidence of actual authority.[90] In *Autoficio*, the Court found that an email sent from the principal stating, "we decided to have [the agent] sign all documents, so I made those changes and obtained [the agent's] signature[,]" "evidence[d] that member of [the principal] designated [the agent] to sign the Agreements on [the principal's] behalf."[91]

Securus's emails evidence that same delegation of authority when Cole sought confirmation from BenMoshe whether Brennan should sign Change Requests.[92] BenMoshe internally responded to Brennan to tell him "moving forward the approval should come from you":[93]



**From:** Hezi Benmoshe
**Sent:** Wednesday, August 10, 2022 7:44 PM CDT
**To:** David Brennan
**Subject:** FW: SHI / Securus - Hodge - AP needed

Did you approve this work for them ? not sure I understand what she mean , yes moving forward the approval should come from you but I don't think you knew about it before

[88] *Autoficio, LLC v. Cimble Corp.*, No. 4:17-CV-00404-KPJ, 2020 WL 3209014, at *6 (E.D. Tex. June 15, 2020).

[89] *Pierce v. Fondren Orthopedic Grp., LLC*, No. H-18-1686, 2018 WL 6200049, at *6 (S.D. Tex. Nov. 28, 2018) ("Express actual authority exists when the principal has made clear to the agent that he wants the agent to act on the principal's behalf.").

[90] *Autoficio,* 2020 WL 3209014, at *7.

[91] *Id.*

[92] Ex. 63, Aug. 10, 2022 Email from Jessica Cole, "SHI/Securus – Hodge – AP needed."

[93] Ex. 64, Aug. 10, 2022 Email from Hezi BenMoshe, "SHI/Securus – Hodge – AP needed."

Then, BenMoshe responded to Cole—and copied Brennan—confirming that Brennan **"is the right person to approve any changes on the SOW."**[94] This exchange alone establishes Securus's express written delegation of authority to Brennan.

Moreover, Securus orally communicated to Brennan as well as Securus and SHI employees that Brennan was authorized to approve Change Requests. At the August 1 meeting, Saxon told everyone that going forward Brennan was authorized to approve Change Requests:[95]

> Securus Attorney: Okay. All -- all right. Tell me what you recall about who -- the authorization process -- … for getting change requests signed from this August meeting?
>
> Cooper: **Greg Saxon told all of us in the room that David Brennan had authorization to sign off on these change requests.**
>
> Securus Attorney: The ones you were discussing at this meeting?
>
> Cooper: **Change requests in general. When we had change requests coming up, who has authorization to sign them.**

Cooper reiterated this again later in her testimony:[96]

> Securus Attorney: Okay. **And you've told me that Mr. Saxon told you at one point, you think at that August meeting, that Mr. Brennan could sign change requests; is that right?**
>
> Cooper: **I 100 percent remember Mr. Saxon saying that.**
>
> Securus Attorney: Tell -- tell me what -- how it came up.
>
> Cooper: Because we asked who -- who has authorization to sign off on these things. Like what's your authorization process to sign off on change requests when they come up so we don't slow work down, **and [Saxon] said [Brennan] has authorization to sign off on the change requests.**

---

[94] Ex. 1, August 11, 2022 Email from Hezi BenMoshe "SHI / Securus - Hodge - AP needed." (emphasis added).

[95] Ex. 61, Cooper Tr. at 37:6-16 (emphasis added).

[96] *Id*. at 83:20-84:5 (emphasis added).

These express communications—coupled with Securus's internal actions—support a finding of actual express authority. Saxon informed Brennan that Brennan "owns" the TDCJ Project.[97] And Brennan confirmed with his superiors that he was responsible for approving all SHI Change Requests; No one at Securus disputed his authority to do so.[98] Because Securus caused Brennan to believe he had authority over the TDCJ Project, including Change Requests, Brennan had actual express authority to sign Change Requests.[99]

**b. Brennan had actual implied authority because his actual express authority to complete the project led him to believe he could sign the October Change Requests.**

Brennan had actual implied authority to sign the October Change Requests. "An agent with express authority to achieve an objective also includes the implied authority to do all things proper, usual, and necessary to achieve that end."[100] "Implied actual authority may arise in a number of ways, including by indication 'from the principal that the agent possesses the authority,' 'from being the necessary implication of an expressly authorized act,' and 'from a previous course of dealing.'"[101]

Courts have found where the agent has overarching authority to complete a project, the agent has authority to bind the principal to decisions made to complete that project.[102] In *Craig*,

[97] Ex. 54, June 14, 2022 Email from Greg Saxon, "Priorities" (Saxon telling Brennan that Brennan "now owns contract labor").

