# EXHIBIT 5

Planet Depos
We Make It Happen™

# Transcript of Alex Dougherty, Designated Representative and Individually

**Date:** March 8, 2024
**Case:** SHI International Corp. -v- Securus Technologies, LLC

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

SHI INTERNATIONAL CORP., )
PLAINTIFF, )
VS. ) CIVIL ACTION
) NO.: 4:23-CV-00200-SDJ
SECURUS TECHNOLOGIES, LLC, )
DEFENDANT. )

---

ORAL AND VIDEOTAPED DEPOSITION OF
ALEX DOUGHERTY
MARCH 8, 2024

---

ORAL AND VIDEOTAPED DEPOSITION OF ALEX DOUGHERTY, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on the MARCH 8, 2024, from 9:05 a.m. to 3:55 p.m., before Kelly Bryant, CSR in and for the State of Texas, reported by machine shorthand, at Tillotson Johnson & Patton, 1201 Main Street, Suite 1300, Dallas, Texas pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.



A P P E A R A N C E S

FOR THE PLAINTIFF:

JAMIL N. ALIBHAI
MADDISON CRAIG
TONI L. ANDERSON
Munsch Hardt Kopf & Harr, P.C.
500 N. Akard St., Suite 4000
Dallas, TX 75201
Telephone: (214) 855-7500
Jalibhai@munsch.com
Tanderson@munsch.com
Mcraig@munsch.com

FOR THE DEFENDANT:

J. AUSTEN IRROBALI
TILLOTSON JOHNSON & PATTON
1201 Main Street, Suite 1300
Dallas, Texas 75202
Telephone: 214.382.3044
Airrobali@tillotsonlaw.com

ALSO PRESENT:

Darrell Harvey, videographer
William Bird (via Zoom)
Josh Martin, general counsel



INDEX


| | PAGE |
|---|---|
| ALEX DOUGHERTY | |
| DIRECT EXAMINATION BY MR. ALIBHAI | 6 |


EXHIBITS


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | 30(b)(6) Notice of Deposition | 11 |
| Exhibit 2 | Organization chart for Operations department | 15 |
| Exhibit 3 | Master contract between Securus Technologies and TDCJ | 22 |
| Exhibit 4 | E-mail from Mr. Pareti to Mr. Dougherty, Mr. Abel and Mr. Boyd | 41 |
| Exhibit 5 | E-mail from Mr. Pareti with PowerPoint attachment | 46 |
| Exhibit 6 | PowerPoint | 50 |
| Exhibit 7 | E-mail from Mr. Saxon | 55 |
| Exhibit 8 | E-mail from Adam Edwards | 59 |
| Exhibit 9 | E-mail from Mr. Abel | 67 |
| Exhibit 10 | Series of e-mails | 83 |
| Exhibit 11 | E-mail from Mr. Abel | 91 |
| Exhibit 12 | E-mail forwarded to Mr. Dougherty by Mr. Saxon | 101 |
| Exhibit 13 | E-mail from Mr. Saxon to Mr. Dougherty | 108 |
| Exhibit 14 | Series of e-mails | 112 |
| Exhibit 15 | Aventiv OpCo deck for January 2023 | 121 |
| Exhibit 16 | Series of e-mails | 136 |
| Exhibit 17 | Message from Mr. Dougherty to Mr. Saxon | 155 |
| Exhibit 18 | Message from Mr. Saxon to Mr. Dougherty | 155 |
| Exhibit 19 | Message from Mr. Saxon to Mr. Dougherty | 160 |
| Exhibit 20 | Message from Mr. Saxon to Mr. Dougherty | 161 |
| Exhibit 21 | Message from Mr. Saxon to Mr. Dougherty | 163 |
| Exhibit 22 | Message from Mr. Saxon to Mr. Dougherty | 164 |
| Exhibit 23 | Message from Mr. Saxon to Mr. Dougherty | 164 |
| Exhibit 24 | Message from Mr. Dougherty to Mr. Saxon | 167 |
| Exhibit 25 | E-mail from Mr. Fikes | 166 |





| | | |
|---|---|---|
| Exhibit 26 | Message from Mr. Dougherty to Mr. Saxon | 169 |
| Exhibit 27 | Mr. Saxon's response to Mr. Dougherty | 171 |
| Exhibit 28 | Series of e-mails | 174 |
| Exhibit 29 | Series of e-mails | 176 |
| Exhibit 30 | Change request | 179 |
| Exhibit 31 | Change request | 180 |
| Exhibit 32 | Aventiv corporate authorization policy as of October 2022 | 188 |
| Exhibit 33 | Contract between Broadband America Corp and Securus | 191 |
| Exhibit 34 | E-mail from Mr. Edwards to Mr. Boyd | 194 |
| Exhibit 35 | E-mail from Mr. Saxon to Mr. Dougherty | 199 |
| Exhibit 36 | Agreement between ITsavvy and Securus Technologies | 201 |
| Exhibit 37 | Description | 204 |
| Exhibit 38 | Securus' Responses to SHI's First Set of Interrogatories | 205 |
| Exhibit 39 | Mr. Dougherty's Declaration | 205 |
| Exhibit 40 | Securus Technologies' First Supplements to Its Response to the First Set of Interrogatories | 211 |
| Exhibit 41 | Second set of responses to interrogatories | 215 |
| Exhibit 42 | Mr. Dougherty's Declaration | 216 |
| Exhibit 43 | Statement of work between SHI and Securus | 217 |

