# EXHIBIT 6

Planet Depos
We Make It Happen™

# Transcript of Hezi Ben Moshe, Designated Representative and Individually

**Date:** March 19, 2024
**Case:** SHI International Corp. -v- Securus Technologies, LLC

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

SHI INTERNATIONAL CORP., )
Plaintiff, )
VS ) Civil Action No.
) 4:23-CV-200-SDJ
SECURUS TECHNOLOGIES, LLC, )
Defendant. )

*********************************************

VIDEOTAPED DEPOSITION OF
HEZI BEN MOSHE
March 19, 2024

**********************************************

Job No. 529079
Pages 1 - 169
Stenographically Reported by:
Susan S. Klinger, RMR-CRR, CSR



March 19, 2024
9:00 a.m.

VIDEOTAPED DEPOSITION OF HEZI BEN MOSHE, produced as a witness at the instance of the Defendant, and duly sworn, was taken in the above-styled and numbered cause on the 19th of March, 2024, from 9:00 to 1:19, before Susan S. Klinger, RMR-CRR, CSR in and for the States of Texas and California, reported by stenographic method, at Tillotson Johnson & Patton, 1201 Main Street, Dallas, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.



A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:
Ross Parker, Esquire
Madison Craig, Esquire
MUNSCH HARDT KOPF & HARR, P.C.
500 North Akard, Suite 4000
Dallas, Texas 75201
214.855.7511

ON BEHALF OF THE DEFENDANT:
J. Austen Irrobali, Esquire
TILLOTSON, JOHNSON & PATTON
1201 Main Street, Suite 1300
Dallas, Texas 75202
214.382.3041

Also Present:
William Bird, Esquire (Via Zoom)
Brian Krieger, videographer



I N D E X


| WITNESS | PAGE |
|---|---|
| HEZI BEN MOSHE | |
| EXAMINATION BY MR. PARKER | 7 |


E X H I B I T S


| No. | Description | |
|---|---|---|
| Exhibit 1 | Deposition notice | 8 |
| Exhibit 2 | 30(b)(6) Deposition notice | 8 |
| Exhibit 3 | Organizational chart, SECURUS216244 | 24 |
| Exhibit 4 | Statement of Work, SHI-009372 | 27 |
| Exhibit 5 | Email, SECURUS087047 | 53 |
| Exhibit 6 | Email, SECURUS134717 | 60 |
| Exhibit 7 | Email, SECURUS024654 | 65 |
| Exhibit 8 | Email, SECURUS168104 | 69 |
| Exhibit 9 | Email, SHI-055263 | 76 |
| Exhibit 10 | Email, SECURUS205226 | 77 |
| Exhibit 11 | Email, SECURUS062926 | 79 |
| Exhibit 12 | Email, SHI-068396 | 85 |
| Exhibit 13 | Email, SHI-295758 | 89 |
| Exhibit 14 | PowerPoint, SHI-295761 | 89 |
| Exhibit 15 | Email, SHI-117142 | 104 |
| Exhibit 16 | Email, SHI-117697 | 106 |

53

(Exhibit 5 marked.)
Q This is an email from Jerimy Thompson to Cheryl Beal copying Kevin Brown on January 16th, 2022. Do you see that?
**A I do.**
Q And who was Jerimy at this time?
**A He was part of the install for TDCJ. He managed, I think he was the regional manager for TDCJ and he had a lot of technicians and install folks reporting to him. And he might have reported to Kevin Brown, but I'm not sure.**
Q And to whom did Kevin Brown report?
**A Someone in the field organization, maybe Johnny Hicks, but that is a guess.**
Q And how about Cheryl Beal, who is Cheryl Beal?
**A Cheryl Beal is one of the project managers we had for TDCJ and she reported to me.**
Q The email says, Here are rough estimates. Anything past June is highlighted in yellow. This is super aggressive. This takes into account SHI being able to do Regions 2 and 5 concurrently with our obligations in Region 1.
Do you see that?
**A I do.**

54

Q And then I'm going to skip down. Towards the end it says, To meet these dates, it will take lots of escorts from the TDCJ side along with a contractor ramping up their staff accordingly. There are tons of moving parts that need to align to make this happen.
Did I read that correctly?
**A You read it correctly, yeah.**
Q I know you're not on this email, but do you understand what was occurring in January of 2022 with regards to the aggressive timeline for the TDCJ project?
MR. IRROBALI: Object to form.
**A From reading this email, it looks to me like we are trying to expedite the install for TDCJ.**
Q I'm sorry, say it one more time?
**A From reading this email, it looks to me like we are trying to expedite the time to install TDCJ based on what I'm reading there -- here.**
Q And is that because Securus wanted an aggressive timeline?
MR. IRROBALI: Object to form.
**A I can't tell from this email.**
Q What is your knowledge in January of 2022

