# EXHIBIT 10

Planet Depos
We Make It Happen™

# Transcript of Matthew Pareti

**Date:** March 1, 2024
**Case:** SHI International Corp. -v- Securus Technologies, LLC

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

--------------------------------X
SHI INTERNATIONAL, CORP., :
Plaintiff, :
v. :Cause No:
:4:23-CV-00200-SDJ
SECURUS TECHNOLOGIES, LLC, :
Defendant. :
--------------------------------X

DEPOSITION OF MATTHEW PARETI
FRIDAY, MARCH 1, 2024
10:00 A.M.

Job No.: 527469
Pages 1 - 282
Reported by: Adrienne Mignano, RPR

2

Deposition of MATTHEW PARETI, held at the law offices of:

SCHULTE ROTH & ZABEL LLP, LLP
919 Third Avenue
New York, New York 10022

Pursuant to Notice, before Adrienne M. Mignano, a Notary Public and Registered Professional Reporter in and for the State of New York.

3

A P P E A R A N C E S

ON BEHALF OF PLAINTIFF:
ROSS PARKER, ESQUIRE
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street
Suite 3800
Dallas, Texas 75201
214.855.7511

ON BEHALF OF DEFENDANT AND THE WITNESS
J. AUSTEN IRROBALI, ESQUIRE
TILLOTSON JOHNSON & PATTON
1201 Main Street
Suite 1300
Dallas, Texas 75202
214.382.3044

ALSO PRESENT:
Harold Rodriguez - Videographer
Maddison Craig, Esq. - Munsch Hardt
Josh Martin, Esq. - Securus Technologies

4

C O N T E N T S


| EXAMINATION OF | | PAGE |
|---|---|---|
| By Mr. Parker | | 8 |


E X H I B I T S

(Attached to the transcript)


| PARETI DEPOSITION EXHIBITS | | PAGE |
|---|---|---|
| Exhibit 1 | Notice of Deposition | 9 |
| Exhibit 2 | Org Chart | 21 |
| Exhibit 3 | Master Contract between Securus and TDCJ | 32 |
| Exhibit 4 | Statement of Work #8423 for TDCJ Site Surveys, dated 8-25-21 | 52 |
| Exhibit 5 | Statement of Work #9086 for Keegan Unit Cabling, dated October 5, 2021 | 67 |
| Exhibit 6 | Statement of Work #9295 for Duncan Unit Cabling, Dated October 18, 2021 | 79 |
| Exhibit 7 | Statement of Work #9461 for Lewis Unit Cabling, Dated October 27, 2021 | 83 |
| Exhibit 8 | Statement of Work #9462 for Polunsky Unit Cabling, Dated October 27, 2021 | 89 |
| Exhibit 9 | Statement of Work #10300 for Region 2 Cabling, Dated December 22, 2021 | 93 |
| Exhibit 10 | Statement of Work #10492 for Region 5 Cabling, Dated January 13, 2022 | 107 |
| Exhibit 11 | Statement of Work #11168 for Region 6 Cabling, Dated March 9, 2022 | 127 |
| Exhibit 12 | Statement of Work #11406 for Region 4 Cabling, Dated March 24, 2022 | 135 |
| Exhibit 13 | Teams Message from Matt Pareti, dated January 14, 2022 | 46 |
| Exhibit 14 | E-mail chain, Bates stamped SECURUS076289 | 151 |

isn't that correct?
MR. IRROBALI: Object to form.
A They would have -- they would be in a position that they would -- they would not be in a position --
Q And "they" being SHI?
A SHI would -- was a subcontractor for Securus directly.
Q So they would not be in a position to deal with TDCJ. It would be Securus that dealt with TDCJ, correct?
MR. IRROBALI: Object to form.
A The -- SHI -- if SHI was interacting directly with the Department, I don't know what those would have been, if they had or they hadn't. But in order to fulfill their subcontracting requirements, they may have had to seek approval from Securus, or at least interact with the different facilities to make sure that their work was being done and what they were being subcontracted to do would be completed as expected in order for them to fulfill their requirements as Subcontractor.
So it doesn't require them to interact with the Department, which is TDCJ.



But for them to be successful, they have to actually know what they were subcontracting and then what they were actually doing to fulfill the scopes of work that would have been generated from this, from this solicitation.
Q In your role as COO of Aventiv/Securus, do you have any knowledge about whether or not SHI ever directly dealt with TDCJ?
MR. IRROBALI: Object to form.
A The -- I'm going to answer your question slightly differently.
Every physical installation provider is expected to fulfill the requirements that they have signed on as part of their SOW. They do not need to interact with the Department directly at any time, other than they show up at a facility, which means they're interacting with the Department, to enter the facility, do their work.
And then when they leave and they're complete with their work, they're not actually interacting directly with the Department. They are interacting with Securus to understand what was completed and then ultimately how they could



bill; to say, hey, you know, we completed these pieces of work, you know, we want to -- we want to be billed -- we want to bill you for it. And that's why a lot of this work is subcontracted.
But at no time was TDCJ involved in remuneration between Securus for these activities of installation. All of the remuneration was going on between Securus and SHI, which I think is the -- which I think is what I think you're trying to get to, but I don't know if that's the case.
Q So when you say "remuneration," that, to me, means exchange of money. Is that what you're talking about?
A Well, in other words, we would pay SHI for equipment purchases which would then be deployed to these facilities. And then at some point later, it was -- the relationship was expanded to include installation services. And in order for SHI to get paid for installation services, they would have had to produce, you know, documentation of work being completed.
Q So I'm not talking about exchanges of money. I'm talking about communication and correspondence.



