# EXHIBIT 17

Planet Depos
We Make It Happen™

# Transcript of Mary Clear

**Date:** March 6, 2024
**Case:** SHI International Corp. -v- Securus Technologies, LLC

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

SHI INTERNATIONAL CORP., )
)
PLAINTIFF, )
)
VS. ) CIVIL ACTION
)
) NO.: 4:23-CV-00200-SDJ
SECURUS TECHNOLOGIES, )
LLC, )
)
DEFENDANT. )

---------------------------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF

MARY CLEAR

MARCH 6, 2024

---------------------------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF MARY CLEAR, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on the MARCH 6, 2024, from 9:05 a.m. to 3:29 p.m., before Kelly Bryant, CSR in and for the State of Texas, reported by machine shorthand, at Tillotson Johnson & Patton, 1201 Main Street, Suite 1300, Dallas, Texas pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.



A P P E A R A N C E S

FOR THE PLAINTIFF:

JAMIL N. ALIBHAI
MADDISON CRAIG
TONI L. ANDERSON
Munsch Hardt Kopf & Harr, P.C.
500 N. Akard St., Suite 4000
Dallas, TX 75201
Telephone: (214) 855-7500
Jalibhai@munsch.com
Tanderson@munsch.com
Mcraig@munsch.com

FOR THE DEFENDANT:

J. AUSTEN IRROBALI
TILLOTSON JOHNSON & PATTON
1201 Main Street, Suite 1300
Dallas, Texas 75202
Telephone: 214.382.3044
Airrobali@tillotsonlaw.com

ALSO PRESENT:

Darrell Harvey, videographer
William Bird (via Zoom)



INDEX


| | PAGE |
|---|---|
| MARY CLEAR | |
| DIRECT EXAMINATION BY MR. ALIBHAI.............. | 6 |


EXHIBITS


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | 30(b)(6) notice..................... | 11 |
| Exhibit 2 | Contract between the Texas Department of Criminal Justice and Securus Technologies, LLC.......... | 21 |
| Exhibit 3 | Statement of work between Securus Technologies and SHI............... | 57 |
| Exhibit 4 | Invoice from SHI to Securus......... | 58 |
| Exhibit 5 | Consolidated invoice issued by SHI.. | 70 |
| Exhibit 6 | Invoice from SHI to Securus......... | 82 |
| Exhibit 7 | Invoice from SHI to Securus......... | 84 |
| Exhibit 8 | Invoice from SHI to Securus......... | 91 |
| Exhibit 9 | Invoice from SHI to Securus......... | 92 |
| Exhibit 10 | Series of e-mails between Mary Clear and individuals at SHI........ | 94 |
| Exhibit 11 | Spreadsheet of invoices and credit memos.............................. | 95 |
| Exhibit 13 | Invoice from SHI to Securus......... | 103 |
| Exhibit 14 | E-mail from Ms. Ortiz to Ms. Cipriano........................... | 103 |
| Exhibit 15 | String of e-mails................... | 105 |
| Exhibit 16 | E-mail between Mr. Saxon and Mr. Dougherty.......................... | 107 |
| Exhibit 17 | E-mail exchange between Mary Clear, Mr. Dougherty, Mr. Boyd and Mr. Ninan........................... | 109 |
| Exhibit 18 | SHI open invoice report............. | 113 |
| Exhibit 19 | E-mail from Mary Clear to Mr. Ben-Moshe.......................... | 123 |
| Exhibit 20 | E-mail from Mr. Brennan............. | 129 |
| Exhibit 21 | Communication between Mary Clear, Ms. Pelton and Mr. Ninan............ | 130 |
| Exhibit 23 | Series of e-mails involving Mr. Thompson and individuals at SHI..... | 135 |
| Exhibit 24 | Series of e-mail exchanges.......... | 140 |
| Exhibit 25 | Past due invoices................... | 141 |
| Exhibit 26 | E-mail between Mr. McAllister and Mr. Ninan........................... | 146 |





| | | |
|---|---|---|
| Exhibit 27 | E-mail chain between Mary Clear and Mr. Ninan....................... | 154 |
| Exhibit 28 | E-mail with Ms. Cooper.............. | 157 |
| Exhibit 29 | Invoice No. 15477166 for hardware... | 159 |
| Exhibit 30 | Invoice No. 15063407 - hardware sent to Bridgeport.................. | 160 |
| Exhibit 31 | Invoice No. 15044215 - hardware..... | 161 |
| Exhibit 32 | Invoice............................. | 162 |
| Exhibit 33 | E-mail with Ms. Ortiz............... | 163 |
| Exhibit 34 | E-mail from Mr. Lawler.............. | 173 |

13

**A. I did as my role of controller over the time that we were working with SHI.**
Q. But not after that?
**A. No.**
Q. And other than the documents you mentioned -- bless you -- which I wrote down as petition expert reports, SOWs and e-mails, did you review any other documents?
**A. No.**
Q. Did you review any spreadsheets or accounting software documents?
**A. I did -- I did look at a spreadsheet, yes.**
Q. Which spread --
**A. You could add that.**
Q. Which spreadsheet did you look at?
**A. It was a listing of invoices in Great Plains.**
Q. Great Plains is the accounting software you use at Securus?
**A. Yes.**
Q. And does it use spreadsheets or had you generated a spreadsheet from that software?
**A. There was a spreadsheet that was generated based on a report that came out.**
Q. And what typing -- what type of list of invoices did it generate?