[98] Ex. 57, June 22. 2022 Email from David Brennan, "SHI Change Orders" (Brennan informing McCallister, BenMoshe, and Edwards that he is required to approve SHI Change Requests).

[99] *Autoficio,* 2020 WL 3209014, at *6 ("Express authority is delegated to an agent by words of the principal that expressly and directly authorize the agent to do an act or series of acts on behalf of the principal.") (internal quotations omitted).

[100] *Craig v. B. Riley, FBR, Inc*., No. 3:19-CV-0058-G, 2020 WL 6889018, at *15 (N.D. Tex. Nov. 23, 2020).

[101] *Johnson,* 2022 WL 17546957, at *4.

[102] *Craig*, 2020 WL 6889018, at *15.

the court found that although the agent did not have express authority to make hiring decisions, the authority to do so was implied because the agent had actual authority to solicit investors for the fund, i.e., the principal.[103] On multiple occasions, Saxon informed Brennan and Securus employees that Brennan was in charge of the TDCJ Project and responsible for overseeing contract-labor, like SHI.[104] These types of statements "sent an unmistakable signal" that Brennan had implied authority.[105]

The actions and communications of Securus executives led Brennan to reasonably believe he had authority to sign the October Change Requests based on his express actual authority to complete the project.[106] Brennan was also told that he had authority to approve Change Requests.[107] Thus, Brennan had implied actual authority to sign the October Change Requests.

#### c. Brennan had apparent authority to execute the October Change Requests because Securus told SHI Brennan had authority to sign Change Requests.

Brennan had actual authority based on Securus's statements; also, Securus's delegation of authority to Brennan is a textbook example of apparent authority. "Apparent authority arises 'either from a principal knowingly permitting an agent to hold [himself] out as having authority or by a principal's actions which lack such ordinary care as to clothe an agent with the indicia of

---

[103] *Id*.

[104] Ex. 54, June 14, 2022 Email from Greg Saxon, "Priorities"; Ex. 55, June 14, 2022 Email from Greg Saxon, "Organizational Announcement – Value Chain Operations"; Ex. 58, June 28, 2022 Email from Greg Saxon, "SHI TDCJ Resource Allocation – Notes 6/16/22"; Ex. 59, Sept. 26, 2022 Teams message from Greg Saxon.

[105] *Craig*, 2020 WL 6889018, at *15.

[106] *Autoficio,* 2020 WL 3209014, at *7 ("These actions tend to show that Whiteside may have implied authority to execute the Agreements as an extension of his express powers of negotiating and carrying out the Agreements.")

[107] Ex. 64, Aug. 10, 2022 Email from Hezi BenMoshe, "SHI/Securus – Hodge – AP needed"; Ex. 61, Cooper Tr. at 37:6-16, 83:20-84:5; Ex. 62, Cole Tr. at 135:9-25.

authority, thus leading a reasonably prudent person to believe that the agent has the authority [he] purports to exercise.'"[108] The "court may consider only conduct by the principal, leading a third party to believe that the agent has such authority."[109]

Texas courts have found that where the third-party asked for and received confirmation that the agent had the authority to act and the principal does not object to the agent's authority, it creates a reasonable belief by the third-party that the agent had authority.[110] Moreover, Texas courts have found that the duty to limit apparent authority rests upon the principal. In *PanAmerican*, the principal argued the trial court erred in finding apparent authority because it did not have an affirmative obligation to "expressly disclaim authority."[111] The appellate court summarily found this position "wrong," citing authority standing for the premise that "when an agent acts within the apparent scope of his authority, a duty rests upon his principal to give notice of any limitations which affect the rights of parties dealing with the agent."[112]

---

[108] *Matter of Russell,* 941 F.3d 199, 205 (5th Cir. 2019) (quoting *Gaines v. Kelly*, 235 S.W.3d 179, 182 (Tex. 2007)); *NationsBank, N.A. v. Dilling*, 922 S.W.2d 950, 953 (Tex. 1996) ("To establish apparent authority, [SHI] must show that [Securus] either knowingly permitted [Brennan] to hold [him]self out as having authority or showed such lack of ordinary care as to clothe the agent with indicia of authority").

[109] *Matter of Russell*, 941 F.3d at 205.