Mr. Saxon?
**A. Correct.**
Q. And he was, at that time, the vice president of procurement and planning; is that correct?
**A. He was vice president of procurement and planning, vice president of operations, broadly.**
Q. And when did Mr. Saxon leave?
**A. Mr. Saxon left in September I believe of '23, the fall of '23.**
Q. And so who's responsible for the TDCJ project after Mr. Saxon leaves?
**A. Ongoing sustainment of that and other installation activities are now Dan Daleo.**
Q. That was the vice president you mentioned earlier?
**A. Correct. He's who succeeded Greg Saxon.**
Q. With respect to overseeing subcontractors --
**A. Uh-huh.**
Q. -- was it the same people involved, you and Mr. Saxon, when you took over the role?
**A. Say a little bit more about what you're asking.**
Q. I was asking you about the TDCJ project in general first.
**A. Yeah.**



Q. I want to focus on the part that related to subcontractors, like SHI.
**A. Uh-huh. Uh-huh.**
Q. When you took over the role as COO --
**A. Uh-huh.**
Q. -- was that Mr. Saxon who was overseeing the subcontractors?
**A. Correct.**
Q. And that's who was reporting to you about those issues?
**A. Correct.**
Q. Anyone else that you worked with in operations with respect to specifically SHI subcontractor?
**A. There's a myriad of other people there involved in lots of ongoing business operations, but ultimately, Greg is where that all funneled and was responsible for the project.**
(Plaintiff's Exhibit No. 3 marked)
MR. ALIBHAI: I'm handing you what's been marked as Exhibit 3.
THE WITNESS: Uh-huh.
MR. IRROBALI: Thank you.
Q. (BY MR. ALIBHAI) Is this a copy of the master contract between Securus Technologies and the TDCJ?
**A. Statement or a question?**



Q. Is this a copy of the master contract?
**A. That looks -- yes, that looks to be the case.**
Q. And you've reviewed this, correct?
**A. I have reviewed this.**
Q. I want to talk to you about a couple of sections in here.
**A. Sure.**
Q. If you flip to page 10, Section B is entitled, Tablet Services and Cost/Fees.
Is it your understanding that the tablet project provided to the TDCJ was without any cost to the department?
**A. That is correct.**
Q. And the term of the contract initially was through August 31, 2023, correct?
**A. Correct.**
Q. Has that been extended?
**A. We still provide services to TDCJ for this contract.**
Q. Do you know what the contract extension is through?
**A. It is managed through the one-year vehicles that it outlines here.**
Q. So it's currently extended through August 31, 2024?



**A. Correct.**
Q. And the second extension hasn't happened yet?
**A. Not until we get closer to that and then they will extend.**
Q. And then what, sir?
**A. And then, presumably, they will extend, but it's -- it's an ongoing active contract discussion.**
Q. And who's involved in those contract discussions?
Is that you or someone else?
**A. Someone else.**
Q. Who would it be?
**A. Our sales and account management team will manage any ongoing contract activities. We deliver things. We don't negotiate them.**
Q. We being operations?
**A. Correct, yes.**
Q. All right. If you flip to page 12, I'm looking at Section B.2.3. Is it Securus' understanding that Securus is the contractor, correct?
**A. Securus is the prime contractor for this contract, yes.**
Q. And that Securus retained ownership of the tablets, terminals and hardware deployed pursuant to the contract, correct?

A. **Correct.**
Q. Are all of the sites relating to the TDC project now live?
A. **All the sites that were contemplated here are now live.**
Q. And when did that occur?
MR. IRROBALI: Object to form.
A. **That finally occurred in, I believe, May of '23, about a year after it should have.**
Q. (BY MR. ALIBHAI) You said a year after it should have.
Where are you getting your understanding as to when it should have happened?
A. **Thereabouts, right? Original conversations with portions of the sites, right? SHI was not responsible for every site across TDCJ.**
**The ones that they were also the ones that were the final laggers that took until the following summer from the original conversations to -- to finish.**
Q. Where is the timeline set forth for when the project was supposed to go live?
A. **Final project, in the initial discussion documents and scoping with SHI.**
Q. Well, back up to me with respect to TDCJ first.