55

about the anticipated timeline for completion of the TDCJ project?
MR. IRROBALI: Object to form.
**A I believe we wanted to get it done for the summer of 2022 at some point.**
Q When you say "summer," do you mean June, July, August is there --
**A August/September, yeah.**
Q And do you recall a discussion in January where that timeline was going to be accelerated?
**A I do not.**
Q Do you recall a concern within Securus that the timeline was unreasonable for completion of the project?
MR. IRROBALI: Object to form.
**A There were many discussion around the schedule. So that what you just mentioned might have been discussed, but I don't remember.**
Q Do you know why Mr. Thompson thought it was super aggressive?
**A Mr. Thompson, Kevin Brown and myself have a lot of experience in working in prison environment. And I'm assuming he is saying it is super aggressive, because like I explained earlier before our break, there was a lot of moving parts**

56

**in prison. Escort, it is enough that the facility all of a sudden goes to a lockdown and you are losing two weeks.**
**So in order for -- based again reading from this email and from my experience, in order to meet all of that you need all the stars to align. It is not easy, possible but not easy.**
Q Do you recall any conversation that you had where you were especially concerned that all these stars were not going to align and you couldn't complete in the timeline anticipated?
**A I remember voicing my concern that the September or let's call it summer of 2022 is not a reasonable timeframe to finish the project, yes.**
Q And when did you start voicing those concerns?
**A I don't remember the exact date, but before, let's say, let's call it Q1 probably of 2022.**
Q So around January of 2022 you had the same concerns Mr. Thompson had, correct?
MR. IRROBALI: Object to form.
**A I think he's more specific. I was more overall as the project in order to get this done, yeah. You need to understand that it is not only**

85

materials which is causing sites to slip, right?
**A She is saying that, yes.**
Q And do you recall talking to Ms. Beal about any of those issues on or about July 20, 2022?
**A I do not remember. I'm copied here, but I don't remember the conversation around that.**
Q Let's look at Exhibit Number 12.
(Exhibit 12 marked.)
MR. IRROBALI: Did you say 12?
MR. PARKER: Yes, sir.
MR. IRROBALI: Thank you.
Q It is another email from Ms. Beal. This is July of -- sorry, July 27 of 2022 dated, sorry, the time is 3:13 to Ms. Angel, the other Ms. Angel and Lisa Gauger.
Do you see that?
**A I do.**
Q And the title is Double Shifts. Do you recall in summertime of 2022 where there was a request to go to a double shift staffing for the project?
**A Actually I remember that very well.**
Q Why?
**A It is when is my summer vacation, fair enough.**

86

Q Well, we as lawyers know how that feels.
**A Okay.**
Q The email from Cheryl says, Good afternoon Alejandra and Gabriela. I want to let you know that TDCJ has given us the green light for us to move forward with double shifts at the sites below. Estes is still pending final approval, but all others are a go.
Why -- let me ask you this question.
Did Securus request from TDCJ that they give the green light to move forward to double shifts?
**A Yes. So what happened is, as you can see we're in the summer as my testimony earlier, we planned to finish around the summer timeframe. Come summer we still see that we are not there yet. And that gave the idea of let's try to do double shift in order to speed the process.**
**And we -- if we talk about what we discussed earlier, escorts availability, we needed to make sure that the facilities can support that. So we asked TDCJ is that okay to work double shifts. Common thing by the way in this industry, you need to understand that there are really minimum hours that you can work. The morning shift starts sometimes 6:00, end at 2:00, so you can do that. So 6:00 to 2:00 it is not really a time we try to work.**

87

So if you come at 8:00, we want to make sure the afternoon have escorts available. Afternoon sometime you have less people in prison. Some prisons also ask us to work at night. Yeah, in this specific case, we are asking for double shifts.
Q And so after this point in time, Wednesday, July 27th, 2022, did you proceed to work double shifts on the project?
**A On this site it looks like, yes. The DOC approved that and SHI, which is the vendor on this site will work double shifts.**
Q And so just so I'm clear, the way I read double shifts is if you had two techs on a project working from 8:00 to 4:00, now you are going to have, those two work from 8:00 to 4:00 and a new set of two coming in from 4:00 p.m. to 2:00 a.m. or how does that work?
MR. IRROBALI: Object to form.
**A You have many, many different options. So I cannot speak on all of them. The one that you just described can be the case. More common would be you have two people working and they will stay there and maybe the escorts will change for the afternoon.**