A Yeah, I have no knowledge of SHI talking or interacting directly with the Department, TDCJ, on any topic.
(Pareti Exhibit 4 marked for identification and attached to the transcript.)
Q I'm going to hand you what I have marked as Exhibit 4.
And, Mr. Pareti, this is a Statement of Work between SHI and Securus Technology, if you look at the first page, dated August 25, 2021.
Do you see that?
A I do.
Q And if you turn to -- it's page 9 of 11. It's SHI-92357. Let me know when you're there.
A I'm there.
Q And do you see that's your signature on the bottom?
A I do.
Q And the next page, SHI-92358, it's dated 8-31-2021.
Do you see that?
A Yes, I see that.
Q Okay. Are you familiar with this

53

document?
A I'm not.
Q Have you never seen it before or you just don't recall it?
A I do not recall it. I mean, it's three years old -- two and a half, three years old.
Q But that is your signature, correct?
A Yes. I recognize it.
Q In your role as COO, would you routinely sign SOWs on the TDCJ project between SHI and Securus?
A From -- you know, from time to time, but not -- it depended also -- could have been signed by myself or one of the -- you know, one of the other parties within my team.
Q You mean one of the other parties on your team would have signed your name?
A No. I'm saying that they could have signed a contract as well, an SOW.
Q Well, I'm going to represent to you that you signed 11 SOWs on the TDCJ project between Securus and SHI.
Does that surprise you?
A No.

54

Q Okay. So it was more normal for you to sign these documents regarding this project, correct?
A Yes. And others could have as well.
Q Correct.
Well, if it's your signature, you signed it, right?
A That is correct.
Q And, as you sit here today, you have no recollection of signing this document?
A This particular exhibit, no, I do not, but I know what it is. This was a -- this was essentially a piece of -- this, this Scope of Work, was for $150,000. And this would have been a labor installation contract that we would have -- that we would have negotiated with SHI. And SHI wanted to use their own, their own contracting documentation, which is also not uncommon. And this would have been one of many.
But essentially this is a -- this is a -- I would refer you, sir, to page 8, where it basically says it's a $150,000 contract. I'm looking for the location, but ...
Q I don't mean to cut you off, but we're going to walk through the document, so --

55

A Okay. Go ahead.
Q -- I don't want to waste your time looking for something if we're --
A Yeah, yeah. Go ahead.
Q And, Mr. Pareti, you called it a Scope of Work. The title of the document is "Statement of Work."
Are they really the same thing?
A Yes. I think, in most cases, we can -- you can use those interchangeably. I think Securus documents would have said "Scope of Work" and I think this is an SHI document --
Q Yep.
A -- so they may have called it a "Statement of Work," but that may be the only difference.
Q Look at page 3 of 11. It's SHI-92351. Its Section number 1 is entitled "Executive Summary."
Do you see that?
A Yes.
Q It says, "Securus Technologies is defined as a Customer"; is that correct?
A Where are --
Q I'm sorry. Very first line on that

56

page.
A Yes. No, no, no, not "where."
We -- this is basically saying Securus Technologies is SHI's Customer.
Q Okay. But that term -- word "Customer" is a defined term, capital C, correct?
A It is.
Q And so if you see "Customer" throughout these SOWs, that refers to Securus, correct?
A Yes.
Q And if you see SHI throughout these documents, that refers to my client, SHI, correct?
A Yes.
Q And Section 2 on the same page is entitled "Project Description."
Do you see that?
A Yes, I do.
Q And Section 2.1 says, "In Scope Site Survey."
Do you see that?
A I do.
Q So is it your understanding that this

the State of Texas, have entered into a Contract August" -- I'm sorry -- "dated August 19, 2021 (the 'Master Contract')."
I'm going to stop there. That's the document we looked at earlier, Exhibit Number 3, correct?
**A No.**
Q We can look at it if you want.
**A I mean, I'm not really sure. The dates are -- the dates are different, but regardless ...**
**This is Exhibit 3? This is Exhibit 3? This is dated in January. This is -- this says it was dated August 19th, but ...**
Q So let's look at Exhibit 3 real quick, so we'll -- just to clarify.
**A Yeah.**
Q Look at the first page of the document. It's SHI-091115.
Do you see that?
**A Yes.**
Q And look in the lower right-hand corner. It says, "Texas Department of Criminal Justice," and is signed by Bryan -- is that



Coltier, I think?
**A Collier.**
Q Collier.
**A Yes, I recognize it.**
Q And that date is 8-19-21.
Do you see that?
**A Very good. Yes.**
Q Okay. So --
**A The dates are accurate.**
Q Okay.
**A They're good.**
Q So when you go back to Exhibit Number 4, looking in Section 10 --
**A Uh-huh.**
Q -- on SHI-92357 and that's talking about the Master Contract dated August 19, 2021, it's talking about Exhibit Number 3, correct?
**A Yes.**
Q And so the Master Contract that is Exhibit Number 3 is incorporated by reference into this SOW; is that correct?
**A Yes.**
MR. IRROBALI: Object to form.
Q And, in fact, it says -- back looking at Section 10 -- "In accordance with Section