14

**A. You know, I only looked at it for a few seconds, so it -- what I saw was a listing of SHI invoices and that's all I saw.**
Q. Was it, if you remember, all invoices or paid invoices or unpaid invoices?
**A. I don't know.**
Q. All right. Any other documents that you reviewed to prepare for your deposition?
**A. I did look at an invoice, so we can add that to the list as well.**
Q. Which invoice did you look at?
**A. I don't recall.**
Q. Just one?
**A. I don't recall.**
Q. When you said you looked at the petitions, are you referring to the claims filed by both sides?
**A. Yes.**
Q. And which expert reports did you review?
**A. I reviewed the one that our expert prepared and I reviewed the one that SHI's expert prepared.**
Q. Securus's expert prepared two expert reports.
Did you look at both of those?
**A. Yes. I think one was a response. So, yes, I did look at both of those.**
Q. And you're referring to Mr. Mordaunt's

15

reports?
**A. Yes.**
Q. And why did you look at those reports?
**A. Because it was part of my preparation to understand what would -- had been presented in the matter.**
Q. And what conclusions did you draw from reviewing the reports?
**A. I would not --**
MR. IRROBALI: Object. To -- to the extent that answering the question requires you to get into conversations that you had with counsel, you're instructed not to answer. To the extent that they're opinions you drew without consultation with counsel, you're welcome to answer.
**A. Can you repeat the question, please?**
Q. (BY MR. ALIBHAI) What conclusions did you draw from reading Mr. Mordaunt's reports?
**A. I -- I did not draw any conclusion and would refer to his report for any conclusions on the matter.**
Q. Did you have any agreements or disagreements with what you read in the reports --
**A. I did not.**
Q. -- of Mr. Mordaunt?
Sorry. What was that?

16

**A. As -- can you repeat the question?**
Q. Yeah. Did you have any agreements or disagreements with what you read in Mr. Mordaunt's reports?
**A. I -- asking me personally, I did agree with what I read in his report as far as the fact that we had overpaid for invoices that were above the caps.**
Q. And did you reach a conclusion as to the amount that was overpaid?
**A. No. And I would refer to -- to his report as far as any amounts for overpayments.**
Q. And so as the controller, you have no independent opinion as to the amount overpaid by Securus?
**A. Well, as controller and as we went through and looked at the documents, we were not able to ever reconcile. We were not able to track. So we had to actually employ this consultant in order to put all that together for us.**
**So I would refer to what he said in his report as far as what was overpaid.**
Q. When you said "this consultant," you were referring to Mr. Mordaunt?
**A. Yes.**
Q. And that consultant was hired after the

17

lawsuit began, correct?
**A. Correct.**
Q. And so was there any consultant hired or reconciliation performed prior to the time that there was a lawsuit?
**A. We did attempt to reconcile, but we were unable to reconcile based on the documentation that we were given by SHI.**
Q. And so just to make sure that I understand your testimony, as the controller, you have no independent opinion as to the amount overpaid by Securus?
**A. Not the exact dollar amount, no.**
Q. You just have the opinion that there was an overpayment?
**A. Yes.**
Q. But you can't tell the jury what that amount is, correct?
**A. I would refer to the expert report as far as the amount of the overpayment.**
Q. And did you review the expert report for any errors?
**A. No, I did not.**
Q. Did you have any involvement with the preparation of Mr. Mordaunt's reports?

18

**A. No.**
Q. Did you speak with Mr. Mordaunt during the time that he was preparing reports?
**A. No.**
Q. Have you ever spoken to him?
**A. No.**
Q. Has anyone from accounting spoken to Mr. Mordaunt in connection with this litigation?
**A. I don't know.**
Q. And you call it the accounting department, where you work?
**A. I'm -- I'm sorry?**
Q. Do you call where you work the accounting department? Is that the department you oversee?
**A. That is the department, yes.**
Q. Did somebody from the accounting department assemble documents for Mr. Mordaunt?
**A. I don't know who assembled the documents.**
Q. Well, do you know if anyone did?
**A. Well, they had to in order for him to receive them and review them.**
Q. That's what I'm trying to figure out.
Did somebody from accounting provide documents to Mr. Mordaunt?
**A. I don't know who provided the documents to**

19

**Mr. Mordaunt.**
Q. But it wasn't you?
**A. No.**
Q. All right. If you'll take a look at Exhibit 1 to your deposition. You've been designated on certain topics, and I want to confirm with you that your understanding and my understanding is correct as to the topics you're going to testify to today.
**A. Okay.**
Q. So if you'll flip to the topics, which are on the back couple of pages, the first set of categories that I have you listed for is 17 through 20; is that correct?
**A. Yes.**
Q. And 24?
**A. Yes.**
Q. And then you're designated on Topics 46 to 53 to the extent that the questions are related to accounting or invoices, correct?
**A. Can you please repeat those last numbers?**
Q. Certainly. 46 through 53 to the extent that the questions are related to accounting or invoices, correct?
**A. I believe 49, 50. I don't believe 46 through 48. 49, 50.**

20

Q. What about 51 through 53 to the extent that it relates to accounting or invoices?
**A. I believe 51, and I am not sure about 52 and 53.**
Q. And so you're not prepared to testify with respect to topics 46 through 58, 52 and 53 with respect to accounting and invoice issues; is that correct?
MR. IRROBALI: Object to form. Did you mean 58 on that question?
MR. ALIBHAI: Let me rephrase that.
MR. IRROBALI: Sorry.
Q. (BY MR. ALIBHAI) So you're not prepared to testify with respect to Topics 46 through 48 and 52 through 53 with respect to accounting and invoice issues; is that correct?
**A. I believe I can testify related to accounting for 49, 50, I think 51. And then I'm not sure about the other ones, 52, 53.**
Q. And 46 through 48?
**A. Not 46 through 48.**
Q. Okay. Did you, as part of your preparation for today's deposition, review the master contract between TDCJ and Securus?
**A. No, I did not.**
Q. Have you seen that contract before?