[110] *Protect Env't. Servs., Inc., v. Norco, Corp.*, 403 S.W.3d 532, 542 (Tex. App.—El Paso 2013, pet. denied) (finding "continued silence for over four months regarding the issue of Bailey's authority to bind them is indicia of their manifestation of the acceptance of that contract and authority.").

[111] *PanAmerican Operating v. Maud Smith Estate*, 409 S.W.3d 168, 175 (Tex. App.—El Paso 2013, pet. denied).

[112] *Id*. (citing *Funderburg v. Sw. Drug Corp.*, 210 S.W.2d 607, 610 (Tex. App.—Fort Worth 1948, no writ); *see also Sealy Oil Mill & Mfg. Co. v. Bishop Mfg. Co.,* 235 S.W. 850, 852 (Tex. Comm'n. App. 1921) ("That the powers of an agent are prima facie coextensive with the business [e]ntrusted to his care, and that they will not be narrowed by limitations not communicated to the person with whom he deals.").

Saxon's statements at the August 1 meeting, followed by SHI's request for and receipt of confirmation that Brennan had authority to sign change requests, evidence his apparent authority.[113]

While Securus may argue Brennan signed the October Change Requests in contravention of Securus's internal authorization policy, Securus cannot demonstrate it put SHI on notice of the policy as there is no evidence that *anyone* at SHI received this policy.[114] Moreover, the doctrine of apparent authority effectively disregards whether the October Change Requests were signed in compliance with Securus's internal policies.[115] Apparent authority operates on estoppel, equitably preventing the principal from denying the existence of authority.[116] Because the principal's actions create the belief in authority for third parties, Securus bears the burden if it deviates from its own internal policy.[117] Therefore, even if Brennan did not comply with an internal policy, Securus remains liable for his actions as it represented to SHI that he was an authorized signatory.

**2. Securus is unable to show that it suffered damages.**

The party claiming a breach of contract bears the burden of pleading and proving damages.[118] "[A] complete failure of proof concerning an essential element of the nonmoving

---

[113] *See supra* nn. 92-96 and accompanying text.

[114] *See Matter of Russell*, 941 F.3d at 205 (citing *G.D. Douglass v. Pan., Inc*., 504 S.W.2d 776, 779 (Tex. 1974)) ("A principal is not bound where the other transacting party "has notice of the limitations of the agent's power.") (internal quotations omitted).

[115] *Id.* (quoting *Dilling*, 922 S.W.2d at 953) ("A court may consider only the conduct of the principal leading a third party to believe that the agent has authority in determining whether an agent has apparent authority.") (internal quotations omitted).

[116] *Thomas Reg'l Directory, Inc. v. Dragon Prods., Ltd.*, 196 S.W.3d 424, 428-29 (Tex. App.—Beaumont 2006, pet. denied) (finding B&A acted as an agent in part because B&A was authorized to enter into contracts on the principals behalf).

[117] *Matter of Russell,* 941 F.3d at 205.

[118] *See Sport Supply Group, Inc. v. Columbia Casualty Co*., 335 F.3d 453, 465 (5th Cir. 2003) ("The plaintiff bears the burden of demonstrating that he suffered a loss as a result of the breach.").

party's case necessarily renders all other facts immaterial" and "mandates the entry of summary judgment" for the moving party.[119]

Securus has no evidence of damages arising from its breach of contract claim. Securus admits that it is relying on Mordaunt's expert report to calculate the amounts of overpayment.[120] Securus itself has not determined how much it allegedly overpaid SHI and cannot tell the jury what that amount is. As Securus's corporate representative testified: "There's not an -- an exact calculation, no, other than the expert report."[121] Because Mordaunt no longer has an opinion as to the amount of Securus's overpayment,[122] this Court should grant summary judgment in favor of SHI on Securus's breach of contract claim based on lack of evidence of damages.[123]

**3. The Court should also dismiss Securus's quasi-contractual claims because (1) the SOWs are valid agreements and (2) Securus cannot prove damages.**

Securus alleges quasi-contractual claims for money had and received and unjust enrichment.[124] Securus admits that the SOWs constitute valid and enforceable contracts between Securus and SHI.[125] And as shown above, the October Change Requests are valid and enforceable. Once the Court determines the party had a valid agreement, Securus's quasi-contractual claims fail

---

[119] *U.S. ex rel. Farmer v. City of Houston*, 523 F.3d 333, 337 (5th Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[120] Ex. 69, Securus's Response to SHI's First Set of Interrogatories, No. 1; Ex. 5, Dougherty Tr. 207:1-6 & 208:7-10; Ex. 17, Clear Tr. 16:8-11.