A. **Uh-huh.**
Q. Was there a deadline or a timeline set forth for when the project was supposed to go live?
A. **That will almost never exist in a contract vehicle. That is something that's established after a signature through ongoing conversations with the customer because it has to include their own realities of staffing and availability and what their sites can support.**
Q. And so what type of document would set forth the go-live date for sites?
A. **Project plans and agreements between both customer on one end and then ourselves if we were doing installation or any subcontractors, sub-primes on the other side.**
Q. And have you seen project plans that set forth a go-live date?
A. **Yes.**
Q. And those are between Securus and TDCJ?
A. **The ones I was referencing a moment ago were between Securus and SHI.**
Q. Those are --
A. **Those would have then been flown to TDCJ. They have to agree to all of those documentation.**
Q. And you're talking about the statements of



work?
A. **Correct. Statements of work, RP materials, all the things that are included there in the same way that we are bound to those things with our own customers.**
Q. And so my question is slightly different.
A. **Uh-huh.**
Q. Is there a project plan between -- well, let me back up.
You're aware that SHI was providing services with respect to some of the sites that are the subject of the TDCJ contract, correct?
A. **That's correct.**
Q. And that there were other subcontractors that were providing services as well to Securus, correct?
A. **Uh-huh. That's correct.**
Q. And is it also the case that Securus handled some of the sites itself?
A. **That's typically how we install anything around the country. It's a mix of our own resource and others where we need to augment.**
Q. And so is there some project plan that aggregates all the sites, regardless of whether SHI was involved --
A. **Uh-huh.**



Q. -- with respect to a completion date and go-live date for the tablet project?
A. **There were master project plans that show proposed schedule that are kept -- kept up with over the life of any project.**
Q. And you've seen those documents?
A. **For this, sure.**
Q. And those are updated on an ongoing basis?
A. **Uh-huh. They are.**
Q. Was there also project documents that tracked cost by site?
A. **Yes.**
Q. And what type of documents are those?
A. **The same. So they would have tracked same in project plan, right? So it's typically a unified planning tool that will track costs where available.**
**Oftentimes, the ability to reconcile and get those costs are delayed in some cases due to work in getting the updates; in other cases due to things like we will undoubtedly go through here about an inability to reconcile invoices through appropriate locations.**
Q. And did you review these project plans to prepare for your deposition today?
A. **I have seen them, yes.**
Q. All right. If you'll turn to page 17 of

29

Exhibit 3, there's a section at the bottom, F, that says, "Contractor shall," and it's got three sub-points under it.
**A. Uh-huh.**
Q. Is what we were just talking about in terms of project plans what is contemplated by F2 project plan and timetable for installation?
**A. That appears to be the case.**
Q. And so those are documents that are provided to the TDCJ as well?
**A. Correct.**
Q. And from your time as COO from November 2022 to May '23 when all the sites went live, was that something that was being provided to the TDCJ on a regular basis?
**A. It was.**
Q. And I'm not sure I've seen one, so can you tell me what it shows?
**A. It will show a high-level outline of current view of sites and what their current tentative go-live and testing dates would be.**
**So that -- that is -- again, customer has to provide their own resources to do these things as well. They want to stay on top of what those dates are. We have to keep them abreast.**

30

Q. And who's responsible for preparing these project plans?
**A. That, ultimately, falls to Mr. Saxon.**
Q. And during the time that you were COO, did you have any involvement with the project plans?
**A. Reviewing and seeing them, not in creating them.**
Q. Is there a financial component to project plans?
**A. No, not for the state.**
Q. And so where is data regarding tablet usage kept?
**A. Why would that be part of a project plan to the -- to the customer?**
Q. Well, there were commissions owed to the TDCJ, correct?
**A. Sure.**
Q. And so my understanding from Ms. Clear is that there are monthly reports that are sent to the TDCJ about tablet usage; is that correct?
**A. There are. That's not part of the project planning activity, right?**
Q. Correct. So I'm -- I'm trying to figure out what types of document shows that.
**A. Got it. So now quarterly business review are**

31

**done with the customer, right, and with other similar major customers, and there's a bevy of information that's shared with them during those processes that show utilization of activity, what's going on, volumes, ensuring nothing unexpected is happening in the contract.**
Q. And so that's in ongoing meetings --
**A. Correct.**
Q. -- and reporting that occurs?
**A. Correct.**
Q. And how are commissions paid to the TDCJ calculated?
**A. For this contract, I believe it is a flat fee in contract terms that, behind it, is an estimate of eMessaging usage, but that it's a flat annual requirement of what they're going to be paid.**
Q. And so it's not related to usage?
**A. It has an early basis in usage and that is how it's determined in contract negotiations certainly, but I believe that the actual language in here is that there's an annual expectation of dollars paid for eMessaging that, while derived from usage, is just outlined as a flat dollar amount per year.**
Q. And you're referencing one of the features that tablet uses -- use -- users can do --

32

**A. Correct.**
Q. -- which is eMessaging, correct?
**A. Correct.**
Q. There are other components of tablet usage as well, correct?
**A. Correct.**
Q. Media downloads, for example?
**A. Correct.**
Q. How is commissions calculated for those things or is that something different?
**A. It's entirely different, right?**
**So every -- every product that you have on a pricing sheet has its own conversation with the customer on what that will look like. Some things bear commissions, some do not. Calculations therein change regularly.**
**Ultimately, Ms. Clear is going to be the one with the most knowledge of that because she's dealing with the group that does that on a monthly basis.**
Q. And so what's the role of the operations department after the go-live date?
**A. Sustainment of what's there on the sites.**
Q. And so describe what you mean by sustainment?
**A. Make sure it keeps working, right?**

**So we install infrastructure and we install a user base of consumer devices, whether that be tablets or phones or it be honest infrastructure, trenching to go do cabling, to do fiber work, to do WAP installations, move conduit throughout facilities.**

**All these have to continue working. They're in hard environments; oftentimes environmentally hard environments. Also at times, people break things, right? They're in tough, challenging environments. We have to make sure that things keep working. That means keeping the infrastructure op -- up and operational.**

**It also means making sure that we keep devices regularly updated, ensuring an inventory managed throughout the process.**

Q. So if something is not working with respect to wireless access, that's part of operations to handle the servicing of that equipment?