88

Q So those two people just work longer hours?
**A Correct, and that is more common. And the main reason is in the prison when you go in and out it takes about 30 to 45 minutes. Let's not waste the time on that. Let's make sure that they are staying there and working.**
Q So what you are describing is just the process for checking into the prison and checking out of the prison because of the environment?
**A Yes.**
Q And if you are having two people work double shifts, more hours, there is a corresponding increase of the cost for doing that; is that correct?
**A It will cost more money to do so, yes.**
MR. PARKER: I'm moving on to a new topic. Do you guys want to take a break or are you guys good?
MR. IRROBALI: Actually if we could just take 5 minutes so Mr. Ben Moshe can order his

101

A Yes.
Q Causes lockdowns of the prisons; correct?
A Yes.
Q And that causes a delay; right?
MR. IRROBALI: Object to form.
A COVID can cause some delay, yes.
Q Next one says, Inmate counts, fights, lockdowns, delay the techs.
Again, the cause of the delay would be if there is a fight between inmates, right, and the prison gets locked down?
A Cause prison -- yes, if some inmates escape from prison can cause a lockdown.
Q And if there is a lockdown, the techs can't go do their job, right?
A Typically no one is allowed to go in prison, yeah, when there is a lockdown.
Q And then the last two are also supply chain issues, like the one we looked at before. The same issue, right, the one that says cable shortages naturally may impact the schedule.
Do you see that?
A I do.
Q Do you recall a issue with shortage of cable in June of 2022?

102

A Not recall the specific one, but like I said earlier, we had -- there was supply chain issues all across the board.
Q That would include fiber shortages, right, the last item?
A Yes.
Q So these were all examples of SHI raising its hand, to use your word earlier, telling Securus, hey, all these problems exist with the timeline; correct?
MR. IRROBALI: Object to form.
A This is one form for them to make concerns about issues that they are having.
Q Correct. And so they were telling you that in June of 2022, correct?
A Yes, they are telling us that.
Q Let's go to Exhibit 15.
A Before we go to that, can I add something on that specific -- for the risk issues?
Q Sure.
A This is common to prison environment.
Q I'm sorry, say it one more time?
A This is common for prison environment.
Q Okay.
A If I would just exclude here the COVID

103

situation which is, you know, all across the board, any other vendor would probably bring it to our attention. But the impact is in reality for this specific project wasn't that -- with other vendor, wasn't as bad as the sites SHI worked on.
So if I look at Broadband or ShawnTech or 4K, they had challenges getting folks cleared as well. They had challenges getting escorts availability. However, when I look at the timeframe of how long did it take them to finish their sites, there wasn't such a significant delay.
Where with SHI, they brought the concerns, but the delay was significant.
Q You mentioned 4K, Broadband --
A And ShawnTech.
Q -- and ShawnTech.
A Yes.
Q The scope of the projects that those vendors were doing for Securus, similar scope to SHI?
MR. IRROBALI: Object to form.
A They did install in TDCJ and other facilities, yes, other states I should say.
Q But on as large of a scale as SHI?

104

A 4K for sure. He at the same time was working in Florida, in Georgia, and in TDCJ, so he had people running in many, many places.
Q And how about ShawnTech?
A It they did -- there were ShawnTech only TDCJ, Broadband probably were involved also in Florida.
Q Similar scope to as far as similar size of the project for SHI?
A Yes, yes.
Q Let's look at Exhibit 15, please.
(Exhibit 15 marked.)
Q This is a -- it says, subject Placeholder.
Do you see that?
A Yeah.
Q On Monday, August 1st to Tuesday, August 2nd, it is entitled Securus/Aventiv Technologies Midyear Review and the location is at SHI International Headquarters, 290 Davidson Avenue, Somerset, New Jersey.
Do you see that?
A I do.
Q And the attendees are Kristin Cooper, Klark Sweitzer, Greg Saxon, Ryan Edwards, you, correct?