H.2.1 of the Master Contract, SHI acknowledges that this SOW is subject to the Master Contract and agrees to comply with the terms of the Master Contract to the extent applicable to goods and services that the Customer is engaging SHI to perform under this SOW."
Do you see that?
**A I do.**
Q And did I read that correctly?
**A Yes, I believe you read it correctly.**
Q And so, again, SOW in Exhibit Number 4 is saying we've got to incorporate Exhibit Number 3 because this is -- that's the document that we're all agreeing to be bound by, correct?
**A Yes.**
Q Mr. Pareti, we've been going about an hour. Do you want to take a break?
**A Sure. We can take a break.**
MR. PARKER: I'm not forcing you to, but I'm just giving you the option.
THE VIDEOGRAPHER: Stand by. Going off the record at 9:58 a.m.
(A recess was taken.)
THE VIDEOGRAPHER: Back on the



record. The time is now 10:13 a.m.
(Pareti Exhibit 5 marked for identification and attached to the transcript.)
Q Mr. Pareti, I'm going to hand you what I marked Exhibit 5.
**A Thank you.**
Q And this is another Statement of Work. If we look at the first page, this one's dated October 5, 2021.
Do you see that?
**A I do.**
Q I'm going to direct you to SHI-4190. It's page 14 of 17 of the document.
Let me know when you're there.
**A Yes, I'm there.**
Q And is that your signature on that page?
**A Yes, it is.**
Q And that's dated 10-14-21, correct?
**A Yes.**
Q And do you have a familiarity with this document?
**A No, I do not.**
Q So, again, just like we talked before, you don't recall signing this document?

Q And maybe other stuff as well.
**A Yes.**
Q But you need the escorts to make sure you're complying with 7 and 9, right?
**A Yes.**
Q And then let's look at page 11 of 17.
We have Section 8 that says "Duties of SHI."
Do you see that?
**A Yes.**
Q So if we're comparing number 7, which are "Customer Responsibilities," and number 8, which are the "Duties of SHI," number 8's showing this is what SHI is responsible for, and number 7 is showing what Securus is responsible for, correct?
**A Yes.**
Q And let's look at page 12 of 17. We have "Price and Payment Information."
Let me know when you're there.
**A I'm there.**
Q And so underneath that chart you see a bold section that says, "The total cost of this project is not to exceed $79,488.34."
Do you see that?



**A I do.**
Q And so, correct me if I'm wrong, but what that bold paragraph is saying is that this, approximately, $79,000 cost estimate is a cap or a not-to-exceed price for the Materials and Services being provided under Exhibit 5, this SOW, correct?
MR. IRROBALI: Object to form.
**A The $79,488.34 is for what is listed above in the table and is not to exceed.**
Q Correct.
And that includes materials for this one, right?
**A It does.**
Q But not travel expenses.
**A Correct. There's no travel expenses listed.**
Q And then when you go back to the next section -- I mean to the next page, page 13, under "Billing Terms," 11.3 --
**A I'm there.**
Q -- it says, "Invoices are processed monthly. All invoices are due and payable within 30 calendar days of the invoice date," and then it talks about -- fees don't include



taxes.
Do you see that language in Section 11.3?
**A I do.**
Q But, again, just like we looked at before with Exhibit 4, there's no specificity about how invoices are sent by SHI to Securus, correct?
**A Yes, that seems to be the case.**
Q Could be individual. Could be consolidated. Could be really however SHI wants to do it, right?
MR. IRROBALI: Object to form.
Q Is that correct?
**A Well, SHI had been billing for -- had a long track record of billing with Securus. So I don't -- I would say that for this particular project it was expected that they would process it monthly, as stated.**
Q So let me ask you the question a little different way.
Under the terms, 11.3 in Exhibit 5, the way the invoices are to be sent to Securus by SHI are just what this says, which is they're processed monthly, invoices are due and payable



within 30 calender days of the invoice date.
And that's all it says. It doesn't say any other specificity about how those invoices are to go from SHI to Securus, correct?
**A That is correct.**
MR. PARKER: Exhibit 6.
(Pareti Exhibit 6 marked for identification and attached to the transcript.)
Q So here's another SOW, Mr. Pareti, and this one is dated October 18, 2021 on the first page, for Duncan Unit Cabling.
Do you see that?
**A Yes.**
Q And let's go to page 14 of 17 of that document, in Exhibit Number 6.
Is that your signature?
**A Yes.**
Q It's dated December 15, 2021, correct?
**A Yes.**
Q Do you recall this document, as you sit here today?
**A No, I do not.**
Q But that is your signature on page 14, correct?

A Yes.
Q And this is a similar SOW that we looked at with the other two exhibits, right, Exhibit 4 and 5?
A Yes.
Q When we look at Section 2 on page 8164, it says, "Project Description."
Do you see that section?
A Yes.
Q And so as you go through page 3 and 4 of 17, you'll see all those bullet points in black and bold headings, correct?
A Yes.
Q And that's the scope of the project under Exhibit Number 6, this SOW, right?
A Yes.
Q And then under Section 2.3, which is on page 5 of 17 of Exhibit 6, it says, "Project Specific Customer Responsibilities."
Do you see that?
A Yes.
Q It says, "Customer" -- and it's Customer Securus, right?
A Yes.
Q "Customer to provide access and



escorts to the facilities in a timely manner, not to exceed 15 minutes of wait time."
Did I read that correctly?
A Yes.
Q And there's a bullet point underneath it that says, "Escorts to allow for work in multiple areas at one time to accommodate, but not limited to, core drilling, cable and fiber runs," correct?
A Yes.
Q Let's go to page 7 of 17, Section 3, "Project Duration."
Let me know when you're there.
A I'm there.
Q On the bottom of that page, similar language to what we saw before in Exhibit Number 5. I'm looking at the last -- the second-to-last paragraph.
"Note that Time and Materials budgets and durations are estimates. The final duration of the Services is affected by the actual time provided by all resources against the budget."
Do you see that?
A I do.
Q Did I read that correctly?