33

Q. And then the invoice is reviewed to make sure it has the vendor name, amount, date, invoice amount, invoice number, project, correct?
**A. And site. All those are actually input into the DocLink system.**
Q. And so is the DocLink system like a database?
**A. The DocLink system is a document management system, so it -- it stores the images of the invoices as well as holds the data that's input into the system, and it's -- it's used for our approval process.**
**So -- so once all that data is entered, the -- the person that will approve it just initially would be the -- would be another accounts payable person who just looks to make sure there's not keying errors, you know, that it's complete. And once that's done, that's when we start routing for approvals.**
**So we have an assigned initial approver of -- of these invoices. So the -- every invoice will go to an initial approver, and from there, it will route to different individuals based on their level of authority and based on the dollar value of that invoice.**
Q. So, first, someone like an AP processor like Ms. Ortiz keys in the information in the DocLink system, and then a different accounts payable person quality control checks that the information was keyed in

34

correctly?
**A. Correct.**
Q. For the SHI invoices, who was the person in charge of QC of the invoices?
**A. At that time, I believe the person would have been Linda Cipriano.**
Q. And then once she confirms that it's been keyed correctly, what does she do next?
**A. She then approves it, and I -- I'm sorry. I don't remember the exact status, but she approves it to where it's -- it's then ready to be routed to the various business owners for their review, validation and approval.**
Q. And earlier you said that it goes to the operations team. Is that the people that are going to review and approve it?
**A. For these SHI invoices, yes.**
Q. And so how does the system tell the people in the operations team that there are invoices available for review and approval?
**A. Once -- once the invoice is sent to the initial approver, it is essentially in their workflow in DocLink and they -- they will receive an e-mail that says you have a document to review.**
Q. Does the DocLink system generate that e-mail?

35

**A. Through Microsoft Office, yes.**
Q. And so for every invoice that was ever entered into DocLink, is there a corresponding e-mail that went to an approver?
**A. Related to these SHI invoices?**
Q. Well, I was asking more generally, but...
**A. Generally speaking, yes, it is set up that way.**
Q. And with respect to the SHI invoices, after an invoice was keyed in and quality control checked, is there an e-mail that would have been sent to someone on the operations team alerting them that there's an invoice for approval in their workflow?
**A. As soon as it was set to their workflow, they would have received an e-mail momentarily after that that they had an approval -- an invoice, excuse me, in their workflow for them to review and approve.**
Q. And you've used the term the "workflow." Is that a system or part of the DocLink system?
**A. Yes.**
Q. And so after it goes into an initial approver's workflow, what do they have to do next to review and approve the invoice?
**A. So when it is in a person's workflow, they will open the DocLink system and they will go to their**

36

**workflow. They will click on -- you know, it says invoices. They will -- they will go in there and there will be essentially a listing of invoices that are in their workflow. And so you would just essentially click on the first one, and when you click on that, the screen will open up to a PDF image of that document, the invoice document.**
**And so at that point in time, they will review the document. They have to validate that the charges are accurate. They also look to see is it within our budgets. And so they look at all that information in order to validate it, and -- and -- in order to approve that invoice.**
**And then, once they approve it, it then goes to -- routed to the next approver based on their level of authority and the dollar value of that invoice.**
Q. With respect to the SHI invoices, who was the initial approver during the time that the project was going on?
**A. David Brennan was the initial approver.**
Q. When did Mr. Brennan start at Securus?
**A. I don't know.**
Q. Do you recall that it was sometime in 2023? Sorry. Do you recall that it was sometime in 2022?
**A. I don't know.**

93

**A. Yes.**
Q. And refers to trenching materials, correct?
**A. Correct.**
Q. Time and expense, correct?
**A. Correct.**
Q. And tech time?
**A. Correct.**
Q. And trenching materials is equipment, correct?
**A. I don't know.**
Q. And with respect to all of the four entries on Exhibit 9, they refer to the Jordan Unit, correct?
**A. Correct.**
Q. That's a site within Region 5; is that correct?
**A. I'm sorry. Can you repeat the question?**
Q. The Jordan Unit is a site within Region 5, correct?
**A. I don't know without looking at Region 5, but it is listed as a site on this invoice.**
Q. And so for Exhibits 6 through 9 that we looked at, all four of those are on Exhibit 5 and relate to Region 5, correct?
**A. All four of these are -- have their invoice's numbers listed on this invoice, yes, and they relate to Region 5.**

94

(Plaintiff's Exhibit No. 10 marked)
MR. ALIBHAI: All right. Let's look at the next exhibit.
Ms. Clear, I'm handing you what's been marked as Exhibit 10 to your deposition.
Q. (BY MR. ALIBHAI) Is this a series of e-mails between you and individuals at SHI, including Kristin Cooper?
**A. Yes.**
Q. I'm going to start chronologically, so if you'll flip to the back of the document. Did you in January 2023 request from Ms. Cooper detail of every invoice/CM issued since 1/1/22 on the service account?
**A. Yes.**
Q. And does CM refer to credit memo?
**A. Yes.**
Q. Did Ms. Cooper provide you with that information?
**A. Yes, she did.**
Q. And if we turn to the top of Exhibit 10, that's an e-mail from Ms. Cooper attaching a spreadsheet which she states is a reporting of all invoices and credit memos that have generated on the services account from 1/1/2022 through year-to-date, correct?
**A. Correct.**

95

Q. Did you ever ask Ms. Cooper for detail about an invoice or credit memo and she turned you down?
**A. No.**
Q. So these documents that are attached were produced in native or spreadsheet form, so I'm going to show it to you on a computer and --
MR. ALIBHAI: Did you send them a copy?
(Voce sotto discussion)
Q. -- and I'm going to e-mail Mr. Irrobali a copy --
MR. IRROBALI: It's the attachment to this e-mail; is that right?
MR. ALIBHAI: That's correct.
MS. CRAIG: Correct. I have a placeholder for the Bates label for that if it's easier for you to look at.
MR. ALIBHAI: So I'm going to hand the court reporter the placeholder, which is Exhibit 11, and it's the native document SHI-350548.XLSX.
(Plaintiff's Exhibit No. 11 marked)
MR. IRROBALI: Just to clarify, you're marking Exhibit 11 as the attachment separately from Exhibit 10; is that right?
MR. ALIBHAI: Correct. Just -- just to keep --

96

MR. IRROBALI: Yeah, of course.
MR. ALIBHAI: Do you mind if I walk over and hand you this? And feel free to navigate that however you want to.
Q. (BY MR. ALIBHAI) My first question is: Is Exhibit 11 to your deposition a copy of the spreadsheet that lists all invoices and credit memos that are generated on the services account from 1/1/2022 through year-to-date?
MR. IRROBALI: Object to form.
**A. Can you repeat that?**
Q. Is the spreadsheet that you're looking at the spreadsheet that Ms. Cooper e-mailed you which was a reporting of invoices and credit memos on the services account from 1/1/2022 through year-to-date?
THE WITNESS: Let me just spend a moment to look at this.
MR. ALIBHAI: Absolutely. Take as long as you need.
**A. This is what she e-mailed us, yes.**
Q. (BY MR. ALIBHAI) And does it provide a report of all invoices and credit memos to the services account from 1/1/2022 through January 17, 2023?
**A. It is a listing, yes. It appears to be for that timeframe.**