[121] Ex. 17, Clear Tr. 17:9-20 & 139:8-18.

[122] Ex. 70, Mordaunt Tr. 123:4-24, 124:10-16, 126:4-23, & 127:24-128:16.

[123] *See* FED. R. CIV. P. 37(c)(1) ("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, …").

[124] Securus' First Amended Counterclaim ¶¶ 86-97.

[125] *Id.* ¶ 78 ("The SOWs and properly approved and properly authorized change requests constitute valid and enforceable contracts between Securus and SHI.").

as a matter of law.[126] Additionally, summary judgment is warranted because neither Securus nor its expert have identified any unjust enrichment or money had and received damages.[127]

**B. SHI is entitled to partial summary judgment on its breach of contract claims because (1) the SOWs and subsequent Change Requests are valid agreements; (2) SHI performed under the agreements; and (3) Securus breached the agreements by refusing to pay.**

The Court should grant summary judgment on SHI's breach of contract claims because each liability element is conclusively established with undisputed facts. First, as established above, valid agreements binds the parties. Second, Securus admits that SHI performed under the pertinent SOWs. Third, Securus breached the SOWs and subsequent Change Requests because it refuses to pay for services and materials provided, causing SHI damages.

**1. Securus is bound by the SOWs and subsequent Change Requests.**

SHI and Securus are bound by the SOWs and all subsequent Change Requests, including the October Change Requests. As established above, Brennan had actual or apparent authority to bind Securus to the October Change Requests. Even if the Court does not find that the Change Requests were authorized as a matter of law, Securus is not disputing the validity of the SOWs and most of the Change Requests.[128]

---

[126] *E.g., Fortune Prod. Co. v. Conoco, Inc.,* 52 S.W.3d 671, 684 (Tex. 2000); *Collin Cnty. v. Sungard Public Sector, Inc*., No. 4:14-cv-364, 2015 WL 5853169, at *2 (E.D. Tex. Sept. 29, 2015) (quasi-contractual claims are "unavailable when a valid, express contract governing the subject matter of the dispute exists.").

[127] *See supra* section IV.A.2.

[128] Securus's Answer to SHI's Second Am. Complaint (Dkt. #36) ¶¶ 8, 10; Securus's First Amended Counterclaim ¶ 78.

**2. SHI performed its obligations pursuant to the SOWs.**

SHI was hired to work on 51 of the TDCJ sites.[129] SHI completed 23 sites due to mutually-agreed scope changes, as evidenced by Change Requests.[130] At these 23 sites, SHI provided and installed cabling, access points, fiber optics, electrical outlets, network racks, and network equipment, and completing trenching and electrical work.[131] SHI's completion of its work on these sites is evidenced by Securus's own tracking spreadsheets showing that the sites were completed prior to SHI's February 2023 termination.[132] Further, Dougherty testified that all of the work performed by SHI was accepted by TDCJ.[133] Moreover, Securus is currently generating revenue from SHI's work at these sites and paying TDCJ commissions under the Master Contract.[134] SHI performed all of its obligations under the SOWs.

**3. Securus breached its obligations because it refuses to pay SHI for services and materials provided under the SOWs.**

SHI's services and hardware and equipment sales are evidenced by more than 5,000 invoices SHI sent to Securus, which have been produced in this case. SHI-425694 is a spreadsheet of these invoices identifying which invoices have been paid and which remain unpaid.[135] Securus does not dispute any of these individual invoices;[136] however, it refuses to pay them.[137] Securus

---

[129] *See supra* n. 15.

[130] Ex. 51, David Brennan's TDCJ Vendor and Labor Tracker.

[131] *See supra* n. 15.

[132] Ex. 51, David Brennan's TDCJ Vendor and Labor Tracker.

[133] Ex. 5, Dougherty Tr. at 25:2-9, 36:4-21, 37:6-12.

[134] *Id*. at 30:15-17, 31:11-16, 74:18-75:10.

[135] Ex. 52, SHI spreadsheet showing unpaid-paid invoices; Securus's First Am. Counterclaim ¶ 73.

[136] Ex. 69, Securus's Responses to SHI's First Set of Interrogatories at 1-2.

[137] Securus's First Am. Counterclaim ¶73 ("Securus promptly stopped paying SHI's invoices.").

breached its contractual obligation to SHI as a result of its refusal to pay.[138] And importantly, Securus has no defense for not paying invoices for materials (because they are not subject to the NTEs).[139] Multiple unpaid invoices relate solely to materials.[140] Thus, Securus breached the SOWs by failing to pay unpaid invoices.