**A. That's correct.**

Q. And then sounds like you're also talking about there's a servicing or updating, upgrading function to the tablets themselves?

**A. Correct. Keeping them operational.**

Q. Anything other than those two general components that we discussed for operations?

**A. Those are the right categories. Those are**



**pretty broad categories.**

Q. All right. If you'll turn to page 21 of the contract, there's a section about implementation under C.3.3.1.

Are you there?

**A. I am.**

Q. It references an implementation plan.

Is that what you were talking about that would be done after the execution of the contract?

**A. Correct.**

Q. And have you seen this implementation plan?

**A. On a regular update, this is one in the same with the project conversations that we talked about, right?**

**So that plan is a living, breathing thing that exists throughout the life of the implementation and ongoing work there.**

Q. And you've reviewed that in your role as COO?

**A. Correct.**

Q. Were you involved in, you personally --

**A. Uh-huh.**

Q. -- updating the implementation plan from the time that you became COO to the time that the go-live happened?

**A. Me personally, no.**



Q. Whose role would that be?

**A. Greg Saxon.**

Q. Is the operations team also the one that is involved in obtaining approval from the TDCJ regarding final system?

MR. IRROBALI: Object to form.

**A. Say more on -- on what you're looking for? What -- what final system?**

Q. (BY MR. ALIBHAI) So the -- when you've completed the project at a particular site --

**A. Uh-huh.**

Q. -- it has to be approved by the department, correct?

**A. Uh-huh.**

Q. Yes?

**A. Yes. It was an acceptance process --**

MR. IRROBALI: Make sure you give verbal answers --

THE WITNESS: Yes, sorry.

MR. IRROBALI: -- for the court reporter.

THE WITNESS: Yes.

Q. (BY MR. ALIBHAI) And so is the operations department the one that works with the agency to make sure that the system has been approved?

**A. Ultimately, yes. It's -- it's part operations**



**and part ongoing account management to go do that and work on logistics of getting the right people to do it, but yes.**

Q. If you turn to page 24 of the contract, the section entitled, Testing and Acceptance, it's under C.3.3.4.

**A. Yes.**

Q. At the last sentence of the first paragraph, it says, The department shall provide final approval in writing prior to go-live operations.

Do you see that?

**A. I do.**

Q. Is that something that the operations department is involved in is getting that final approval?

**A. They're -- it's something they're involved in for sure.**

Q. And so for each site, prior to going live, there's a process that Securus went through to obtain final approval from the department?

**A. Correct.**

Q. On page 36 of the contract, Section G4 references annual financial disclosure reports.

MR. IRROBALI: Sorry, what page, Jamil?

MR. ALIBHAI: 36.

37

MR. IRROBALI: Thank you, kindly.
Q. (BY MR. ALIBHAI) Is that something done by the accounting department or is that still in the operations department?
**A. Accounting department.**
Q. If you turn to page 44, Section I is entitled, Contract Clauses, and I3 has a section called, Defaults and Termination.
Are you aware of any events of default that were noticed by the TDCJ to Securus?
**A. No, we have not received any notice of default from TDCJ.**
Q. And so with respect to all of the different subcontractors that were performing services for Securus with respect to the TDCJ project, are there project plans or whatever the name of the document is that tracks percentage completion, date of completion, cost of completion?
**A. There should be. There increasingly are now. Where we've had gaps with vendors in the past that were unable to provide the information, obviously those are shortcomings.**
Q. And I'm talking about a Securus document. Did Securus tabulate and aggregate all that information?
**A. We do where the information's available.**

38

Q. And so from November 2022 to May 2023, was that your department doing that?
**A. Where available, yes.**
Q. And -- and what type of document would contain that information?
**A. Regular updates with the customer will contain status on their projects. Information coming into us from vendors typically contain the status on their own sites that they were responsible for.**
Q. And what I was looking for is: Is there some type of aggregation of that data that came from all the different subcontractors?
**A. There is high-level aggregation of the timing, general financial outlay that we believe is accurate at the time and what that means for timing of delivery and go-live for these sites that are updated regularly between operations group and finance group, account management groups. Those again, though, are reliant on information coming in to be able to do that.**
Q. What type of document would you look to to find that information?
**A. Say -- say more on what you're looking for.**
Q. The -- you said that accounting and operations work together --
**A. Uh-huh.**