105

**A Uh-huh.**
Q Keith Tessin, Chris LaBleu, Sean McAllister, Henry Egan and David Brennan?
Do you recall a meeting on August 1st, 2022 at SHI's headquarters in New Jersey?
**A I remember we went to New Jersey in August. It probably was 8/1, but yeah, I remember going there, yeah.**
Q Did you attend that meeting personally?
**A I was there.**
Q Were all the people listed as attendees also there personally?
**A I believe so. I'm not sure about Ryan, but I believe -- I remember the rest of the team, yes.**
Q So as you sit here today, you recall that Kristin and Klark and Greg and you and Keith and Chris and Sean and Henry and David Brennan were all there personally; is that correct?
**A Yes.**
Q But you just don't recall Ryan Edwards?
**A I don't remember if he was there.**
Q Who from the SHI side attended that meeting?
**A Well, I definitely remember Henry, I**

106

**definitely remember Klark, Kristin. I do remember also -- if I'm not mistaken they added maybe from, you know, a Zoom call with a few folks from --**
Q From SHI?
**A -- SHI, if I'm not mistaken. Some of their PM team was also on-site with us.**
Q Tell you what. Let me hand you the next exhibit, because it is not a memory game. I'm not trying to -- I'm not trying to be difficult with you.
**A I understand.**
Q Here is Exhibit 16.
(Exhibit 16 marked.)
Q So this is an email also dated August 1st from Lisa to you. Do you see, Mr. Ben Moshe, you are the first name on this "to" line?
**A Yeah.**
Q And a bunch of other people. You will see that CC is Alejandra Angel, Gabriela Angel, Victor Carrion, Keith Tessin, Kristin Cooper and Henry Egan. Were those people all present at the meeting in New Jersey on August 1st?
**A I believe so, yes. I remember Keith, Henry for sure, Victor for sure. Regarding Gabriela and Alejandra, I'm not sure if both were**

107

**there or maybe one. For some reason I remember someone joining in Zoom. It might have been Lisa. To be honest, I don't remember if Lisa was there.**
Q What was the purpose of the meeting in New Jersey on August 1st?
**A To review where we stand and when it comes to our services, not necessarily for the TDCJ project, but in general where we are. SHI always made us feel like we are a very important customer for them and we definitely valued the relationship with SHI. We not only did install with them, we also had, you know, purchased a lot of hardware and software licenses from them. They're a big VAR in the industry, so we met there.**
Q And why did that meeting occur in-person in New Jersey as opposed to over a Zoom call like the meeting we just looked at in Exhibit 14?
MR. IRROBALI: Object to form.
**A Maybe some of our folks wanted to see their headquarters. We also used their third-party warehouse or their warehouse is a third-party to kind of store equipment. So people wanted to see that as well and it hasn't gotten there. Yeah, that is what I would say.**
Q Had you been to that facility before in

108

New Jersey?
**A I believe I was there before. I think that was in December of 2021 there and -- yeah.**
Q And the meeting on August 1st of 2022, was it just one day, was it multiple days, how did it work, tell me?
**A I think it was two days. Like, I think if I remember correctly we had a tour in the warehouse and then a meeting or a meeting, tour in the warehouse and then the day after more meetings.**
Q And how long did those meetings last?
**A A few hours.**
Q Did you eat breakfast, lunch and dinner with folks from SHI?
**A Yes, yes.**
Q All at the facility or did you go elsewhere?
**A For sure breakfast and lunch and dinner I'm not sure.**
Q Did you fly out that night back to where you are from or did you stay there overnight?
**A I stayed probably one day and I usually try to be very quick. So if I -- if I'm guessing, if the meeting was two days I arrived the night**

Q Is that what you mentioned?
What you are telling him on August 10th is yes, moving forward, the approval should come from you.
That is what you told Mr. Brennan on August 10th, correct?
**A Correct.**
Q Those are your words, sir, right?
**A These are my words, yes.**
MR. PARKER: Do you want to take a break, lunch here?
MR. IRROBALI: I saw your lunch come in, so if you are ready and now is a good time --
MR. PARKER: Are you eating lunch?
MR. IRROBALI: I am.
MR. PARKER: So let's go off the record.
VIDEOGRAPHER: Off the record at 11:54 a.m.
(Recess, 11:54 to 12:34 p.m.)
VIDEOGRAPHER: The time is 12:34 p.m. We are back on the record.
Q Mr. Ben Moshe, I just want to remind you you are still under oath. Do you understand that?
**A I do understand that.**
Q I will hand you Exhibit 24, please.