A Yes.
Q And so, again, the Time and Material budgets contained in Exhibit 6 are estimates, correct?
A Yes.
Q And Securus knew that, right?
MR. IRROBALI: Object to form.
Q Did you understand that on behalf of Securus when you signed this SOW?
**A I would say that I knew that this, this contract, would have a do-not-exceed. Regardless of the estimates, there was also a cap to a do-not-exceed for each contract.**
Q Okay. But that wasn't my question.
When you signed this SOW on behalf of Securus, did you understand that the Time and Material budgets are estimates?
A Yes.
Q Go to Section 5 on page 9 of 17 entitled "Customer Responsibilities."
A Yes.
Q And just like before, Customer is Securus, right?
A Yes.
Q And we see number 7 and number 9



talking about access to buildings and ensuring that SHI project personnel have safe access to the project site.
That's regarding escorts, right?
A Yes.
(Pareti Exhibit 7 marked for identification and attached to the transcript.)
Q I'm handing you Exhibit 7.
A Thank you.
Q So, Mr. Pareti, I've handed you what's been marked Exhibit Number 7. Look at the first page. It says, "TDCJ - Lewis Unit Cabling Statement of Work." And it says, "October 27, 2021."
Do you see that?
A I do.
Q And let's look to page 14 of 16. It's SHI-8154. And let me know when you're there.
A I'm there.
Q And is that your signature on behalf of Securus as the COO dated 12-15-2021?
A Yes, sir.
Q And do you have familiarity with this document, as you sit here today?

**A No, I do not.**
Q But that is your signature, correct?
**A Yes.**
Q And you signed this SOW on behalf of Securus, like the others, correct?
**A That is correct.**
Q And just like with the other exhibits we looked at, we have Section 2, which is the scope of the project beginning on page number 3.
Do you see that?
**A Yes.**
Q And that goes through page 5 of 16; is that correct?
**A That is correct.**
Q And if it's -- if items are not in the scope of the project under Section 2.1, they would be out of scope; is that right?
**A Yes.**
Q Look at "Project Duration" on page 7 of 16.
It says, "Project duration is defined as the entire time taken to complete the project, based on the resources allocated," and "The estimated project duration is six weeks."
Do you see that?



**A I do.**
Q Then it says, "SHI and the customer will provide the required resources to deliver this project within the estimated duration," right?
**A Yes.**
Q And so the obligation is on both SHI and Securus to provide those resources such that those estimated durations of the project can be met, right?
**A Yes, although "customer" is not capitalized, but I think we can -- we should be mindful of that.**
Q Are you saying that when it says "SHI and the customer," that "customer" does not refer to Securus in that language?
**A I don't know why they changed it.**
MR. IRROBALI: Object to form.
Q Any reason to believe it's not intended to be Securus?
MR. IRROBALI: Object to form.
**A I don't know.**
Q So let's go to page 9 of 16, Section 7, capital C, "Customer Responsibilities."
"Both Customer and SHI are



responsible for the successful execution of this engagement."
Do you see that?
**A Yes.**
Q So "Customer" there is capitalized, right?
**A Yes.**
Q So that means Securus.
**A Yes.**
Q Right?
And those numbers, 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, spilling on to page 10 of 16 enumerate what are Securus' responsibilities underneath this SOW, Exhibit 7, correct?
**A That is correct.**
Q Let's look at -- page 13 of 16 has a -- it has a section entitled "Terms and Conditions," Section 11.
**A Yes.**
Q We looked at that provision earlier. That's a reference to that Master Contract dated August 19, 2021, correct?
**A Yes.**
Q And, as you sit here today, do you recall that section being in all these SOWs?



**A I do not recall.**
Q When these Statements of Work were submitted from SHI to Securus, were you involved in that process at all?
MR. IRROBALI: Object to form.
Q Well, let me ask you a better question.
Did you have any role in negotiating the terms of these individual SOWs?
**A No, not the individual SOWs. Not in most cases, no.**
Q So in, like, these exhibits that we looked at -- you said, "not in most cases."
Were there cases where you were involved in negotiating one of the SOWs between SHI and Securus?
**A There may have been.**
Q As you sit here today, do you recall any of those specifically?
**A I do not.**
Q Why do you think there may have been?
**A Well, these are all for different Statements of Work. One of them was for site surveys. One of them was for actual installation activities. So there's a variety**

**of different sets of activities that are being, you know, reviewed here.**

Q So how does that matter with regard to my question?

**A A facility could have had a special -- a specific topic, you know. There's a difference between a minimum-security or maximum-security facility, for example.**

Q Would there be an occasion where you would have gotten involved because it was of greater import, for example?