113

**A. A specific time limit, no.**
Q. Is there a general time limit?
**A. There is a practice that people will review them in -- in time to meet payment requirements, but there's no written procedure. There's no written policy.**
Q. And when you say "in time to meet payment requirements," is that like net 30, net 60?
**A. Yes.**
Q. Based upon whatever the agreement is of the vendor?
**A. Correct. But, obviously, they have to be able to validate them before they can do any kind of approval.**
(Plaintiff's Exhibit No. 18 marked)
MR. ALIBHAI: All right. Exhibit 18 is a native document Bates-labeled Securus 068707_confidential.XLSX.
MR. IRROBALI: ^ Thank you.
MR. ALIBHAI: I'm going to hand you a computer again.
MR. IRROBALI: Is there a parent to this one?
MS. CRAIG: Are you asking if there's, like, an e-mail --

114

MR. IRROBALI: Sorry, are you -- are you including whatever parent is attached or is she just looking at the spreadsheet? Just so I know.
MR. ALIBHAI: This is how it's produced.
MR. IRROBALI: Okay.
Q. (BY MR. ALIBHAI) Is this a SHI open invoice report?
**A. This is an Excel file that started out as an open invoice report which we then edited.**
Q. We meaning Securus?
**A. Securus, yes.**
Q. And is the way that you can tell that is because it's got notes by Norma as a column?
**A. Well, it's got multiple columns that we would have added.**
Q. What are the columns that you added?
**A. Starting Column I in GP. Is it in GP or not.**
Q. That's Great Plains?
**A. Great Plains. And anything after that, we would have added.**
Q. Payment date, payment amount, notes by Norma and comments from DL?
**A. Yes.**
Q. And so this was a spreadsheet that started with SHI but then Securus edited?

115

**A. Correct.**
Q. And the -- let's go through the columns if we could. I think you already went through I through N, but column A is the invoice number, correct?
**A. Correct.**
Q. And that's a SHI invoice number?
**A. Correct.**
Q. What's the next column, Column B?
**A. SO number, I believe that's a sales order number.**
Q. SHI number or Securus number?
**A. I'm not -- I'm not sure.**
Q. And then customer requisition, what is that column?
**A. I'm not sure.**
Q. What about the next column, Column D, what's that?
**A. Transaction date. That would be the invoice date.**
Q. Column E, due date, what does that mean?
**A. That's the date the invoice is due for payment.**
Q. And then original invoice amount, is that the invoice amount listed on the invoice?
**A. Yes.**

116

Q. And what's the net amount in Column G?
**A. I'm not 100 percent sure.**
Q. All right. Column H is age?
**A. Correct.**
Q. Is that the date that it was paid versus the date that it was dated?
**A. I would have to recalculate. I don't know.**
Q. And if you click on it, there's no formula there, right, it's just showing a number?
**A. Yeah. In this version, yes.**
Q. And so I'm looking at line 12. That's the first invoice, correct?
**A. Correct.**
Q. That was a transaction date of June 21st, and paid on October 6th, correct?
**A. Correct.**
Q. And so approximately three and a half months after the transaction date, correct?
**A. Correct.**
Q. And then line 13 was an invoice dated December 20, 2021 that was paid on November 3rd, 2022, correct?
**A. Correct.**
Q. So almost 315 days later?
**A. Yeah. So there was something with that invoice that didn't allow for a timely approval. I**

117

**don't see a note on here as to why, but if it was paid that late, there was some kind of issue.**
Q. All of the invoices -- well, let me be more specific.
The first couple of dozen e-mails -- sorry. Start again. A couple of dozen entries on this spreadsheet all show payments beyond the due date, correct?
**A. Yes.**
Q. And looking at this spreadsheet, there are notes as to some of them, but no explanation as to why most of them were paid late, correct?
MR. IRROBALI: Object to form.
**A. Can you repeat that, please?**
Q. (BY MR. ALIBHAI) Sure. So you can't tell me by looking at this spreadsheet why line 13, Invoice No. B14511484 was not timely paid, correct?
**A. I cannot tell you that, no.**
Q. And if you scroll down, the first lines, 12 through 228, reflect paid invoices, correct?
**A. So yes, we show that these were paid.**
Q. And then starting at line 229 is a series of invoices that are entered in GP, correct?
**A. Correct.**
Q. And that goes all the way through line 1136,

118

correct?
Sorry. Let me rephrase that question.
Lines 229 through 745 reflect invoices that have been entered in GP, correct?
**A. 745 is correct. I'll need to go back and check the 229.**
Q. Okay. It's a long spreadsheet, so...
**A. It is a long spreadsheet.**
MR. IRROBALI: So many rows, so little time.
**A. So yes, that's what this reflects, 220 -- starting at 229.**
Q. (BY MR. ALIBHAI) And so if it's been entered into GP, it's already gone through the approval process, correct?
**A. Correct.**
Q. And then it should be in line for payment by the due date, correct?
**A. It -- it will be in line for payment based on the due date and the next check run.**
Q. And if you look at the end of the spreadsheet, it has invoices listed on here through October -- into October 2022, correct?
**A. I see invoices dated November -- no, no, excuse me, that's the due date. I would have to look**

119

**through to find the end date because there's -- not necessarily in order, but I do see October invoices on here.**
Q. So although the tab says, Open Invoice Report 2022/7/15, this actually has invoices into October, correct?
**A. Yeah. I did -- you know, I don't know about the tab -- what's on the tab, but this is pulled from a statement from SHI, and there are invoices on here that are October invoices.**
Q. And so going back up into the 220s and 230s where the first "entered into GP" column starts, as the corporate representative of Securus on invoicing and payment, can you explain why invoices that were due in September and October have not been paid yet?
MR. IRROBALI: Object to form.
**A. Can you repeat that?**
Q. (BY MR. ALIBHAI) So if you start at line 229, that's the first invoice that's entered in GP on the list, correct?
**A. Correct.**
Q. And then we went through -- there's a few hundred invoices that are entered into GP, correct?
**A. Correct.**
Q. So can you explain why invoices that were due