Securus also materially breached the SOWs by failing to timely make payments. The SOWs required Securus to pay invoices within 30 days for all service invoices.[141] SHI extended the payment terms to 60 days for hardware purchases.[142] Yet, Securus systematically and repeatedly made late payments—and sometimes no payments at all—on its services and hardware invoices.[143] Securus began its systematic late payments as far back as January 2022—well before the October Change Requests.[144] The failure to make timely payments is a material breach of the

---

[138] Ex. 9, Region 2 SOW at 32 ("All invoices are due and payable within 30 calendar days of the invoice date.").

[139] *Id*. (explaining that materials are not a part of the NTE amounts).

[140] *See, e.g.*, Ex. 70, Mordaunt Tr. at 48:8-49:3 (admitting outstanding invoices for materials in calculation was in error); *id*. at 52:1-19 (same); 103:1-104:9 (same); *see also* Ex. 52, SHI spreadsheet showing unpaid/paid invoices.

[141] *See supra* nn. 15, 138.

[142] Ex. 22, February 4, 2022 Email from Kristin Cooper "Updated Accounting Terms."

[143] Ex. 72, Jan. 10, 2022, Email from Mary Clear, "SHI Past Dues for SECURUS Technologies 1002122"; Ex. 73, Jan. 7, 2022 Spreadsheet Showing $979,987.96 Outstanding; Ex. 74, July 20, 2022 Email from Sean McAllister, "SHI Overdue Invoices" ("Millions in invoices that are passed due (>60 days)) How quickly can we pay these invoices?"); Ex. 75. Aug. 15, 2022 Email from Philip Ninan, "SHI install work invoices" (demonstrating $10M outstanding).

[144] *Id*.

SOWs.[145] Securus's outstanding balance continued to accrue until Securus stopped making payments entirely and left an unpaid balance exceeding $22 million.[146]

Because SHI has established the elements of its breach of contract claims, SHI is entitled to summary judgment. After granting this relief, the only question for trial will be the amount of SHI's damages (plus attorneys' fees and costs).[147]

## VII. CONCLUSION AND RELIEF REQUESTED

Plaintiff SHI International Corp. respectfully requests that the Court grant summary judgment in favor of SHI on both SHI's affirmative breach of contract claims and Securus's breach of contract and quasi-contractual counterclaims and all other relief to which SHI is entitled.

---

[145] *See Mahmoud v. De Moss Owners Ass'n, Inc.*, 865 F.3d 322, 328 (5th Cir. 2017) (citing *E. Friedman & Assoc., Inc. v. ABC Hotel & Rest. Supply, Inc.*, 413 S.W.3d 561, 565 (Tex. App.—Amarillo 2013, no pet.) ("[Defendants'] failure to pay their balance and to make timely payments on their monthly assessments was a material breach of the [contract].").

[146] Ex. 52, SHI spreadsheet showing unpaid-paid invoices.

[147] *See* FED. R. CIV. P. 56(g) ("If the court does not grant all the relief requested by [a motion for summary judgment], it may enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute and treating the fact as established in the case."); FED. R. CIV. P. 54(d)(2).

Dated: May 1, 2024

Respectfully submitted,

**MUNSCH HARDT KOPF & HARR, P.C.**

By: */s/ Jamil N. Alibhai*
Jamil N. Alibhai
State Bar No. 00793248
jalibhai@munsch.com
Ross H. Parker
State Bar No. 24007804
rparker@munsch.com
Toni L. Anderson
State Bar No. 24105432
tanderson@munsch.com
Jordan R. Curry
State Bar No. 24116242
jcurry@munsch.com
Karen E. Alday
State Bar No. 24112441
klee@munsch.com

500 N. Akard St., Suite 4000
Dallas, TX 75201
Telephone: (214) 855-7500
Facsimile: (214) 855-7584

John Cornwell
State Bar No. 24050450
jcornwell@munsch.com
700 Milam Street, Suite 800
Houston, TX 77002
Telephone: (713) 222-1470
Facsimile: (713) 222-1475

**ATTORNEYS FOR PLAINTIFF SHI INTERNATIONAL CORP.**

**CERTIFICATE OF SERVICE**

I certify that on May 1, 2024, I served a true and correct copy of the foregoing document upon all counsel of record via the Court's CM/ECF filing system.

*/s/ Jamil N. Alibhai*
Jamil N. Alibhai