39

Q. -- to create that information?
**A. Uh-huh.**
Q. Yes?
**A. Correct.**
Q. What type of document would have that data?
**A. A monthly review document often between those groups or between executive groups as Matt would give updates. That continued through, right? So there are plenty of documents that have, here's the overall high-level outline of what we see happening on this major installation activity. Financial pieces thereof we would have to get from our accounting group to be able to reconcile. Where that's not available, you'll find gaps on what that looked like on a site-by-site basis.**
Q. Which department is responsible for monitoring and reporting CAPEX spent? Is that financial or is that operations?
**A. Reporting is all through our financial group.**
Q. All right. Tracking is through operations?
MR. IRROBALI: Object to form.
**A. Groups anywhere across the company that are spending money are responsible for their spend of money. Our financial department is responsible for controls around that and reporting on what's happening.**

40

Q. (BY MR. ALIBHAI) So a project to install tablets for TDCJ would fall under operations?
**A. Correct.**
Q. And so operations has to report that CAPEX spent?
**A. Correct.**
Q. And we'll look at some documents a little bit later, but was Securus also tracking spend in relation to a budget that had been performed?
MR. IRROBALI: Object to form.
**A. It's one in the same question as I understand it. Or if not the case, clarify.**
Q. (BY MR. ALIBHAI) Sure. So even before your involvement as COO --
**A. Uh-huh.**
Q. -- there was a budget for the TDCJ project, correct?
**A. Correct.**
Q. And then the budget was updated over time, correct?
**A. If needed, anything's updated over time.**
Q. And is it operations department that tracks the spending in relation to that budgeted amount?
**A. Tracks and is responsible for it. They obviously have to partner with other groups to get the**

73

A. He's now my direct report, so I report directly to Kevin.
Q. Who's the president?
A. Correct.
Q. And you probably told me this morning, but when did that change happen?
A. November or December last year, end of last year. I forget the exact date that that would have happened, but end of last year.
Q. And prior to that, prior to Mr. Elder becoming --
A. Uh-huh.
Q. -- president, you reported to Mr. Abel?
A. Correct.
Q. All right.
So if you'll turn with me into the deck itself, you'll notice that parts of it have been redacted or blacked out. That's how it was given to me. But I want to talk to you about the parts that are not?
So the first page, under financial review, has that Bates number on the bottom that ends in 216.
A. Okay.
Q. And this was the Financial Summary of the TDCJ project?
A. That looks to be true.

74

Q. If you turn to the Bates number ending in 223, the title of the slide is, Revenue and Cost Remediation.
A. Okay.
Q. Did you and Mr. Yeo prepare this part of it?
A. We would have collaborated in some way there, yes.
Q. And is revenue and cost remediation what we were talking about in that long deck earlier about the gap in the revenue?
A. That one was on revenue, right.
And so Alex's -- Alex Yeo's focus has always been more revenue driven, so whether that's product or the go-to-market teams that he eventually transitioned from Russell, he would have had a very, very strong revenue focus there.
Anything that was on the cost side would have been collaboration with other teams where relevant.
Q. And if you'll turn to the first page in that section that is not redacted, it ends in 226.
A. Yep.
Q. What does this chart show?
A. This chart would have shown a number of initiatives, one of those here that's not redacted being the TDCJ installation and eMessaging product that exists in TDCJ or that was intended to exist, showing a

75

December of '22 completion target, showing '22 end-year impact to EBITDA and analyzed EBITDA.
It's hard to say without further review, but I would interpret this to mean that, in the calendar year, we're expecting that on the current installation schedule that that project will yield $2.9 million with an EBITDA impact.
At a full year run rate, meaning the following year, it would do 34.8 when you've got an entire 12 months to achieve.
Q. Both forecasted numbers, correct?
A. Yes, correct.
Q. And so the 2022 end-year impact is based upon what is expected for the sites that go live in 2022?
A. At this point in time, yes.
Q. And then 2023, building on whatever's happened in 2022, plus what happened in 2023?
A. Correct.
Q. I think we're still in the same section based upon the redactions. It's page 21 ending in Bates label 232.
A. Okay.
Q. Is this a -- and I'm looking at the top half. That's about the TDCJ project, correct?
A. Correct.

76

Q. What is ARPU referring to?
A. Average revenue per unit is the acronym.
Q. And so the unit is a tablet?
A. In this case, that looks right, right?
The chart's labeled, Tablets By Week there and that's what you see on the left axis, and that aligns with the previous chart we looked at in the other reference.
Q. And it's referencing strong performance on installed devices and showing a conservative deployment plan to get TDCJ fully installed by end of year?
MR. IRROBALI: Object to form.
A. That's what it says, yes.
Q. (BY MR. ALIBHAI) And so, as you read this chart, is the left side before the dotted line active tablets, meaning tablets that are turned on?
A. Yes, that's how I interpret the chart.
Q. Was this part created by you or Mr. Yeo?
A. I don't recall who would have created this. We certainly would have discussed it. Actual creation of it, I don't know offhand.
Q. And so the green bars, what do they reflect?
A. That looks to reflect revenue performance of the devices. So again, labeling concerns here notwithstanding, I would interpret that to be

89

March 2023/April 2023 timeframe, did you work with Mr. Brennan on the TDCJ project?
**A. Yes. There were questions that were asked there, right? There was regular question of, hey, what's going on certainly as we started to unpack some things that were troubling about how SHI was handling the matter. He was involved in starting to try to reconcile volumes of information that was there. But he ultimately interacted much more with -- with somebody like a Hezi or with a Greg Saxon than I would have directly.**
Q. And then Mr. Saxon and Mr. Ben-Moshe reported to you?
**A. Correct. Hezi to Greg, Greg to me.**
Q. What was Mr. Ben-Moshe's role?
**A. He was doing -- I believe at that time he was doing broad field installation project management work, so in a broad capacity.**
Q. He was the director of procurement; is that correct?
**A. So his title was at that time --**
Q. Yeah, I'm looking at Exhibit 2.
**A. That's where I was headed back to.**
**Yes, shows him as director of procurement.**
Q. And was that his role when you became COO?