(Exhibit 24 marked.)
Q I've handed you what is the Region 6 cabling statement of work as Exhibit 24.
**A I see it.**
Q Is this one of the documents you reviewed in preparation for your deposition today?
**A I don't remember.**
Q But you have seen this document before, haven't you?
**A Absolutely.**
Q I want to point you to SHI-11529. It is the table of contents.
**A Yes.**
Q And you will see Section 2.1 says, In Scope.
Do you see that?
**A I do.**
Q And it lists seven units in Region 6.
Do you see those units?
**A Yes.**
Q And I particularly want to look at Hughes and Pack. Do you see how those are included in scope for Exhibit Number 24?
**A Yes.**
Q We talked about earlier a change to the scope of any SOW would be made by a change request, correct?



**A Yes.**
Q And that would include decreasing the scope of a project or increasing the scope of a project, right?
**A Yeah.**
Q I'm going to hand you Exhibit 25.
(Exhibit 25 marked.)
Q Which is a change request.
And you see this change request I'm looking at SHI-355651.
**A Yeah.**
Q It says project name TDCJ Region 6 Cabling.
Do you see that?
**A I do.**
Q So would you agree with me that this is a change request that changes the scope of Exhibit 24, the statement of work for Region 6 cabling?
MR. IRROBALI: Object to form.
**A Yeah, it is a change order for Region 6 cabling, yeah.**
Q For which Exhibit 24 is the statement of work, right?



**A Yes.**
Q Do you see the day of the change request is 10/21/2022? Do you see that on the top of the page of Exhibit 25?
**A Yes.**
Q And then we have a change request description. It says, As a result of the approved expansion of labor and scope to include both overtime of work outside of the standard maintenance window, SHI and Securus Technologies agree to modify the budget of the existing SOW to bill as actuals. This CR allows the project billing to exceed the not-to-exceed amount listed in Section 9.
Do you see that?
**A I see it.**
Q Did I read that correctly?
**A You read the words here, yes.**
Q The third paragraph under change request description says, SHI and Securus Technologies also agree to modify the existing SOW for the TDCJ Region 6 cabling project to remove Hughes and Pack from scope.
Do you see that?
**A I see it, yes.**

145

Q And then this change request is signed on the bottom by David Brennan.
Do you see that?
**A I see his signature, yes.**
Q And then it is dated 10/26/2022, correct?
**A Correct.**
Q And so if you recall we were looking at Exhibit 24 and that is the statement of work for Region 6 cabling, correct?
**A Uh-huh.**
Q And we see on page 11529 of Exhibit 24 in the table of contents that Hughes and Pack are included in scope for that SOW Exhibit 24, correct?
**A Yes. Yes.**
Q And then we look at Exhibit 25, we see the change request is removing Hughes and Pack from scope; is that correct?
**A Yes.**
Q And do you recall an occasion where, in fact, Hughes and Pack were removed from SHI and assigned to other vendors?
**A I do not.**
Q This change request is dated, like I said, 10/26/2022, right? Is that a yes?

146

**A Yes, sorry, yes.**
Q If you look back to Exhibit Number 19, which was dated August 11th, 2022, I will give you a moment to pull it back up.
**A Yes.**
Q So Exhibit 19 was dated August 11th, 2022, correct?
**A Uh-huh.**
Q And then we have the change request, which is October 26th, 2022 so about two months after that email; is that correct?
MR. IRROBALI: Object to form.
**A The timeframe seems correct, yes.**
Q Let's go take a look back at Exhibit 4 real quickly, please.
**A 4?**
Q 4.
**A All right.**
Q It is that SOW for Region 5 cabling that we looked at earlier today.
**A Let me find it.**
Q Take your time, sir.
**A I found it.**
Q So do you recall talking about that document earlier today, Exhibit 4?

147

**A Yes.**
Q I'm going to hand you what is marked Exhibit 26.
(Exhibit 26 marked.)
Q And 26 is a change request for Region 5 cabling. Do you see that?
**A Yes.**
Q And so this change request, Exhibit 26, is modifying Exhibit 4, the statement of work that we looked at earlier, correct?
MR. IRROBALI: Object to form.
**A Yes, that's correct.**
Q So let me ask you a different question. You're looking on Exhibit 26, the change request for Region 5 cabling, correct?
**A Uh-huh.**
Q That is in your left hand.
When you look at Exhibit Number 4, that is the statement of work for Region 5 cabling, correct?
**A Yes.**
Q So is it your testimony that Exhibit 26 was a change request that would modify Exhibit Number 4?
**A Yes, I would assume so.**