**A Not that I recall for TDCJ. And, normally, it was more for equipment, making sure equipment was where it was supposed to be, as opposed to labor and installation.**

Q Why? Why was that -- why was the equipment more important than that for --

**A There is no need to have an installation contract if you don't have the equipment.**

Q Because it doesn't matter how many installers are there, if the cabling isn't there, they can't do their job.

**A Precisely.**

**So as it relates to equipment, I was**



**more heavily involved in equipment.**

(Pareti Exhibit 8 marked for identification and attached to the transcript.)

Q Exhibit 8.

**A Thank you.**

Q So we're looking at Exhibit 8, which is the Statement of Work for the Polunsky Unit Cabling, dated October 27, 2021 on the first page.

Do you see that?

**A I do.**

Q And let's flip to page 14 of 16.

And is that your signature, Mr. Pareti?

**A Yes, it is.**

Q And that's dated December 15, 2021, correct?

**A Yes.**

Q And so you're executing this SOW on behalf of Securus as its COO, correct?

**A That is correct.**

Q And just to touch on a few similar questions we've had before, on page 3 of 16, you have the Scope, Section 2 and 2.1.

Do you see that?



**A Page 3, Section 2.1.**

Q Yes, sir.

**A "In Scope"?**

Q "In Scope," correct.

**A I'm there.**

Q And so the -- those bullet points and those bold headings on page 3 and 4 list what is in scope for the Polunsky Unit Cabling project, the subject of the Statement of Work, Exhibit Number 8, correct?

**A Yes.**

Q On page 7 of 16, we have a "Project Duration" section.

Do you see that?

**A Yes.**

Q And that spills over to page 8, the top of page 8 --

**A Yes.**

Q -- where it has the same language we've seen in all the other SOWs, which is the fact that the Time and Materials budgets are estimates, correct?

**A Yes.**

Q And then in -- with an asterisk and an italics, it says, "Please be advised that the



above timeframe is to provide a general timeline for delivery and is not a true reflection of the total man hours/effort involved in this engagement."

Did I read that correctly?

**A Yes.**

Q And just like before, we have Section 7, page 9 of 16, which sets forth Securus' responsibilities under this SOW, correct?

**A Yes.**

Q And there isn't a similar section in this SOW that sets forth the duties of SHI, right, other than the general contractual terms that are contained in the SOW? There isn't a separate section that says SHI's duties, right?

**A There is not.**

Q On page 12 of 16, we have the "Billing Terms" section, the bottom of the page.

Do you see that?

**A Page 12?**

Q Yes, sir. 12 of 16. Section 10.2.

**A Yes.**

Q And that spills over to the next page, page 13, right at the very top of that

page.
A Yes.
Q And that's the same language we've seen in all the prior SOWs, right? "Invoices are processed monthly. All invoices are due and payable within 30 calendar days of the invoice date."
Actually, let me take a step back.
It's not the same because the very first SOW has a 45-day invoice-date provision.
Other than that, that small change, there's no obligation under Section 10.2 for SHI to send Securus invoices in any specific manner, correct?
A Other than what's outlined here.
Q Correct.
(Pareti Exhibit 9 marked for identification and attached to the transcript.)
Q Exhibit 9.
A Sorry. Thank you.
Q No, you're good.
This SOW is a little larger in volume than we've looked at previously, Mr. Pareti, and this is for Region 2 Cabling Statement of Work.
Do you see it on the first page,



December 22, 2021?
A Yes, I do.
Q Then if you flip to page 34 of 39, I'll ask you if that's your signature.
A Yes.
Q And that's dated 12-30-2021, correct?
A That is correct.
Q And you executed this SOW, Exhibit Number 9, on behalf of Securus as its COO, correct?
A That is correct.
Q So let's go to page 2 of 39.
And you'll see in this SOW, unlike the others, there are 14 units referenced in Region 2.
Do you see that?
A I do.
Q And do you know why, with the advent of this SOW, they are involving a -- a number of different units, not just one unit, as we saw previously?
MR. IRROBALI: Object to form.
A Yes.
Q Did you understand my question?
A Yes.



Q Okay. So why? Why is this one different?
A Well, it's not actually different. It's just a -- it's a -- instead of doing each facility individually, we're just doing them as a group.
Q Okay. Why do the parties do that, if you know? Why not enter into individual SOWs for each unit?
Why consolidate them all into one? Was it just for ease?
A I do not recall specifically why we went this route, but it's not for ease. It's -- that's not the answer, no.
Q Well, if you don't know why you went this route, how do you know it's not for ease?
A Well, we were not optimizing for ease. We were optimizing for both -- understanding what risks both parties would be undertaking in all of the contracts. But by this point in the project, we had gone through a success.
You shared with me exhibits. There's an incremental set of activities that have happened. So now we're at the point where we



want to move at a certain pace and a certain scale, and so now we're doing it as a bulk order, if you will, instead of as individual orders. But it's not for ease.
Q So are you saying that, as of the end of 2021, when this SOW, Exhibit 9, is signed, the parties had a good working relationship and it was time for them to increase the amount of work that was being done by SHI for Securus on these projects?
A No.
MR. IRROBALI: Object to form.
Q So explain that to me. I thought what you were intimating was that there was some comfortability built up by this time, so that's why you entered into this SOW with 14 regions.
Explain to me why I'm wrong.
MR. IRROBALI: Object to form.
A The goal at this point was to move at a faster pace, based on the Department, TDCJ, requesting of Securus to move faster.
Q And let's talk about that.
What was the Department, TDCJ, requesting of Securus with regard to speed?
A They wanted the project to move at a