120

in September and October have not been paid yet?
MR. IRROBALI: Object to form.
**A. Can you repeat that again?**
Q. (BY MR. ALIBHAI) Yeah. Let's break it down. Line 231, it's an invoice dated August 19th, correct?
**A. Correct.**
Q. It's due on 9/18?
**A. Correct.**
Q. It has not been paid yet, correct?
**A. Correct.**
MR. IRROBALI: Object to form.
**A. As of the date of this particular spreadsheet.**
Q. (BY MR. ALIBHAI) Well --
**A. Which I don't know what the date is of the spreadsheet.**
Q. Well, the spreadsheet goes into October, correct?
**A. Correct.**
Q. And so the title of the spreadsheet, if you look at the top is, Securus Summary Bill SHI 11.03.22, correct?
**A. Let me page up and see.**
MR. IRROBALI: You're talking about the name of the file, correct?
MR. ALIBHAI: Correct. The green header

121

has the file name.
THE WITNESS: Oh, the file name I see is EX117 Securus.
MR. ALIBHAI: So going back to 231.
THE WITNESS: Okay.
Q. (BY MR. ALIBHAI) As of the date of this spreadsheet, this spreadsheet does not reflect it had been paid, correct?
**A. Correct.**
Q. And is that true for all the ones that are listed as entered in GP?
**A. If they don't have paid written by them in Column I -- well, hold on.**
**So they do not have paid written by them, so in looking at this, it looks like these were still open as of the date of this spreadsheet.**
Q. If it says in GP but doesn't say paid in Column I, correct?
**A. Correct.**
Q. And when it is paid -- and you can look at Number 12 or whichever one you'd like to look at -- that payment date and payment amount is reflected in Columns K and L, right?
**A. Correct.**
Q. And go down with me if you would to line 1476.

122

MR. IRROBALI: I'm sorry. Which one, Jamil?
MR. ALIBHAI: 1476.
MR. IRROBALI: Thank you. Got it.
THE WITNESS: Okay.
Q. (BY MR. ALIBHAI) That's the last one, right?
**A. Yes.**
Q. And that's an invoice dated October 31st, 2022?
**A. Correct.**
Q. And it's not in GP; that reflects that it's not received the approvals through DocLink workflow?
**A. Correct. And at that time, we were discussing with S -- SHI the fact that we wanted consolidated invoices by site by month, and SS -- SHI at the time was not producing these invoices for us.**
**So it wasn't until the end of October somewhere between the -- the middle and the end of October that we received all of these invoices. In fact, we got about 1300 invoices all at once that were -- took some time for the team to be able to enter into the system and route for payment.**
**So -- so, yeah. So some of these are dated September, October, but they were being held until we came to some kind of agreement on how we were going**

123

**to get billed and they were finally sent to us again in one huge bulk, 1300 invoices all at once.**
Q. After Securus elected to proceed with individual invoices, SHI sent you the individual invoices that related to the consolidated invoices?
MR. IRROBALI: Object to form.
**A. To the ones that had -- can you repeat that then, please?**
Q. (BY MR. ALIBHAI) After Securus elected to proceed with individual invoices, SHI sent you the individual invoices that related to those consolidated invoices they previously sent?
MR. IRROBALI: Object to form.
**A. We received the ones that we had not paid. The consolidated invoices that we could not approve, we did then receive these individual invoices, but again, not till mid to late October before we received these, and then a significant number in November as well.**
Q. (BY MR. ALIBHAI) And to your knowledge, does this spreadsheet reflect the paid and unpaid invoices that were linked to the TDCJ project?
**A. As far as I know, yes.**
MR. IRROBALI: Object to form.
(Plaintiff's Exhibit No. 19 marked)
MR. ALIBHAI: Let me hand you what's been

124

marked as Exhibit 19.
THE WITNESS: Do I give this back to you?
MR. ALIBHAI: I'll take it back just to keep your space clean.
Q. (BY MR. ALIBHAI) So I want to flip to the second page, and it's an e-mail from you to Mr. Ben Moshe, dated February 7th, 2022, correct?
**A. Correct.**
Q. We've not, I don't think, talked about Mr. Ben-Moshe.
Who's Mr. Ben-Moshe?
**A. At this point in time, he was within our -- part of our procurement team. He was a director over procurement.**
Q. Is that part of the operations team?
**A. Yes.**
Q. First paragraph of your e-mail, you're talking about SHI invoices, correct?
**A. The first paragraph, I'm talking about essentially their statement with the fact that we've been making payments, but they're not applying their payments to our account timely so that the statement is not accurate.**
Q. The statement being the spreadsheet; is that what you're referring to?

Q. But if you had the entire communication, you could answer that question?
MR. IRROBALI: Object to form.
**A. Can you ask that again?**
Q. (BY MR. ALIBHAI) If you had the entire communication string between you and Ms. Pelton and Mr. Ninan, you'd have a better idea of what this conversation was about?
**A. I would have a better idea. I would be able to review it and see what it was about, yes.**
Q. Do you know why Mr. Brennan had not done any approvals since October?
**A. No.**
MR. ALIBHAI: All right. Let's take a short break now.
MR. IRROBALI: Sure.
VIDEOGRAPHER: Going off the record. The time is 1:34 p.m.
(Break)
VIDEOGRAPHER: We are back on the record. The time on the video monitor is 1:54 p.m.
Q. (BY MR. ALIBHAI) Ms. Clear, are you prepared to resume your deposition?
**A. Yes.**
(Plaintiff's Exhibit No. 22 marked)