90

**A. No. I think his role was broader than that at the time. He had procurement, but he was doing, again, like I said, PMO work, project management group work.**
Q. And so he reported to Mr. Saxon?
**A. Correct.**
Q. And was that Mr. Saxon's title at the time when you became COO? It's listed as vice president of procurement and planning.
**A. I'll have to go off what this says. I -- I can certainly go look for something that was post-dated a few months later than this, but again, his -- his capacity was broader in procurement and planning. His -- his title, I have to trust what's on the document in front of us.**
Q. Did you create a new org chart after you started as COO?
**A. Yes.**
Q. Because some of the roles changed you were telling me?
**A. Uh-huh. And -- and they'll continue to, right? I mean, any organization's a living, breathing entity.**
Q. And do you recall when Mr. Saxon left?
**A. I believe that was, again, fall of '23, so the September timeframe.**

91

Q. And you mentioned that you worked with Mr. Saxon on issues regarding SHI. Was that related to invoicing?
**A. It was related to everything to do with the project, right? So all things around where they were working on TDCJ would have ultimately funneled up to Greg Saxon. He would have been my first point of contact and reference for -- for any questions.**
(Plaintiff's Exhibit No. 11 marked)
MR. IRROBALI: Thank you.
MR. ALIBHAI: I'm handing you what's been marked as Exhibit 11.
Q. (BY MR. ALIBHAI) Is Exhibit 11 an e-mail from Mr. Abel to a group of what you called, I believe, his C-suite and Platinum Equity people?
**A. That looks correct.**
Q. And this is the October 27th version of the OpCo deck, correct?
**A. Correct.**
Q. And I think I asked you, but if I -- so if I did, I apologize.
This is something that happens every month?
**A. Yes, that's right.**
Q. And to review all the projects that operations

92

is working on?
**A. No. That's not the intent of OpCo, right? OpCo happens meaningful every month. Sometimes there are scheduling issues on Platinum's side where it doesn't occur, but typically, it's a monthly cadence that's out there, and they do that across any company that they own as a means of this is a regular checkpoint to understand what's going on in the business, right?**
**It's mostly informative. Sometimes that will have -- depending on the company and depending on what's going on, it'll have different intents, different focus of what's happening here. Certainly with something that's meaningful and material, you'd want to be talking about it on a regular basis. That will often find its way into OpCo.**
**If it's being discussed in other forms and people are apprised and aware of it, it won't always be something that people are interested in because they're already aware. And again, informing them is really the point, so it just depends on what those conversations look like at the time.**
Q. And so let me break that down a bit.
Generally happens monthly?
**A. Yes.**
Q. And is an update on the operations of Aventiv?

**A. Uh-huh.**
Q. -- so I'm trying to make sense of a couple of messages that are being sent.
**A. Absolutely.**
Q. You specifically said in Exhibit 26, Reconciliation work underway. Looks on course to be later than noon.
So I assume that you're referencing something that you know about?
MR. IRROBALI: Object to form.
**A. I'm -- I'm referencing that I've been asking for a reconciliation for the better part of a month because of the problems going on with the invoicing concerns regarding SHI, right?**
**At this point, if I'm asking for it and saying it looks like it's going to be later than noon, I assume that I'd given somebody a clear deadline on I need to see a certain version of something by then. I don't recall exactly what that was.**
Q. (BY MR. ALIBHAI) Okay. And then when he responds to you he said --
**A. Yep.**
Q. -- "reconciliation just about done."
**A. Yep.**
Q. I expect that, as the COO, if you're talking



to one of your direct reports and you're asking for something and they're telling you it's done, that they would send it to you?
**A. That's true. What I don't recall is whether that was actually done and if it was complete and thorough and answered the question.**
Q. And -- and regardless of the complete and thorough --
**A. Sure.**
Q. -- or whether it was still a work in progress I'm trying to understand --
**A. I understand.**
Q. -- how would I find and see what was sent to you around noon eastern on January 17th?
**A. It will be in e-mail hold as with everything else. So if a document was sent, it will absolutely be in there and then we can review.**
MR. IRROBALI: Make sure you let Jamil get his question all the way in the record and then answer, that way the court reporter's not trying to transcribe two people at once.
THE WITNESS: Sure. Yes. Thank you.
(Plaintiff's Exhibit No. 28 marked)
MR. ALIBHAI: So let me hand you what's been marked as Exhibit 28.