148

Q You will see the change request description of Exhibit Number 26 says, As a result of the approved expansion of labor and scope to include both overtime and work outside the standard maintenance window, SHI and Securus Technologies agree to modify the budget of the existing SOW to bill as actuals. The CR allows project billing to exceed the not-to-exceed amount.
Do you see that?
**A I see it, yeah.**
Q And then the last paragraph of that section in Exhibit 26 says, SHI and Securus Technologies also agree to modify the existing SOW for the TDCJ Region 5 cabling project to remove Lindsey, Montford and Wallace from scope.
Do you see that?
**A Yes, I see it.**
Q And do you recall an occasion where Lindsey, Montford and Wallace were taken out of scope from Exhibit 4 and assigned to other vendors besides SHI?
**A I don't remember the specifics of this, but yes, I remember sites being removed from SHI to other vendors.**

157

change request we just looked at, 25 and 6?
MR. IRROBALI: Object to form.
**A Yes, we removed them and swapped them with different vendor.**
Q Right. And that is because, if you look at Exhibit 25, the change request for Region 6 cabling, you had agreed, you being Securus, you had agreed with SHI to make that change pursuant to this change request, correct?
MR. IRROBALI: Object to form.
**A This is the document that is showing that we make the swap for vendors, yeah.**
Q And for Exhibit 26, that change request for the SOW for Region 5 K-1, you made those changes where you removed Lindsey, Montford and Wallace pursuant to that change request, correct?
MR. IRROBALI: Object to form.
**A Legal and purchasing did not sign this document as I stated, but yes, David Brennan signed this document stating that we removed them from those sites.**
Q And then Securus acted accordingly as we see in Exhibit 28, right?
MR. IRROBALI: Object to form.
**A We put different vendors, yeah, on those**

158

**sites.**
Q So Securus did exactly what change request, Exhibit Number 25, and change request, Exhibit 26, said to do, correct?
MR. IRROBALI: Object to form.
**A Securus put different vendor, because SHI was not able to finish the project on time and we needed to finish it.**
Q And so a change request was entered by the parties, correct?
MR. IRROBALI: Object to form.
**A I see a change request, yes.**
Q And in that change request, one of the things it did amongst several was to remove sites from the scope of the project, right?
MR. IRROBALI: Object to form.
**A Correct.**
Q And Exhibit 28 shows that internally at Securus those changes were made, correct?
MR. IRROBALI: Object to form.
**A We put different vendors on those sites, yes.**
Q Exhibit 29.
(Exhibit 29 marked.)
Q I've handed you what has been marked as

159

Exhibit 29, which is a contract with ITsavvy.
Do you see that?
**A I do.**
Q What is ITsavvy?
**A It is a vendor that provides services for us, like, installation. And I also believe we can purchase hardware and software from them or at least hardware.**
Q Was ITsavvy one of the subcontractors that was used on the TDCJ project?
**A I believe so, yes.**
Q And this document I just handed you, Exhibit 29, if you look to page 15 of the document it is SECURUS263275.
**A 275.**
Q Yes, sir.
You will see it is signed by Alex Dougherty, right?
**A Yes.**
Q It is dated February 3rd, 2023, right?
**A Yes.**
Q He has as the title chief strategy and operating officer.
Do you see that?
**A Yes.**

160

Q Do you know when Mr. Dougherty was given that title?
**A After Matt Pareti left the company.**
Q And Matt Pareti left in November of 2022; is that right?
**A Q4 of 2024 -- 2023. I don't remember the exact date, yeah.**
Q I didn't catch that.
**A Q4 of 2022. I don't remember the exact date.**
Q Do you know when the TDCJ project was completed?
**A May 2023.**
Q And so Exhibit 29 we just looked at, this is dated February 3rd, 2023, right?
**A Yeah.**
Q So May is about three months later?
**A Yes.**
Q And so three months after signing this ITsavvy contract is when the TDCJ project was finished?
**A Finally, yes.**
Q And do you recall the date upon which Securus terminated SHI on the project?
**A I don't remember the exact date, no.**

CERTIFICATE OF SHORTHAND REPORTER

I, Susan S. Klinger, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; that reading and signing was not discussed; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise in its outcome.

IN WITNESS WHEREOF, I have herunto set my hand on the 27th of March, 2024.

Susan S. Klinger

Susan S. Klinger, RMR-CRR, CSR
Texas CSR 6531, Exp: 10/23/25
California CSR 14487, Exp: 11/30/24