**you may need people on both ends of the cable, so you have to be in multiple places to send and receive, sort of, the cable, if you will.**
Q And in a prison environment, you would need escorts on both ends.
**A Potentially.**
Q And so it is Securus' responsibility as a Customer, capital C, on page 26 of 39 in Exhibit 9, to provide those escorts, right?
**A Yes.**
Q On page 28 of 39, we have Section 3 entitled "Project Duration."
Do you see that?
**A Yes.**
Q And just like with the other SOWs we looked at, it says, "Note that Time and Materials budgets and durations are estimates."
Did I read that correctly?
**A Yes.**
Q And then in italics with the asterisk at the bottom of that Section 3, "Please be advised that the above timeframe is to provide a general timeline for delivery and is not a true reflection of the total man hours/effort involved in this engagement."



Did I read that correctly?
**A Yes.**
Q And did you understand that to be the case when you signed this SOW on behalf of Securus?
**A Yes.**
Q Let's look at Section 7 on page 29 of 39. It says, "Customer Responsibilities."
**A I'm sorry. Page 30?**
Q Sure. 29 of 39. Section 7.
**A Yes, I'm there.**
Q It says, "Customer Responsibilities: Both Customer and SHI are responsible for the successful execution of this engagement."
And you see that that Customer says capital C, right?
**A It does.**
Q We looked at this section earlier, and it was lower case C, right?
**A Yeah, I guess so.**
Q So this is very clear now that Customer, capital C, is Securus, right?
**A Yes.**
Q And so both Securus and SHI are responsible for the successful execution of this



agreement, right?
**A Yes.**
Q Excuse me. I said, "agreement." I meant "engagement."
**A That's fine.**
Q Is that correct?
**A That's fine.**
Q On page 32 of 39, Section 10.2 is "Billing Terms."
Do you see that?
**A Yes.**
Q And we've looked at this provision before in other SOWs, but in Exhibit 9, this SOW says, "Invoices are processed monthly. All invoices are due and payable within 30 calendar days of the invoice date."
Do you see that?
**A I do.**
Q And it doesn't specify how SHI is to send those invoices to Securus; is that correct?
**A That is correct.**
(Pareti Exhibit 10 marked for identification and attached to the transcript.)
Q Exhibit 10.
**A Thank you.**



Q Here's another Statement of Work. This is for Region 5, and it says, "Region 5 Cabling Statement of Work, January 13, 2022."
Do you see that on the first page?
**A Yes.**
Q And then as we go to page 32 of 37 --
**A Yes.**
Q -- that's your signature, Mr. Pareti?
**A Yes.**
Q And it's dated February 15, 2022?
**A That is correct.**
Q And you signed this SOW on behalf of Securus as a COO, correct?
**A That is correct.**
Q And similar to Exhibit 9, when we looked at the "Project Description" on page SHI-9373, the Table of Contents -- let me know when you're there.
**A I'm at the Table of Contents.**
Q This is similar to Exhibit 9 in that there is a number of different units subsumed within this SOW, correct?
**A Yes.**
Q There's actually 12 units in this one.

understanding is that what you're saying is these three bullet points are things that Securus would expect SHI to do, correct?
**A In a project management role, that they were going to provide a project management role for work to be done, we would expect these activities, yes.**
Q Are you familiar with the concept of change requests?
MR. IRROBALI: Object to form.
**A I'm familiar with the concept of a change order or a change request, yes.**
Q And are you familiar with the concept of those change orders or change requests as set forth in the SOWs?
And let me point you to a specific provision.
**A Go ahead.**
Q If you look at page 29 of 37, it's entitled "Change Control Process." I'm not trying to play coy with you. I'll point out the section for you.
**A Yeah. No, that's fine. Thank you.**
**And I can see that Section 9 on page 29 of Exhibit 9400 is the change control**



**process for this particular Statement of Work.**
Q If you go back to Exhibit 9, Exhibit --
MR. IRROBALI: Exhibit 9, Ross? I'm sorry.
**A Region 2 Cabling?**
Q Oh, I'm sorry. We're in Exhibit 9. Sorry. Go back.
No. We're in Exhibit 10. Yeah, go back to Exhibit 9, please.
**A Very good.**
Q Region 2 Cabling.
And look at page 31 of 39 in Section 8. It's entitled "Change Control Process."
**A Yes, I see that.**
Q And just hold them both side by side: Section 8 in Exhibit 9, Section 9 in Exhibit 10.
Are those the same?
**A They look to be the same.**
Q Well, they look to be or they are?
**A I'm going to have to read it if you want me to answer that fully.**
Q Read it, then.
(Witness reviewing document.)