MR. ALIBHAI: Let me hand you what's been marked as Exhibit 22.
Q. (BY MR. ALIBHAI) Is that a statement of work between SHI and Securus relating to CONEX boxes?
**A. Yes.**
Q. And if you'll turn with me to Section 8, does that describe the price and payment information for this statement of work?
**A. Yes.**
Q. And it's broken down into three subparts, correct?
**A. Correct.**
Q. One is for the CONEX box delivery and first month, right?
**A. Yes.**
Q. And then CONEX boxes per month after the first month?
**A. That's what it says.**
Q. And then time for a project manager, correct?
**A. Correct.**
Q. And then it has a total of $312,605, correct?
**A. Uh-huh. Total not to exceed price.**
Q. And so there's a total cost of this project not to exceed $312,605?
**A. Correct.**



Q. And that's the same total reflected in the total at the top there in the blue line?
**A. Yes.**
Q. And so this was a separate SOW for CONEX boxes specifically?
**A. That's what it appears to be, yes.**
Q. And this was signed by Mr. Saxon, correct?
**A. Yes.**
Q. All right. Did you become aware in 2023 that there was an issue with respect to CONEX boxes?
**A. I was not aware, no.**
(Plaintiff's Exhibit No. 23 marked)
MR. ALIBHAI: I'm handing you what's been marked as Exhibit 23 to your deposition. This is a series of e-mails involving Mr. Thompson and individuals at SHI. You can take a look at whatever parts you want. I'm going to draw your attention to a few parts of it.
And a few pages in, it's the fifth page in, there should be an e-mail from Ms. Gauger to Mr. Thompson dated May 2nd, 2023.
Q. (BY MR. ALIBHAI) Do you have that e-mail in front of you?
**A. Yes.**
Q. And she's asking when the remaining units will be empty and ready for pickup, correct?



**A. That's what it appears to be. I'm not on this e-mail though.**
Q. Correct. And I'm asking you these questions as the controller and corporate representative regarding invoice issues.
Were you aware that there was a delay in getting the boxes -- boxes -- the CONEX boxes emptied and picked up?
**A. I was not aware of any kind of a delay.**
Q. Well, if you look, that e-mail that I just showed you was from May 2nd when Ms. Gauger is asking about when the remaining units will be empty, correct?
**A. That's what appears to be.**
Q. And then she follows up again on May 4th and again on May 2nd, and then on the third page, Mr. Thompson responds to her on July 26th, correct?
**A. Yeah. On July 26th, he responded to her e-mail.**
Q. And he said, looks like this was never followed up on.
Right?
**A. It also says they're all empty.**
Q. And he says that on July 26th, correct?
**A. That's when he said the words, yes.**
Q. And then Ms. Gauger confirms at the beginning

137

of the e-mail string on August 22nd that they've all been picked up and that we will get final invoices for them in the next few weeks and then be able to close the project, correct?
**A. That's what it states, yes.**
Q. And do you know why the invoices relating to CONEX boxes have not been paid?
**A. I would say yes. It's because those -- we have paid you guys more than what the cap is on all of these sales, and so, therefore, we would dispute any invoice that we received that is in excess of all the agreed-upon caps.**
Q. Okay. So we just looked at -- the previous exhibit was the CONEX SOW, correct?
**A. Yes.**
Q. And it had a separate not-to-exceed amount, correct?
**A. Yeah, it had a separate one, but -- but in working with SHI, we would certainly be looking at, in total, what have we paid you guys and have we paid you more than we think we owe you, and if that's the case, then we would not pay any more invoices.**
Q. So sitting here today, can you tell me how much was paid for CONEX rentals under the SOW for CONEX?
**A. No, I cannot tell you that specifically today.**

138

Q. How would I find that out?
**A. I would think SHI can tell you exactly how much was paid.**
Q. Okay. If you wanted to find out, what would you do?
**A. I would look at specific invoices if they were noted as such, and -- and calculate a number.**
Q. Okay. And you've not done that?
**A. No, I haven't.**
Q. Securus has not done that?
**A. We did hire an expert to look at all of these statements of work, so we would refer to his work and figure out what was paid, what wasn't paid and, you know, how much we overpaid.**
Q. And so you're using the term overpaid, and you mean in terms of general not-to-exceed amounts, not with respect to a specific SOW?
MR. IRROBALI: Object to form.
**A. Can you repeat that, please?**
Q. (BY MR. ALIBHAI) Well, you just used the phrase "overpaid," correct?
**A. I did.**
Q. And as I understood your testimony, Securus has not determined how much it allegedly overpaid, correct?

139

**A. Securus --**
MR. IRROBALI: Object to form.
**A. -- determined it by hiring an expert to do the work.**
Q. (BY MR. ALIBHAI) Okay. And so let me differentiate between those two things for a minute, if I could.
Other than Mr. Mordaunt's report, Securus has not determined how much it allegedly overpaid, correct?
**A. Securus has relied on an expert to determine how much we've overpaid.**
Q. And so other than that, other than Mr. Mordaunt's report that you looked at, there's no other calculation that Securus has done regarding alleged overpayments?
**A. There's not an -- an exact calculation, no, other than the expert report.**
Q. And with respect to the CONEX charges, you agree that they were covered by a different not-to-exceed amount pursuant to that SOW?
**A. There was a separate statement of work crews for these, so to the extent it was covered under this statement of work, then it would be a separate one, right?**

140

(Plaintiff's Exhibit No. 24 marked)
MR. ALIBHAI: Ms. Clear, I'm handing you what's been marked as Exhibit 24 to your deposition.
Q. (BY MR. ALIBHAI) Exhibit 24 is a series of e-mail exchanges that begins with an e-mail from SHI to Ms. Ortiz at accounts payable, correct?
**A. Correct. It looks like they're -- what they're asking for is just a payment confirmation.**
Q. Regarding past due invoices, correct?
**A. Correct.**
Q. And then you respond on the first page to Ms. Ortiz that the past due number is quite large, correct?
**A. Yes. And it looks like, from looking at this e-mail, that the reason it is so large is that there's credit memos that we've not received from SHI.**
**Actually, it looks like they sent us the wrong aging report --**
Q. And then --
**A. -- altogether and then needed to send a correct one.**
Q. And a correct one was attached, right, by Mr. Lawler?
**A. Well, I can't see the attachment, but that's what it -- the e-mail states.**