THE WITNESS: Thank you, sir.
Q. (BY MR. ALIBHAI) This is a series of e-mails, and it starts with Mr. Saxon e-mailing Mr. Ninan and Ms. Clear, and you're copied on it, requesting an analysis of SHI billings on a per-invoice level, correct?
**A. Correct.**
Q. Is this the reconciliation that you're requesting?
**A. This is certainly the subject, right, so it's looking for the same thing, yes.**
Q. And then Ms. Clear responds that she can provide information on invoices that are in Great Plains and in DocLink, right?
**A. Correct.**
Q. And then Mr. Saxon says he's looking for a spreadsheet that we can run reporting on by invoice, correct?
**A. Yes. Some flat tabular view that he can look at and understand where things are going, when they came in, what they're for, et cetera.**
Q. And then she forwards an Excel file on January 17th at 3:47 p.m.
**A. Sorry, January 17th?**
Q. The first one in the chain is a forward.



**A. Everything I see is on January 13 -- oh, sorry. I see what you're saying. Yes.**
Q. Is this the reconciliation that you're thinking of or is there something different?
**A. It is the subject of it for sure. I'm not sure what Daniella sent to Philip Ninan with the file here.**
MR. ALIBHAI: All right. Let's take a break there.
VIDEOGRAPHER: Off the record at 1:59 p.m.
(Break taken)
VIDEOGRAPHER: The time is 2:15 p.m. We're back on the record.
(Plaintiff's Exhibit No. 29 marked)
THE WITNESS: Thank you.
Q. (BY MR. ALIBHAI) Mr. Dougherty, I'm handing you what's been marked as Exhibit 29 to your deposition.
Is this the letter of termination that you electronically signed on behalf of Securus?
**A. It is.**
Q. Who prepared this letter?
**A. This was prepared by counsel. I do not recall what that split was between internal, external counsel.**
Q. And when you're referring to external counsel,

you're referring to Mr. Tillotson's firm?
**A. I believe so, yes.**
Q. When did you first speak to Mr. Tillotson's firm about -- I'm asking for a date; no -- I'm not asking you to tell me any conversations.
**A. Uh-huh. Sure.**
Q. I'm just asking for when did you first speak with outside counsel regarding termination of the SHI statements of work?
**A. First would have probably been late January because it would have been in conjunction with a "if we need to do that," right? So it wouldn't have yet been a defined "I need you to go prepare something". It would have been asking some questions and getting smart about the situation.**
Q. All right. So you said you didn't know the split, but do you know that outside counsel helped prepare what is marked as Exhibit 29?
**A. I believe that's correct.**
Q. And in-house counsel worked with you as well?
**A. Yes.**
Q. Who was that?
**A. Josh, Josh Martin.**
Q. The person who's been sitting in your deposition?



**A. Correct.**
Q. Did you have any role in drafting this?
**A. No.**
Q. You just authorized the signature?
**A. Authorize it, discuss what's going on, discuss whether we have a need, discuss risks, do all that. But I'm not -- I'm not drafting that letter.**
Q. And did you have any communications with people inside Securus regarding terminating the SHI statements of work?
**A. Certainly, right? So I would have had conversations with Mr. Saxon throughout the process to understand what it looks like and what, again, alternative pathways would have looked like. I would have had conversations, again, with counsel to -- to better understand risk and where we're going.**
Q. In the letter, there's a reference to Section I, termination of the TDCJ contract with Securus.
**A. There is.**
Q. Prior to sending the February 6th letter, did you or anyone at Securus send an event of default letter to SHI?
**A. I do not recall. Sorry. I'm just not sure.**
Q. Do you remember doing it?
**A. I don't remember doing it.**



Q. And so the part you're not sure about is whether somebody else did it?
**A. Correct. If there's a procedural process or step there somewhere, that may have happened. I -- I'm just not sure.**
Q. And in conjunction with sending the letter of termination, was there a decision made not to pay any outstanding invoices?
**A. That was part of continuing decision around we need to continue the posture that we're already in, right? So we don't yet have that reconciled, we don't have that finalized, we're not going to start paying that.**
(Plaintiff's Exhibit No. 30 marked)
Q. (BY MR. ALIBHAI) I'm handing you what's been marked as Exhibit 30.
Before the break, you were telling me that you had seen change requests in conjunction with preparing for your deposition, correct --
**A. Correct.**
Q. -- that were different than other ones?
**A. Correct.**
Q. Is this one of the ones you're referring to?
**A. Yes.**
Q. And this one is signed by Mr. Thompson?