**A Yes, they are the same.**
Q And do you know if that same exact provision is contained in all the SOWs, or do you need to go back and look at each one of them?
**A I would need to go back and look at each one.**
Q Okay. So I'll point you to page 11 of Exhibit 8.
**A Yes, I see it.**
Q And it's the same provision?
**A Yes.**
Q Page 11 of Exhibit 6, Section 8.
**A Yes.**
Q Did I skip 7?
**A No.**
Q Okay.
**A We -- we've covered Exhibits 8, Exhibit 7, Exhibit 6.**
Q All right. Let's go to Exhibit 5.
**A Very good.**
Q And it's Exhibit -- I'm sorry -- Section 9, page 11 of 17. Same provision?
**A Yes.**
Q And then on Exhibit 4, it's page 7 of



11, Section 7.
Do you see that?
**A Yes.**
Q Same language?
**A Yes. It seems to be.**
Q Okay. So let's go back to where we were on Exhibit Number 10.
**A I'm on Exhibit 10.**
Q You ready? I'm sorry. I'm not. Let me find where I was.
I'm sorry. We're Exhibit 11. Go back to Exhibit 11, please.
**A I don't think Exhibit 11 has been given to me yet.**
Q All right. We're looking at page 23 of 37, Section 3.2, "Project Management," right?
**A That is correct.**
Q And we're talking about how SHI should be "able to identify and successfully navigate change requests (scope, schedule, cost) as needed," right?
**A Yes.**
Q So if there's a change in the cost, that would be subject to a change request, right?

**Yes, this is a Securus responsibility.**
Q And number 7 as well is a Securus responsibility, right?
A **Yes.**
Q As well as number 9, "Ensuring that SHI project personnel have reasonable and safe access to the project site," that's a Securus responsibility?
A **Yes.**
Q And number 11, "Informing SHI of all access issues and security measures and providing access to all necessary hardware and facilities as required," that's a Securus responsibility, right?
A **It is a Securus responsibility to inform SHI of those things.**
Q Correct.
A **Yes.**
Q There is a Section 6 that says "Duties of SHI."
Do you see that?
A **I do.**
Q If you look back to Exhibit 10, at the section on "Customer Responsibilities," there is not a similar section as in 11,



Exhibit 11, that lists SHI's responsibilities.
I invite you to go back and look at Exhibit 10 and compare it to Exhibit 11, then we'll talk about it.
Let me know when you're there.
A **One second, please.**
Q Sure.
A **There is not a section around duties of SHI in Exhibit 10, which I think is what your question was.**
Q That is correct.
Do you know why that provision is in Exhibit 11 and not in Exhibit 10?
A **I do not.**
Q Who at Securus would have been the point person for negotiating these SOWs?
A **At this time, I do not know.**
**In other words, there could have been a variety of individuals that we referenced earlier that were negotiating these regions. So it could have been Hezi Ben-Moshe who we mentioned previously. Could have been Kevin Brown. I don't know if we mentioned him previously, but he's also one of the installation managers.**



**So there would have been -- there would have been a person who would have negotiated them, and that person would have been -- for this particular contract, it should be listed. I will --**
Q Take your time. I appreciate the help.
A **This one would have been -- yes, Kevin Brown, as I said.**
Q So besides -- and where are you looking? I'm sorry.
A **I'm looking at page 25 of 27, where the contact name for this particular Statement of Work was Kevin Brown.**
Q Besides Kevin Brown and Hezi Ben-Moshe, do you know who else would have been the contact at Securus for negotiating these SOWs?
A **Those would have been the individuals that I would have engaged, but if they would have had individuals from their teams, that could have been a whole host of different individuals that they were working with, so to speak.**
MR. PARKER: Let's mark Exhibit 12.



(Pareti Exhibit 12 marked for identification and attached to the transcript.)
Q So I've handed you what I've marked Exhibit 12, which is Region 4 Cabling Statement of Work, dated March 24, 2022.
Do you see that?
A **Exhibit 12, March 24, 2022. Yes.**
Q So let's turn to page 18 of 20 of this document, please, and let me know when you're there.
A **I'm on page 18 of 20.**
Q And you see a gentleman named Greg Saxon signed this document, right?
A **Yes, I see that.**
Q Why did the obligation to sign the SOW shift from you to Mr. Saxon on or about April 1, 2022?
MR. IRROBALI: Objection to form.
Q Well, let me ask you a different question to address Mr. Irrobali's objection.
Did the obligation to change -- the obligation to execute the SOWs move from you to Mr. Saxon at any given time?
A **Well, clearly, he -- Greg signed this -- Mr. Saxon signed this particular**

**Statement of Work.**
Q Do you know why he did and not you?
**A It -- I mean, there were other projects going on, so I'm sure that there were some that I was signing, and I'm sure there's some that he was signing.**
**And there's no -- there's not, like, a specific, you know, mandate where I had to sign every Statement of Work. That's just not how -- that's just not -- you know, there is no mandate for that.**
Q So that wasn't really my question.
My question was, was there internal discussions at Securus that, after you executed Exhibit 11, you would no longer be executing SOWs, it's going to move to Mr. Saxon?
**A No. I don't think that there was anything specific. It was just -- Greg may have taken on some slightly different responsibilities.**
**And, for example, you had shared with me a previous org chart. The org chart's not static; it moves a bit. So Hezi, at this point, may have been reporting in to Greg. And so when that took place -- I also don't remember exactly**



**when Greg started, but he -- you know, when he joined the company, this was part of -- part of his area was going to be installation and project management.**
Q Do you think he joined about this time, April 1, 2022?
**A Sounds about right, yeah. This is probably his first -- if I had to guess, you know, this is -- has been his -- the first contract that he would have signed, but he would have joined the company around this time.**
**Do you have a date?**
Q That he started?
**A Yes, sir.**
Q I don't. I was hoping you did.
**A I don't recall.**
**But in general, though, this probably would have been the first time that --**
Q Yeah.
**A -- he was in the formation, if you will, for -- at the company.**
Q Well, I will represent to you that you signed all the prior SOWs, and then after Exhibit 11, you're not signing them anymore.
**A Right.**