(Plaintiff's Exhibit No. 25 marked)
MR. ALIBHAI: Okay. Let me show you what's Exhibit 25, which is the attachment to that e-mail.
Q. (BY MR. ALIBHAI) Exhibit 25 reflects invoices from April 2021 through November 2021 that are past due, right?
**A. They are -- they are noted here as past due, that's correct.**
Q. Well, they are past due, correct?
**A. Well, according to this statement they are, but if they weren't paid, then most likely there was some kind of problem that caused them to not be paid. So for equipment that we didn't receive, credit memos that we asked for. So there's a multitude of reasons why they would not have been paid.**
Q. Okay. Let's go through each invoice and tell me why it wasn't paid. Let's start with the first one. It's dated April 14th, 2021. It's Invoice No. B13318657.
Why wasn't that timely paid?
**A. I would have to see the communications between Norma and SHI to know why that one wasn't paid.**
Q. Okay. Would that be the same answer for all of them on that list?



**A. Yes, it would.**
Q. And with respect to credit memos, on my copy it looks like it's in purple. There are three credit memos listed as invoice numbers, correct?
**A. I see three of them in that first section, yes.**
Q. Okay. And then, after that first section, it's a list of the outstanding current invoices, right? They're not past due as of January 10th?
**A. That's what it appears to be.**
Q. And so going back to your e-mail, you say the past due number is quite large. You're referring to this $979,000 number that's on Exhibit 25, correct?
**A. I would have been referring to what was on the statement, yes.**
Q. And then you say, Please work on the large dollar ones first for year-end close.
Correct?
**A. Correct.**
Q. It says YE. I assume that means year-end?
**A. Yes, it does.**
Q. When does the fiscal year at Securus or Aventiv close?
**A. December 31st.**
Q. And Ms. Ortiz responds to you and says, Yes,



I'll work on the past due amount.
Correct?
**A. Correct.**
Q. And this e-mail exchange in January of 2022 was prior to any change back and forth on consolidated versus individual invoices, correct?
**A. I don't know the timing of when we started consolidated invoices.**
Q. You don't recall that was in the summertime?
**A. That was -- it -- I do recall that it related to the -- the service account --**
Q. In the summertime?
**A. -- rather than the equipment account.**
Q. Okay. So looking back at Exhibit 25, if the requisition is listed as a P.O., that's an equipment account, correct?
**A. Correct. So that would mean there was -- it wasn't received, it could mean a -- multiple things as to why it was not paid.**
Q. It could mean that it sat in workflow for too long, correct?
MR. IRROBALI: Object to form.
**A. No, it couldn't.**
Q. (BY MR. ALIBHAI) Why not?
**A. Because P.O. invoices don't go through**



**workflow.**
Q. Ah. So it didn't get somebody to validate that it had been received?
**A. Probably it wasn't shipped. We had many multitude of invoices where we were billed before it -- an item was even shipped.**
Q. Because they were being stored in a warehouse for your benefit, correct?
**A. We weren't billed for storage in the warehouse.**
Q. Correct. But there was in -- there was equipment that had been preordered and was being held by SHI for Securus for these projects, correct?
**A. Not related to these invoices, no.**
Q. What do you mean?
**A. What I mean is that, in order to be billed, equipment should have been shipped to a location.**
Q. Correct. But it could have been --
**A. It wouldn't -- we wouldn't be billed for something sitting in a warehouse.**
Q. Right. But when it shipped from the warehouse to the site, it would be billed, correct?
**A. That's when it's supposed to be billed.**
Q. Correct. That's your understanding?
**A. That's when it's supposed to be billed is my**

145

**understanding.**
Q. Okay. And so the invoices that don't have a P.O. number under requisition relate to services?
**A. I believe so, yes.**
Q. So the last entry in the past due section is for a CONEX box at Murray, correct?
**A. That's what it says.**
Q. And do you know why that one wasn't timely paid?
**A. No. I can't tell you any specific one of these without seeing information, although that was certainly -- if this was produced as of January 10th and cash application was slow, it could have already been paid and just not noted by SHI.**
Q. Well, nowhere in this e-mail exchange does it say these have been paid, correct?
**A. Nowhere does it say that in this e-mail, no. There are other e-mails where we stated where we had paid a million dollars -- $800,000. Those were not applied timely.**
Q. And you're not suggesting, as of today, that there's any payments that have not been applied, correct?
**A. As of today's date, no, I'm not suggesting anything as of now has not been applied.**

146

(Plaintiff's Exhibit No. 26 marked)
MR. ALIBHAI: I'm handing you what's been marked as Exhibit 26.
MR. IRROBALI: Thank you.
Q. (BY MR. ALIBHAI) And this conversation's occurring in July 2022, right?
**A. Yes.**
Q. And Mr. McAllister is a director of supply chain?
**A. At that time, yes.**
Q. And what does that mean? What's his role?
**A. That was essentially over the procurement team, over the team that managed warehouse operations as well.**
Q. And in response to his e-mail, Mr. Ninan snips some of the outstanding invoices, correct?
**A. Well, there is an image in here. I don't know what all it entails.**
Q. And then you're copied on Mr. Ninan's e-mail and on Mr. McAllister's top e-mail, correct?
**A. Correct.**
Q. And Mr. McAllister is correct in response to Mr. Ninan's question about net 30 and net 60, that everything service-related is net 30, correct?
**A. So it looks like Philip Ninan is asking him a**

147

**question: Why are there two spreadsheets? One shows net 60, one shows net 30. And what Shawn McAllister responds is that, yes, they're in two different accounts now, but the service account has terms of net 30.**
Q. That's Mr. McAllister's response and that was your understanding at the time as well, correct?
**A. Correct.**
Q. And despite the fact that some invoices were not paid on net 30 or net 60 terms, SHI did not charge the late charge, correct?
**A. Not that I'm aware of, but if they were not paid timely, then they were disputed or couldn't be approved.**
Q. Is it your testimony sitting here today that there's not a single invoice that wasn't paid timely just due to internal Securus issues?
**A. No.**
Q. Well, you keep saying that it was because of some other reason. There were also Securus-related reasons that invoices weren't paid timely, correct?
**A. That could happen, yes, but the bulk of the reason was the fact that they were -- we didn't get them in a format that we could validate and approve timely.**
Q. But that was only during a certain month period that you can't identify as you sit here right