**A. It is.**
(Plaintiff's Exhibit No. 31 marked)
Q. (BY MR. ALIBHAI) And Exhibit 31 is another change request. This one's also signed by Mr. Thompson, correct?
**A. Correct.**
Q. And so you didn't see these two exhibits, 30 and 31, prior to the lawsuit between SHI and Securus, correct?
**A. That's right.**
Q. And you reviewed them this year in conjunction with preparing for your deposition?
**A. That's right.**
Q. And so does this refresh your memory that there were two change requests signed by Mr. Thompson?
**A. Yes.**
Q. And the ones signed by Mr. Brennan were attached to the e-mail that Mr. Fikes sent to Mr. Saxon, correct?
**A. Yes.**
Q. And --
**A. Where's that? 25.**
Q. Which exhibit are you looking at?
**A. 25. I was just looking for it.**
Q. And Exhibit 25, same questions. You did

Q. But you were a person involved in the SHI payment and termination, correct?
**A. Correct.**
Q. As you look at the 14 paragraphs, is there anyone else that's missing from this list?
MR. IRROBALI: Object to form.
**A. No, I think these are the operating principles that would have been around the project.**
(Plaintiff's Exhibit No. 38-39 marked)
MR. ALIBHAI: All right. I'm handing you two different exhibits. The first one is Exhibit 38.
MR. IRROBALI: Thank you.
MR. ALIBHAI: And the second one is Exhibit 39.
MR. IRROBALI: Thank you.
Q. (BY MR. ALIBHAI) Exhibit 38 is Securus's Responses to SHI's First Set of Interrogatories, correct?
**A. That's correct.**
Q. And Exhibit 39 is your Declaration, correct?
**A. Correct.**
Q. And so you're the person that has verified the answers in Exhibit 38 as true and correct?
**A. That's right.**
Q. And it relates to a number of different



topics, and we'll go through them individually, but what did you do to verify these interrogatories?
MR. IRROBALI: Object to form. To the extent that you can answer Counsel's question --
THE WITNESS: Uh-huh.
MR. IRROBALI: -- without getting into the substance of conversation with counsel, you're welcome to do so.
THE WITNESS: Yep.
**A. Similar as before, right? So reviewing pertinent material that had been produced in preparation for this matter and then conversations with appropriate legal counsel on interpretation and understanding of those.**
Q. (BY MR. ALIBHAI) And I don't mean to be repetitive, but I asked you about conversations that you had for preparing for your deposition.
Are there any conversations with individuals that you had for purposes of responding -- or sorry, for purposes of verifying these interrogatory answers?
**A. All the conversations that I had in preparation for the deposition or for the interrogatories were with legal counsel.**
Q. All right. So let's turn to Exhibit 38.



Interrogatory No. 1 asks for identification by invoices by invoice number that Securus disputes and the amount disputed for each invoice.
The answer directs us to a November 2023 expert witness report of Mr. Mordaunt, correct?
**A. Correct.**
Q. And is that the answer to that interrogatory?
MR. IRROBALI: Object to form.
**A. Look, the answer to the interrogatory is -- is -- without being pedantic, is the answer on the interrogatory.**
**It is that there is an expert witness report that was obtained because of the aforementioned troubles that we had doing some of that analysis on our own so that we could get to clarity and finality of an answer.**
**It also is that part of that answer is -- is in some ways unknowable before going through this litigation process because definition of the invoices that are a problem requires that additional information.**
Q. (BY MR. ALIBHAI) And if you look at page 7 of interrogatory responses, you'll see that they're dated December 12, 2023, correct?
**A. I do.**
Q. So with respect to your answer about the



litigation, these are obviously during the litigation, correct?
**A. Correct.**
Q. And so I just want to make sure that I didn't misunderstand something.
**A. Uh-huh.**
Q. The information that Securus has regarding the answer to Interrogatory No. 1 is the answer here about the expert report, correct?
**A. That's correct. And that the part of the disagreement with the question is that the actual invoices that are in dispute is less relevant than the sum of the invoices that should have been contained by NTE caps, right?**
**So whether Invoice 1 through 100 is in dispute or not ties less to whether or not that invoice is accurate or ties to work and more of a collection of the body of invoicing that's being done needs to be able to tie back to those documents.**
Q. And -- and that's what I'm trying to understand.
**A. Yep.**
Q. If there's a specific invoice regarding a specific issue that has been determined by Securus to be in dispute other than the collective amounts?

225

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

)
SHI INTERNATIONAL CORP., )
)
PLAINTIFF, )
)
VS. ) CIVIL ACTION
)
) NO.: 4:23-CV-00200-SDJ
SECURUS TECHNOLOGIES, )
LLC, )
)
DEFENDANT. )

---------------------------------------------------
REPORTER'S CERTIFICATION
DEPOSITION OF ALEX DOUGHERTY
MARCH 8, 2024
---------------------------------------------------

I, Kelly Bryant, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the foregoing deposition of ALEX DOUGHERTY, the witness, hereinbefore named was, at the time named, taken by me in stenograph on MARCH 8, 2024 having been first duly cautioned and sworn to tell the truth, the whole truth, and nothing but the truth, and the same were thereafter reduced to typewriting by me or under my direction.

226

I further certify that pursuant to FRCP Rule 30(f)(1) that the signature of the deponent:

________ was requested by the deponent or a party before the completion of the deposition and is to be returned within 30 days from date of receipt of the transcript. If returned, the attached Changes and Signature Page contains any changes and the reasons Therefor;

__XXX__ was not requested by the deponent or a party before the completion of the deposition.

I further certify that I am neither counsel for, related to, nor employed by any of the parties in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

GIVEN UNDER my hand of office on March 24, 2024.

Kelly Bryant
_________________________________
KELLY BRYANT
Texas CSR No. 5772
Expiration Date: 07/31/25