Q It moves to Mr. Saxon and then others.
So my question to you is, why was, after Exhibit 11, which contained your signature, you no longer signing the SOWs?
**A Yeah, I would just say that that was just administration of who was leading the groups that were leading the projects.**
MR. PARKER: Okay.
All right. This is a good time for a break if you want to take one.
MR. IRROBALI: Sure.
(Discussion held off the record.)
THE VIDEOGRAPHER: Stand by.
We're going off the record. 11:32 a.m.
(A recess was taken.)
THE VIDEOGRAPHER: Back on the record. 11:50 a.m.
BY MR. PARKER:
Q Mr. Pareti, before the break, we were talking about the SOWs. Now, I want to shift gears a little bit and talk about how Securus actually also got involved with SHI on this TDCJ project.



You mentioned earlier that SHI had done work previously for Securus; is that correct?
**A That is correct.**
Q Do you know when SHI first started doing work for Securus?
**A It predates my employment at the company.**
Q And, I'm sorry, your -- you started the -- at -- you started at Securus in Q4 of 2020, right?
**A Probably, it -- well, prior to that, for a period of time when I was at Platinum -- Equity was my employer, for about four months, there was a bit of an overlap where I was interim. But all of SHI's dealings were -- predate that.**
Q When -- if you know, when Securus was going to enter into the Master Contract with the TDCJ, Exhibit 2, was Securus already looking at subcontractors like SHI to help implement that project?
**A We would have gone to a variety of vendors or subcontractors for equipment, as well as for labor installation services, yes. So for**

**Statement of Work.**
Q Do you know why he did and not you?
**A It -- I mean, there were other projects going on, so I'm sure that there were some that I was signing, and I'm sure there's some that he was signing.**
**And there's no -- there's not, like, a specific, you know, mandate where I had to sign every Statement of Work. That's just not how -- that's just not -- you know, there is no mandate for that.**
Q So that wasn't really my question.
My question was, was there internal discussions at Securus that, after you executed Exhibit 11, you would no longer be executing SOWs, it's going to move to Mr. Saxon?
**A No. I don't think that there was anything specific. It was just -- Greg may have taken on some slightly different responsibilities.**
**And, for example, you had shared with me a previous org chart. The org chart's not static; it moves a bit. So Hezi, at this point, may have been reporting in to Greg. And so when that took place -- I also don't remember exactly**



**when Greg started, but he -- you know, when he joined the company, this was part of -- part of his area was going to be installation and project management.**
Q Do you think he joined about this time, April 1, 2022?
**A Sounds about right, yeah. This is probably his first -- if I had to guess, you know, this is -- has been his -- the first contract that he would have signed, but he would have joined the company around this time.**
**Do you have a date?**
Q That he started?
**A Yes, sir.**
Q I don't. I was hoping you did.
**A I don't recall.**
**But in general, though, this probably would have been the first time that --**
Q Yeah.
**A -- he was in the formation, if you will, for -- at the company.**
Q Well, I will represent to you that you signed all the prior SOWs, and then after Exhibit 11, you're not signing them anymore.
**A Right.**



Q It moves to Mr. Saxon and then others.
So my question to you is, why was, after Exhibit 11, which contained your signature, you no longer signing the SOWs?
**A Yeah, I would just say that that was just administration of who was leading the groups that were leading the projects.**
MR. PARKER: Okay.
All right. This is a good time for a break if you want to take one.
MR. IRROBALI: Sure.
(Discussion held off the record.)
THE VIDEOGRAPHER: Stand by.
We're going off the record.
11:32 a.m.
(A recess was taken.)
THE VIDEOGRAPHER: Back on the record. 11:50 a.m.
BY MR. PARKER:
Q Mr. Pareti, before the break, we were talking about the SOWs. Now, I want to shift gears a little bit and talk about how Securus actually also got involved with SHI on this TDCJ project.



You mentioned earlier that SHI had done work previously for Securus; is that correct?
**A That is correct.**
Q Do you know when SHI first started doing work for Securus?
**A It predates my employment at the company.**
Q And, I'm sorry, your -- you started the -- at -- you started at Securus in Q4 of 2020, right?
**A Probably, it -- well, prior to that, for a period of time when I was at Platinum -- Equity was my employer, for about four months, there was a bit of an overlap where I was interim. But all of SHI's dealings were -- predate that.**
Q When -- if you know, when Securus was going to enter into the Master Contract with the TDCJ, Exhibit 2, was Securus already looking at subcontractors like SHI to help implement that project?
**A We would have gone to a variety of vendors or subcontractors for equipment, as well as for labor installation services, yes. So for**

ACKNOWLEDGMENT OF DEPONENT

I, MATTHEW PARETI, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me and any corrections appear on the attached Errata sheet signed by me.

____________________ ____________________

(Date) (Signature)



CERTIFICATE OF REPORTER - NOTARY PUBLIC

I, ADRIENNE MIGNANO, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me and thereafter reduced to typewriting under my direction; that reading and signing was requested; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 11th day of MARCH, 2024.

My Commission Expires: June 2026.

______________________________

ADRIENNE M. MIGNANO, RPR