148

now?
**A. That was during most of 2022 when we got invoices related to the installation project.**
Q. Well, if you go back to the e-mail that we were just looking at, which was Exhibit 24 and the attachment was Exhibit 25, these are all individual invoices, aren't they?
**A. They are indeed.**
Q. So in 2022, Securus was receiving individual invoices by site by region, correct?
MR. IRROBALI: Object to form.
**A. In 2022, we were receiving individual invoices, we were receiving consolidated invoices. We were receiving both kinds of invoices in 2022.**
Q. (BY MR. ALIBHAI) Okay. Tell me when Securus first requested consolidated invoices.
**A. We first requested consolidated invoices by site I believe in early '22. Jerimy Thompson required it.**
**There were e-mails between Norma and Kristin even as far back as '21 talking about invoicing by site. But -- but there were e-mails with Jerimy Thompson in early '22 saying we want consolidated invoices by month by site.**
Q. And then we know that by October, it switched

the people that it needed to be approved by?
**A. This particular invoice, yes.**
Q. And so for a $12.04 invoice, that means that either Thompson or Mr. Brennan looked at it first?
**A. Correct.**
Q. And then Mr. Saxon reviewed it next?
**A. Correct.**
Q. And so in 2022, this level of detail had been provided by SHI regarding that invoice?
**A. This is a statement, yes. So on this statement, we got this information.**
Q. Okay. And -- and that's why you and I are speaking past each other. You said statement and, in my world, I was thinking a paper document, but you're considering this a statement as well?
**A. This is -- this is a statement from SHI. The Columns A through G or H --**
Q. And you're --
**A. -- came from SHI.**
**This is a listing of invoices. It's not an actual invoice. It's a listing of invoices on our account.**
Q. And you don't know, sitting here today, what day you received the invoice that corresponds to line 229?



**A. Can I tell you the -- can you ask that again, please?**
Q. You don't know, sitting here today, what day Securus received the invoice that corresponds to line 229 on this Excel spreadsheet?
**A. I do not know the exact date, but I do know we received 1300 invoices in mid-October after we had not received invoices for some time.**
Q. I understand that. My question was: Do you know what day you received this particular invoice?
**A. I -- I don't know the exact date, no.**
Q. And when is it that you believe that Securus received these 1300 invoices?
**A. In October. It was somewhere between the middle and the end of October, but I don't know the exact date.**
Q. After the decision was made to choose individual invoices instead of consolidated invoices?
**A. Yeah, after we had to choose that because we had no other way to validate the invoices.**
(Plaintiff's Exhibit No. 27 marked)
MR. ALIBHAI: I'm handing you what's been marked as Exhibit 27 to your deposition.
Q. (BY MR. ALIBHAI) This is an e-mail chain between you and Mr. Ninan in August of 2022, correct?



**A. Correct.**
Q. And he's referencing over $10 million unpaid on six invoices going back several months, correct?
**A. Correct. These are the consolidated invoices that we couldn't validate.**
Q. And so what did you do to get the validation that you needed for these invoices?
THE WITNESS: Apologies. I'm having a little trouble reading this.
MR. ALIBHAI: You can blame your counsel for producing it that way.
MR. IRROBALI: I told you, in the afternoon everything is my fault.
THE WITNESS: Okay. I'll blame you for this one.
MR. IRROBALI: It's all right.
**A. Okay. So I don't recall exactly what I did, but I'm sure I would have researched these to figure out why there was a problem and why they're still sitting in someone's workflow.**
Q. (BY MR. ALIBHAI) And again, it's a not memory test, but I -- all I have is the documents I have in front of me.
Is there anything you can tell me that Securus did to figure out why there was a problem and



why they were still sitting in someone's workflow?
**A. Yes. And we would have talked to the operations people. We would have also talked with SHI to say, hey, we have these invoices that we weren't able to validate; we need to work out a solution.**
**That's the point in time where we started talking -- where I was involved, at that point, trying to get what the operations guys had been asking for, which was invoicing -- consolidated invoices by site rather than these large invoices that they could not do anything with.**
Q. Well, with respect to these particular invoices, do you recall who had communications with SHI?
**A. I cannot tell you who had communications on each particular invoice.**
Q. Okay. On any of those invoices?
**A. I would say I did see communications with David Brennan. I -- I saw communications with Norma, so -- and I personally had communications with SHI on consolidated invoices.**
Q. Who did you speak with?
**A. Kristin.**
Q. Ms. Cooper?
**A. Yes, thank you, Kristin Cooper.**
**I believe we also talked with Shareeq, but**

181

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

SHI INTERNATIONAL CORP., )
PLAINTIFF, )
VS. ) CIVIL ACTION
) NO.: 4:23-CV-00200-SDJ
SECURUS TECHNOLOGIES, LLC, )
DEFENDANT. )

---------------------------------------------------

REPORTER'S CERTIFICATION
DEPOSITION OF MARY CLEAR
MARCH 6, 2024

---------------------------------------------------

I, Kelly Bryant, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the foregoing deposition of MARY CLEAR, the witness, hereinbefore named was, at the time named, taken by me in stenograph on MARCH 6, 2024 having been first duly cautioned and sworn to tell the truth, the whole truth, and nothing but the truth, and the same were thereafter reduced to typewriting by me or under my direction.

182

I further certify that pursuant to FRCP Rule 30(f)(1) that the signature of the deponent:

________ was requested by the deponent or a party before the completion of the deposition and is to be returned within 30 days from date of receipt of the transcript. If returned, the attached Changes and Signature Page contains any changes and the reasons Therefor;

__XXX__ was not requested by the deponent or a party before the completion of the deposition.

I further certify that I am neither counsel for, related to, nor employed by any of the parties in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

GIVEN UNDER my hand of office on the March 13, 2024.

Kelly Bryant

KELLY BRYANT
Texas CSR No. 5772
Expiration Date: 07/31/25