# EXHIBIT 70

Planet Depos
We Make It Happen™

# Transcript of Jeffrey J. Mordaunt

**Date:** April 4, 2024
**Case:** SHI International Corp. -v- Securus Technologies, LLC

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

1

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

SHI INTERNATIONAL CORP., )
Plaintiff, )
VS ) Civil Action No. 4:23-CV-200-SDJ
SECURUS TECHNOLOGIES, LLC, )
Defendant. )

**********************************************

VIDEOTAPED DEPOSITION OF
JEFFREY J. MORDAUNT
APRIL 4, 2024

**********************************************

Job No. 530150
Pages 1 - 143
Stenographically Reported by:
Susan S. Klinger, RMR-CRR, CSR

2

April 4, 2024
9:05 a.m.

VIDEOTAPED DEPOSITION OF JEFFREY J. MORDAUNT, produced as a witness at the instance of the Defendant, and duly sworn, was taken in the above-styled and numbered cause on the 4th of April, 2024, from 9:05 to 2:02, before Susan S. Klinger, RMR-CRR, CSR in and for the States of Texas and California, reported by stenographic method, at Tillotson Johnson & Patton, 1201 Main Street, Dallas, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

3

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:
Jamil Alibhai, Esquire
Madison Craig, Esquire
Toni Anderson, Esquire
MUNSCH HARDT KOPF & HARR, P.C.
500 North Akard, Suite 4000
Dallas, Texas 75201
214.855.7511

ON BEHALF OF THE DEFENDANT:
J. Austen Irrobali, Esquire
TILLOTSON, JOHNSON & PATTON
1201 Main Street, Suite 1300
Dallas, Texas 75202
214.382.3041

Also Present:
William Bird, Esquire (Via Zoom)

4

INDEX


| WITNESS | PAGE |
|---|---|
| JEFFREY J. MORDAUNT | |
| EXAMINATION BY MR. ALIBHAI | 7 |


EXHIBITS


| No. | Description | |
|---|---|---|
| Exhibit 1 | Mordaunt Expert Report | 8 |
| Exhibit 2 | Statement of Work, SHI-009372 | 14 |
| Exhibit 3 | Change Request, SHI-128641 | 19 |
| Exhibit 4 | Change Request, SHI-355675 | 20 |
| Exhibit 5 | Notes, SECURUS181023 | 24 |
| Exhibit 6 | Invoice, SHI-243068 | 40 |
| Exhibit 7 | Invoice, SHI-242371 | 41 |
| Exhibit 8 | Invoice, SHI-339034 | 43 |
| Exhibit 9 | Invoice, SHI-364946 | 47 |
| Exhibit 10 | Invoice, SHI-364014 | 51 |
| Exhibit 11 | Invoice, SHI-242784 | 55 |
| Exhibit 12 | Invoice, SHI-496991 | 56 |
| Exhibit 13 | Change Request, SHI-128507 | 71 |
| Exhibit 14 | Excel, SECURUA230807.xlsx | 72 |
| Exhibit 15 | Invoice, SHI-287139 | 76 |
| Exhibit 16 | Invoice, SHI-337441 | 76 |
| Exhibit 17 | Invoice, SHI-240773 | 77 |
| Exhibit 18 | Project final acceptance, Duncan, SHI-215700 | 81 |

37

correct?
**A Correct.**
Q And it actually is done site-by-site that way as well, correct?
**A It is, correct.**
Q Would you agree with me that if the overpayment for a site is incorrectly calculated it would also affect the region analysis?
MR. IRROBALI: Object to form.
**A If there is a mistake in a number, it would likely lead to a mistake in the number for the region analysis as well. But then you would have to determine whether it was relevant or not to the region analysis when you are looking at it from a global basis. I'm not disagreeing with you. There could be -- like, if there was a mistake, it will similarly flow to the region analysis.**
Q With respect to a couple of items you mentioned, you have a column here, I believe it is I, total invoice excluding materials, correct?
**A Total invoice excluding materials post tax, correct.**
Q Why are you excluding materials?
**A Materials, the SOW is the only**

38

**not-to-exceed amount applied to service. So we basically had to breakdown every single invoice into materials, time and expense or travel and expense and service hours or -- and equipment hours.**
Q And so with respect to overpayments, you are looking for payments for services, correct?
**A Payments for what would be comparable to the service component in the SOWs, correct.**
Q Not materials, correct?
**A Correct.**
Q Not travel and expense, correct?
**A Correct.**
Q And not taxes?
**A Correct.**
Q And that is why you are doing the pre and post-tax analysis?
**A Correct. Because all the -- all the invoices just lump a tax amount on. So you -- you have to basically back all the taxes applied out to have something to compare it to the SOW not-to-exceed limits.**
Q All right. So my question was how you arrived at 12,852. And there is an analysis that is reflected in Exhibit H as to how you arrived

39

there, correct?
**A Correct.**
Q So now I want to ask a more granular question about some of the particular components. How would I go about determining what made up the different buckets in H through M to arrive at the 12,852?
**A Sure. So in H and M we're largely picking this up, I believe, in its entirety outside of the tax application. We're picking that information up from Exhibit L.**
**So you will have the -- so I'm going to set the consolidated invoices aside for a second, but the total service payment and the travel and expense component would be being picked up from Exhibit L, because Exhibit L is where if you look at -- there is categories where we classify them as service materials or consolidated invoice. And then we pick up the pretax amounts for travel and expense as well as materials there.**
Q So if I searched Exhibit L for Lindsey, that would show me all the instances of invoices that you used for that calculation?
**A I believe so.**
Q All right. So I have tried to do that.

40

Let me hand you some invoices and see if you can walk me through the analysis that is reflected in Exhibit H to your report for Lindsey.
(Exhibit 6 marked.)
Q Exhibit 6 to your deposition is an invoice that relates to Lindsey Conex. Was this part of your analysis?
**A It should be, yes. I'm assuming this was in the batch of invoices that were produced to us before my report.**
Q Well, can you look at Exhibit L and determine whether it was?
**A I can try to match an amount up, but that is pages and pages and pages of invoices. Let's see what I can do here. This is going to test my eyesight.**
Q These are your spreadsheets, your decision to put them together this way. All right. Let me try to guide you here. Line 687 on Exhibit L, does Exhibit 6 match up to that?
**A It appears to be, yes.**
Q And so have you classified this invoice in terms of services or materials or other?
**A It is classified as materials.**
Q And so where would that show up on Exhibit

45

your deposition references two invoice numbers, correct?
**A It does.**
Q And did you look at those invoices?
**A If we had them at the time of my report, we did. There were -- I would say for probably 90 percent of the consolidated invoices we did not have the underlying invoice. There were a handful that we did.**
Q Did you do any further analysis regarding consolidated invoices since the time you issued your report?
**A I guess what do you mean by "further analysis"?**
Q Well, did you look at the individual invoices referenced in the consolidated invoices after preparing your report?
**A I mean my population of invoices hasn't changed. The only thing I noticed was it appeared Mr. Nolan in the new spreadsheet that has been produced apparently had each one of these individual invoices listed on that spreadsheet. But outside of those that 10 percent where I was able to find the underlying invoice, I haven't seen the under -- any of the underlying invoices otherwise.**

46

Q You reference Mr. Nolan's report and a spreadsheet. Did you see the spreadsheet that was produced in December?
MR. IRROBALI: Object to form.
**A I couldn't tell you when it was produced. I saw the spreadsheet that Mr. Nolan is relying on. I don't know if that is the one you are referencing to that was produced in December or not.**
Q Put aside the date. Did you look at the spreadsheet that Mr. Nolan was relying on?
**A I have looked at it, yes.**
Q Did that change your analysis in any way?
**A I don't believe so. I mean, it listed all the invoices individually as opposed to being consolidated, but it doesn't -- I mean, that spreadsheet doesn't really give you the ability to do anything with it. And if the underlying invoices aren't produced, we still don't have the level of detail necessary.**
Q And have you determined whether the individual invoices have been produced?
**A To my knowledge, they haven't.**
MR. IRROBALI: When it is convenient, can we take a 5-minute convenience break?

47

MR. ALIBHAI: Yes. Give me one more minute.
MR. IRROBALI: Sure.
(Exhibit 9 marked.)
Q Let me hand you what has been marked Exhibit 9. Is Exhibit 9 an individual invoice numbered B14 -- sorry.
Is Exhibit 9 an individual invoice numbered B15477095?
**A It is.**
Q And did you understand that the consolidated invoices used the first invoice number as the consolidated invoice number as well?
**A I'm sorry --**
MR. IRROBALI: Object to form.
**A -- can you repeat that?**
Q The previous exhibit was a consolidated invoice, correct?
**A Correct.**
Q What is the number on the consolidated invoice?
**A It is B15477095.**
Q And did you understand that the consolidated invoices used the invoice number of the first invoice number identified in the individual invoices?

48

**A I believe that was consistent, yes.**
Q Right. And so going back to Exhibit 8 and 9, is Exhibit 9 the individual invoice for the consolidated invoice for Exhibit 8?
**A It appears to be.**
Q And on Exhibit 9, what are the services provided?
**A It looks like it is all material.**
Q And so materials on Exhibit 9 would not be part of an overpayment, correct?
**A If we were measuring against the NTE amount it would not be, correct.**
Q But in your Exhibit H, by listing the consolidated invoice you have reflected that as an overpayment, correct?
**A Correct. If I -- if we did not have the underlying invoice at the time of my report to try to break that out, we counted them all as service, because we didn't have anything else we could do with it.**
Q So that inflated the overpayment amount, correct?
MR. IRROBALI: Object to form.

49

A Based on what you have just provided me, I would change that and move that amount to materials, correct.
Q But by assuming that every consolidated invoice was a services amount, that inflated the overpayment amount, correct?
A It may or may not depending on what the underlying invoice on the consolidated invoice says.
Q Okay. And so looking at Exhibit 9, at least that amount of $3,272.99 is an amount that should not be included as an overpayment, correct?
A I would agree. I would move that to -- from the services component to the materials component.
Q So it would come out of -- it would come out of Column H on Exhibit H to your report?
A Correct.
Q And it would move into Column K, sorry, is it H? It is Column H on the next set of lines.
A In general you are correct. You would move it from the top half of Exhibit H of service, the bottom half is materials. So it would go into materials as opposed to being in service.
Q And so the effect of moving it out of

50

Column H would mean that it would also move out of Column K; correct?
A Yes. If I remove it from the service component of Column H, it would also be removed from -- on a tax affected basis from Column K.
Q And then it would also come out of Column N, which includes Column K as part of its sum?
A Correct.
Q And then it would come out of the total that is at the bottom of the chart at line 15?
A That's correct.
Q And it would come out of Column B then -- sorry.
It would come out of Exhibit B to your report?
A Yeah. Exhibit B would have to be updated and similarly Exhibit A would have to be updated.
Q And then paragraph 40 of your report would have to be updated?
A Correct.
Q So based on the analysis you have seen just on this one exhibit, the conclusions in your report are off by at least $3,272.99?
MR. IRROBALI: Object to form.
A I mean based on what you just showed me,

51

which I don't believe I had ever seen before, I would -- I would revise my schedule accordingly.
Q And this is a document that has been produced in the case, correct?
MR. IRROBALI: Object to form.
A It has got a Bates stamp.
Q Is it your understanding that when it has a Bates stamp it has been produced in the case?
A Yeah.
MR. ALIBHAI: Let's take a break then.
MR. IRROBALI: Sure, thank you.
(Recess, 10:08 to 10:25 a.m.)
Q Mr. Mordaunt, are you prepared to resume your deposition?
A Yes.
Q I'm handing you what has been marked as Exhibit 10.
(Exhibit 10 marked.)
Q Exhibit 10 is invoice number B15063419, correct?
A Correct.
Q And that is reflected on the consolidated invoice that is Exhibit 8, correct?
A That appears to be the same invoice number, correct.

52

Q And what are the services and materials reflected on this Exhibit 10?
A At first glance it appears to be all materials.
Q All hardware, correct?
A It is all -- each line item is labeled hardware hardware.
Q So that would not be services, correct?
A Correct.
Q And so that should not be part of Exhibit H with respect to the amount of the overpayment, correct?
A It should not be. It would not be part of the service component. It would be part of the material component, correct.
Q And so it would not be part of the overpayment analysis?
A As -- the overpayment analysis as it relates to the NTE amounts, correct.
Q And so in the Lindsey consolidated invoice amount of $6,724, that entire amount should not appear, correct?
A I mean, again, based on what you have just showed me, I would agree. I would change those amounts, but I don't believe I had these invoices

61

**just a "sum if" that looks up the service amounts in Column L.**
**So I mean, on the fly I don't know that I can necessarily give you an answer. I would have to kind of dig into the formulas and Exhibit H in -- or I'm sorry, Exhibit H and Column I, because that would probably be wherever this is flowing from.**
**So I would just have to double-check that, but I don't disagree with you based on the -- the filtering that I just did. I think the dollar amount for service was, I think, 7,481 or something like that.**
Q Based on the exhibits we just covered, I have 6,795 and $115 is what you testified to; is that correct?
**A Yeah, and then obviously the tax impact of adjustment.**
Q Well, I'm using the pretax numbers from the invoices.
**A Sorry. Right, so the pretax numbers you -- I'm sorry, what was your total, again? I'm not disagreeing with you.**
Q I want you to verify for me that the numbers are for service payment pretax $6,795 and

62

$115 for Lindsey?
**A Based on those invoices, you are correct.**
Q And those are all the invoices listed in your Exhibit L, correct?
**A When I filter by Lindsey, that is correct.**
Q And so the amount that is reflected on Exhibit H for the total service payment is incorrect?
MR. IRROBALI: Object to form.
**A Based on the quick and dirty filtering that I just did, I would not disagree that the numbers don't match. I would just like to take the time to figure out why it doesn't. I mean, not necessarily. I mean, if I need to amend something I would amend something after my deposition.**
Q Well, this is the only chance, as far as I know, that I get to depose you. So I want to know how you arrived at the number that is reflected in Column L of Exhibit H based upon what we've looked at today?
**A Right. And Column L of Exhibit H is basically the total -- basically Column I, right, minus your tax rate, right. So -- so what I'm saying is if something is off, it is in**

63

**whatever -- however Column I is pulling it.**
Q Okay. And so tell me how you arrived at $9,677 in Column I?
**A I mean, it should -- the way the formula works is it should be looking at anything that was marked paid that is similarly marked service that gets -- that is getting pulled into that column. And it should be pulling from, I believe, Column D and then we walk-through the tax affecting and backing out the time and expense.**
Q Travel and expense?
**A Sorry, travel and expense. I keep saying that, my apologies.**
Q All right. So sitting here right now you can't explain how you arrived at $9,677 in Column I or the 6 -- sorry, $8,879 in Column L, correct?
**A I believe the 9,677 is the invoice total for the two on Column L that are marked as service. So it would be Exhibit 7 that you handed me along with Exhibit 12 I believe. So that is -- that is the 9,677 if you just did the totals after tax.**
Q But the pretax amounts on these invoices that you just referenced, Exhibit 7 and 12, adds up to $6,910, correct?

64

**A I believe that is roughly right. So I think -- I think where this could potentially be off is how we tax affected anything, because we used a percentage, because if you look at Column H, I think we're kind of getting to a similar place.**
**But I think your question -- so what we basically did was we took Column N and then tax affected it to get to that service amount. So I think perhaps because Column N included some travel in there or, sorry, travel and expense in there I believe we -- it looks like we may have inadvertently included that as a service rather than backing it out. We did back it out, but it is -- I think we might have included that twice.**
Q So the --
**A Kind of based on looking at it, but again, I'm doing this on the fly.**
Q So the service payment towards NTE for Lindsey is higher than it should be?
MR. IRROBALI: Object to form.
**A On first glance it may be. But I do believe we're -- I mean, the ultimate conclusion we reach on service payment excluding the consolidated invoices is $6,683. And based on**

65

**what you just showed me we were at -- I don't remember the exact number that you gave me, but it was, like, around $6,800.**

Q So from the 12,000 and change service payment towards NTE, you're now subtracting out the consolidated invoice; is that correct?

**A What I was simply doing was taking the 8,879 minus the 2,196 and that gives me 6,683, which would be the service component that we're talking about excluding the consolidated piece.**

Q Why are you excluding the consolidated invoice?

**A That wasn't your question.**

Q I'm looking at --

**A You asked how I got to the 9,677 and the 8,879 and that is what I'm trying to explain.**

Q Okay. But I was asking you about -- I thought you were referencing the $12,000 number. That is Column N, right?

**A The 12,000 is this -- in the hard copy it is Column N, in the spreadsheet it is Column S, so I don't want to get confused. Column N is the $12,000. So if you subtract out the consolidated component you are at 6,683, and what you just showed me added up to be about $6,800. So what**

66

**I'm trying to say is I think that is how we applied a general tax rate that may make-up that 100 or so dollar difference.**

Q So let's -- let's talk about how you computed the tax amounts. Going back to your report, Exhibit H, how did you determine the pretax amount?

**A I mean, what we basically did was we took the total invoice amount. We selected some invoices from each one of the sites to determine what the tax rate was being applied to the total invoice amount and then we backed taxes out of each component as we needed to, service or materials or travel and expense.**

**So we assumed -- we assumed that 5 -- if we look at Exhibit 7, we assumed the $561 of tax applied to every single thing that was in the invoice. So -- so that is -- that is kind of how we did that. We assumed that there weren't -- that taxes were applied to everything that was listed in the invoice not just one type of product that may be in an invoice.**

Q And the formula that you used was taking the invoice amount, multiply it by 1 minus the tax percentage?

67

**A Correct.**

Q That is not the correct formula for determining a pretax amount, correct?

MR. IRROBALI: Object to form.

**A I mean, that is a way to get to the pretax amount.**

Q Well, I want to figure that out. If the tax rate that you are using is 8.25 percent, is that what you used for Lindsey?

**A Yes.**

Q So if I had a $100 amount and the tax rate was 8.25 percent, if I wanted to know the post-tax amount, it would be $100 times 1 plus 8.25, correct?

**A Correct.**

Q And so if I wanted to determine the pretax amount, it would be the amount divided by 1 plus the tax amount, correct?

**A I think you could do it that way, correct.**

Q Well, let's say that in Texas we have 8.25 percent in most cities?

**A Okay.**

Q So a $100 amount would yield a total amount after taxes of $108.25, correct?

**A I believe that is right, based on what you**

68

**just said.**

Q Well, you have an Excel in front of you, correct?

**A I do.**

Q And so you can determine the tax of what would be $100 multiplied by 8.25 percent sales tax and get to the total?

**A Right.**

Q What would that total be?

**A I'm sorry, can we start over? What was your example?**

Q $100.

**A Yeah.**

Q Try to make it simple.

**A Okay. $100, and if you want to tax it it is $100 times 1 plus the tax rate.**

Q Okay. What would that yield?

**A $108.25.**

Q And if I've applied your formula in Column L, what would be the pretax amount if I used your formula?

**A It would be $99.31.**

Q And that is incorrect, correct?

**A I would agree that is not what it should be.**

69

Q Because you have used the post-tax amount times 1 minus the tax rate, correct?
**A That was the formula that was used, correct.**
Q And the correct formula should have been the amount divided by 1 plus the tax rate, correct?
**A I believe you are correct. I would want to double-check things off, you know, when we're not doing it on the fly, but I think I will go back and double-check the tax rates and how we're doing it.**
Q Well, run that formula for me. Run the amount divided by 1 plus the tax rate on that $108.25 and tell me what you get.
**A You will get $100.**
Q So do you agree that the tax adjustment that has been made in the entire report is using an incorrect formula?
**A Again, it may be. And let me -- I would like to go back and look at it not on the fly, but, you know, the example you just walked me through I said I think we're off on the tax rate somewhere, then this perhaps may be the reason that we're off slightly.**

70

Q All right. Let's turn to Wallace, that is also in Region 5, correct?
**A If you need the -- someone want their computer back?**
Q Sure. I'm looking at your report.
**A I don't know if you need this still or not, if I need this or not.**
Q You might. We will come back to it if you do.
So I'm going back to your report. If I want to look at Wallace that is reflected in Exhibit H as well, correct?
**A It is.**
Q And on this particular one there is no -- you start with a statement of work amount, correct?
**A I do.**
Q And so that was the same exhibit that we looked at earlier for the SOW, correct?
**A It should be, correct.**
Q And the amount reflected there for total is $218,770 for Wallace for Region 5, correct?
**A Correct.**
Q And that is the number that you used in Column A for Wallace?

71

**A Correct.**
Q And then Change Request 1 reflects a deduction for $10,058?
**A It does.**
Q And so to go back to the Change Request 1 that you had for Region 5 as well, it is Exhibit 3.
**A Okay.**
Q That is the $9,540 plus the $517.50, correct?
**A Correct.**
Q So that is how you got to Column B's $10,058?
**A I believe that's correct.**
Q Okay. This is Exhibit 13. This is Change Request 4, correct?
(Exhibit 13 marked.)
**A It is.**
Q And here it is reflecting an addition of $5,880 in materials, 8,400 in labor and $276 in PM costs, correct?
**A Correct.**
Q And so the addition of labor and PM cost adds up to $8,676?
**A Correct.**

72

Q That is reflected in your Column E on Exhibit H?
**A Correct.**
Q And then Change Request 5 removed Wallace from the SOW, correct?
**A Yes.**
Q And that is Exhibit 4. And that is why you reflect a negative $210,000 on Change Request 5?
**A I mean, that is in part. There is also a percentage completion applied in that calculation as well.**
Q And the percentage completion, I don't think we looked at the spreadsheet. Let me hand this to you. This is Exhibit 14.
MR. IRROBALI: Thank you.
(Exhibit 14 marked.)
Q Is Exhibit 14 what you used to determine percentage completion?
**A No, I testified earlier I obtained the percentage completions from talking to Ms. Thibodeaux.**
Q But using a spreadsheet, correct?
**A No, Ms. Thibodeaux told me what the amounts were which I believe she had gone and**

85

for Kegan, correct?
**A That appears correct, yes.**
Q And this one is broken down by labor and materials, correct?
**A Labor and materials are listed separately, correct.**
Q And the labor is listed at $78,000 and -- $78,015, correct?
**A That is what it is listed at, correct.**
Q Which is greater than the NTE amount that you have used on Exhibit D, correct?
**A I would agree that the 78,000 is greater than the 72,000 or so that I used and that is NTE in my exhibit.**
Q The NTE used is 67,203, correct?
**A The actual NTE amount, yes, is 67,203, correct.**
Q And the service payment towards NTE is 72,278, correct?
**A 72,228 is what we determined, correct.**
Q Which is lower than the 78,015 reflected in Exhibit 19; correct?
**A I would agree.**
Q And that one is differentiated, that one being Exhibit 19, between labor and materials,

86

correct?
**A Exhibit 19 does separate out labor and materials, correct.**
Q Let's look at Exhibit E to your report. Exhibit E to your report is for Region 2, correct?
**A It is Region 2 by site, correct.**
Q And I want to focus on Michael. You determined that there was an overpayment with respect to Michael; is that correct?
**A That is correct.**
Q In the amount of how much?
**A Relative to service overpayments for the NTE, $670,863 or, I'm sorry, that is not the overpayment. That is the difference between that and the NTE amount is the overpayment.**
Q So you would take the amount in M, which is the service payment and compare it to the amount in F, which is your calculation of the NTE amount, correct?
**A Correct, and that should be on Schedule B.1, which is $182,923. It is line item 9.**
Q And so those two numbers that we just referenced, the 670,000 and the 487,000 from Exhibit E are the input into Exhibit B.1 and their difference is calculated as the overpayment --

87

**A Correct.**
Q -- of $182,923?
**A That's correct.**
Q And looking at Exhibit E, it is still using that incorrect formula for tax, correct?
**A Without going back into the native Excel file assuming they are all utilizing that formula that may be an issue that I will go back and look at after the deposition.**
Q Well, I only get to depose you once as far as I know, so I'm basing it on what you know now. You're looking at Exhibit E with me, correct?
**A I am.**
Q The formula is listed at the top of the columns, correct?
**A Correct. No, I'm not disagreeing with you. They likely all use the same formula.**
Q And that formula is incorrect?
**A Based on the quick and dirty that we did today, I would look at it and revise it if it is incorrect, but it appeared to be perhaps incorrect.**
Q It is a mathematical formula, correct?
MR. IRROBALI: Object to form.
**A I mean, all formulas are mathematics.**

88

Q And they're either right or they're wrong; isn't that correct?
**A Truthfully there can be some that give you wiggle room as well, it all depends. If you are doing an array, there -- there is a whole host of numbers that could theoretically be.**
Q This is not an array, correct?
**A I'm not disagreeing with you. I mean, that is the formula that we used and if it is incorrect then I will look at it and revise my analysis if I need to.**
Q And what I'm trying to understand is, as you sit here today, is this the incorrect formula to determine a pretax amount?
**A I don't know how else to answer this. Based on what we looked through earlier today, it perhaps is. I just don't want to tell you every single one of these is correct without taking the time to actually study it, that is all.**
Q I'm not saying each of the calculations. I'm just asking the formula. How did you determine Column K according to Exhibit E?
**A No, according to the formula is what you walked me through earlier, which is 1 minus the tax rate.**

Q Multiplied by the amount?
**A Correct.**
Q And that is the incorrect formula?
**A Based on what we walked through earlier today, that may be incorrect.**
Q So let's walk-through some invoices for Michael.
Before we do that, the NTE amount is based upon the statement of work and then two change requests, correct?
**A Correct.**
Q And you don't have a negative amount in Change Request 4, so this was a completed site that you used the full NTE amount subject to change requests?
**A I generally believe that is correct, yeah.**
Q Handing you what has been marked as Exhibit 20.
(Exhibit 20 marked.)
Q Isn't this invoice number B15477102 related to Michael?
**A Yes. This is the -- this is the consolidated invoice that we have in Column G related to Michael in Exhibit -- Exhibit E.**
Q And Column G reflects $155,000 -- sorry.



It is 1 million 550 -- no, said it right the first time. Let's do that again.
Column G on Exhibit E reflects $155,042, correct?
**A Correct.**
Q Which is the amount of consolidated invoice B15477102, correct?
**A Correct.**
Q And then to do your calculation, you determined a pretax amount and included that in the service payment towards NTE, correct?
**A That's correct.**
Q And the only reason that it should be included in that line item is if it is actually for services, correct?
**A That is generally what we tried to do. We just didn't have -- you know, I think I testified earlier we only had about 10 percent of the underlying invoices of these consolidated ones at the time of our analysis.**
Q All right. Let's go through the invoices that are reflected on the consolidated invoice that is Exhibit 20.
(Exhibit 21 marked.)
Q Exhibit 21 is individual invoice



B15477102, correct?
**A That is correct.**
Q Relates to Michael, correct?
**A Correct.**
Q And relates to hardware, correct?
**A It appears each of the line items relate to hardware.**
Q So that should not be included in a service payment?
**A I mean, that would be one based on our methodology we use. We would have put in materials as opposed to a service had we had the invoice.**
Q And so the overpayment reflected for Michael based upon Exhibit 21 is overstated by the amount of at least $3,345.80, correct?
**A I mean, again --**
MR. IRROBALI: Object to form.
**A I would agree that if, you know, using our methodology this would shift from service to materials leading to a higher amount in the NTE analysis than there should be. Again, we're -- I'm limited to what -- what we had at that point in time.**
Q And where did you obtain the invoices that



you relied upon in preparing your analysis?
**A From counsel.**
Q Who?
**A Mr. Irrobali, right here.**
Q Outside counsel?
**A Outside counsel, yes.**
Q Okay. Did you ask Ms. Ortiz for the invoices that made up these consolidated invoices?
**A I did not specifically ask Ms. Ortiz. My understanding was the invoices that were in their possession had been produced.**
Q And did you look at the pivot tables and spreadsheets that Securus and SHI exchanged regarding the invoices?
**A I mean, I think I saw, like, one or two of those maybe when I was reviewing Mr. Nolan's file, but I don't believe I looked at them relative to the affirmative analysis. I don't know that I had them.**
Q When you say Mr. Nolan's analysis, that was after the date of your report?
**A I didn't get his analysis until after the date of my report, correct.**
Q So my question -- let me be clearer. Prior to submitting your November 20th report, did

101

in the service payment towards NTE for Michael, correct?
MR. IRROBALI: Object to form.
**A It would be classified as material not service.**
Q Handing you what has been marked as Exhibit 33 to your deposition.
(Exhibit 33 marked.)
Q Is this invoice number B14981819?
**A It is.**
Q Is it part of the consolidated invoice that has been marked as Exhibit 20 to your deposition?
**A It is.**
Q Is it for Michael?
**A It is for Michael.**
Q And reflects hardware on each of the line items, correct?
**A Correct.**
Q And should not be included in the amount towards -- service payment towards NTE for Michael, correct?
**A It would be classified as material not service, correct.**
Q All right. And if you need a computer or

102

calculator, tell me so and we can provide you one unless you have one.
Do all of the invoices that we've marked as exhibits 21 through 33 total the $155,000 number referenced in Exhibit 20 that you have listed in Exhibit E under consolidated invoice on your report?
**A I will have to add on the calculator if that is okay.**
Q Absolutely.
**A It does.**
Q Just to make sure the record is clear, the invoices that we marked as exhibits 21 through 33 to your deposition are all of the invoices listed on Exhibit 20 to your deposition, correct?
**A I believe each of exhibits 21 through 33 were each of the individual invoices that were listed in Exhibit 20.**
Q And you have just added up invoices marked as exhibits 21 through 33 and they total the amount that is listed on Exhibit 20; is that correct?
**A That's correct.**
Q Which is $155,042.21?
**A Correct.**

103

Q And that $155,042.00 number is what is on Exhibit E to your report as the consolidated invoice, correct?
**A That is correct.**
Q And that amount in its pretax amount was included in the service payment towards NTE, correct?
**A The pretax amount related to those was included in the service payment towards NTE, correct.**
Q But they're all for hardware now that you have seen them, correct?
**A Now that I have them, yes.**
Q And as a result, they should not be included in the service payment towards NTE?
**A I would agree if you were going to adjust these numbers now that I have the underlying detail, they would be removed from the service payment and they would be included as materials.**
Q And so by removing the $144,577 number from the service payment on your Exhibit B.1, that would reduce the total payment pretax?
**A It would.**
Q And it would reduce the overpayment, correct?

104

**A It would.**
Q And it would reduce the total overpayment by site, correct?
**A It would.**
Q And it would also reduce the total overpayment by region analysis that you have done in Exhibit B.2, correct?
MR. IRROBALI: Object to form.
**A I believe it would, yes.**
Q Well, the region analysis is made up of all the different sites in the region, correct?
**A Correct.**
Q So if one of the sites has got a reduction in the overpayment, the region would also have a reduction in the overpayment?
**A You would logically think so, yes.**
Q I'm just trying to understand how the structure of the report and exhibits work.
**A Yes.**
Q Now, one more exercise. Can you add up exhibits 21 through 33 in the pretax amount?
**A That is going to take --**
Q Would you prefer to have the Excel? Would you rather do it on the spreadsheet?
**A No, it will be fine.**

121

Q Right. If you turn to SECURUS228735, there is an email from Ms. Ortiz to Ms. First copying Ms. Clear where she says oh, no, I did short pay the consolidate bill. No one caught my mistake. And it reflects that there was a payment of $700.28, correct?
**A It appears -- I mean glancing at the emails that appears what is happening.**
(Exhibit 41 marked.)
Q Exhibit 41 is invoice number B15228657, the individual invoice, correct?
**A That appears to be correct.**
Q And that is -- go ahead?
**A No, go ahead, I'm sorry.**
Q That is the only invoice reflected on the consolidated version of B15228657, correct?
**A That is correct.**
Q And it is all for hardware?
**A It appears to all be for hardware.**
Q And totals the $70,028 reflected in the consolidated invoice, correct?
**A It does, correct.**
Q And so this is not an overpayment against services in any shape or form, correct?
MR. IRROBALI: Object to form.

122

**A It does not appear to be related to services, correct.**
Q And so it would not be an overpayment?
**A It would not be included in our NTE analysis, which is only services, so therefore, it wouldn't be included in overpayment.**
Q And so should not be listed in exhibits A.1 or A.2, correct?
MR. IRROBALI: Object to form.
**A I don't know that I agree with that, because I mean that was based on the information we had at that point and we didn't have the underlying invoices to the consolidated invoices.**
Q Do you know when that invoice was produced in this case?
**A This, no. I mean, I asked for all invoices that had been produced.**
Q Okay. But you don't know when it was produced?
MR. IRROBALI: Object to form.
**A I don't know the specific day it was produced. My belief would be it was not produced prior to my report.**
Q So as you sit here today, exhibits A.1 and A.2 should not include consolidated invoice

123

B15228657 as a damages overpayment?
**A I mean, I would not have included materially related items in my calculation.**
Q And so with respect to the various sites that we've discussed today, the total damages under scenario 1 is not 6,474,575, correct?
MR. IRROBALI: Object to form.
**A If I incorporate the invoices that you have shown me today, I would agree that number would likely go down.**
Q And the number under total damages under scenario 2 is not $5,652,334, correct?
**A It is not likely that amount either, yeah, again, assuming I would adjust this analysis for invoices that I didn't have.**
Q And the conclusion that you reach in paragraph 40 is based on those two exhibits, correct?
**A That's correct.**
Q And so what is the correct amount for total overpayment under scenario 1?
MR. IRROBALI: Object to form.
**A I don't have a different amount than what is in this report.**
Q But you said it would go down?

124

**A Correct. I mean, you haven't shown me -- I mean, I would have to -- this is not something I can come up with on the fly.**
Q So you're not going to testify in court in front of a judge or a jury that the damage amount is 6,474,575, correct?
MR. IRROBALI: Object to form.
**A I mean, I think it will depend on how the case proceeds.**
Q Based on what you have learned today, you agree with me that this number is overinflated, correct?
MR. IRROBALI: Object to form.
**A Based on what you have shown me today consistent with the methodology that I used, I would agree that those numbers would come down. I think it is more a matter of, you know, relative to when the invoices were produced and did I have them all. If I am asked to revise the report, I don't know what I'm going to be asked to do at this point.**
Q Sure. And I just want to know if you are going to show up in court, because I'm not going to see you until then I don't think, and testify to this number that is in Exhibit A.1?

125

MR. IRROBALI: Object to form.
**A Again, I think I'm -- I think the -- I think the amount in A.1 or in paragraph 40 if I change anything it is going to be related to that tax-related issue. So that would adjust these numbers relative to any of the other items that you showed me today related to the consolidated invoices or otherwise, I think it is going to depend on what happens relative to the underlying invoices that support that amount. I don't disagree with you, that if I had the underlying invoices, my number would be different.**
Q Right. And my question was a little bit more specific.
Are you going to show up at court and tell the judge that scenario 1 damages are $6,474,575?
MR. IRROBALI: Object to form.
**A And again, I don't know how to answer it any differently. As I sit here today, I don't know. I would probably -- if my tax -- if the tax issue is an error, then you know perhaps I change that and that is a different amount. But like relative to all these other underlying items, if it is based on what was available to me as of the date of my report, that number is still correct**

126

**outside of the tax issue.**
Q Well, let's separate the tax issue and separate the methodology issue.
The overpayment analysis depends on something being service related, correct?
**A The way my analysis works, correct.**
Q And you have seen today that you have included amounts in the service payment that were for materials, correct?
**A I don't disagree with you that some of the consolidated invoices that you have shown me today had material amounts in them.**
Q And as a result, the total damages under scenario 1 is higher than it should be?
**A It would be -- assuming I incorporate invoices that I did not have at the time of the report, I would agree with you.**
Q And the same question with respect to damages under scenario 2. It includes amounts that are for materials and should not be included within that amount, correct?
**A As it pertains to the consolidated invoices, I would agree with you.**
Q With respect to the tax issue, you said if the tax issue is incorrect, you have determined by

127

virtue of adding up the exhibits that made up the consolidated exhibit, 21 through 33, that you incorrectly calculated the tax payment, correct?
**A Again, we're doing this on the fly. I think you are correct. I think it is incorrect, but --**
Q And that had nothing to do --
**A I would like to step back and double-check that after the deposition.**
Q And you have -- that had nothing to do with whether you had invoices or didn't have invoices?
**A That is -- that is correct.**
Q And you don't know when Securus had the particular invoices that we've looked through today?
**A When -- I don't have specific dates relative to when Securus may or may not have gotten an invoice.**
Q And you don't know when Securus' counsel had the invoices that made up the consolidated invoices, correct?
**A I don't know that for certain.**
Q Now, with respect to any adjustments you would make to scenario 1 or scenario 2, you can't

128

tell me what that number would be today?
**A I cannot tell you what that number would be today, because I would need to have every one of the consolidated invoices or any other invoices that theoretically would change the number.**
Q And not theoretically, they would change the number, right? They're materials, you saw that they were for materials, you testified they were for materials?
MR. IRROBALI: Object to form.
**A Again, if I were incorporating those invoices I would agree with you the number would go down.**
Q But you couldn't tell me what the number would be though?
**A I can't as I sit here today, no.**
Q And you can't tell me what using the correct formula for tax would impact the opinions either?
**A Not off the cuff I cannot, no.**
Q You testified at the beginning of your deposition that you have assumed, as a financial expert does, that the counterclaim is correct, correct?
**A That is correct. I assume liability as it**

141

**A I don't have a basis to dispute whether they were entitled to them or not. I can just simply say that, you know, I can see that they're not here.**
Q And you're not disputing whether Securus owes for Conex boxes that were kept on sites past June, correct?
MR. IRROBALI: Object to form.
**A Again, that is not my place to determine whether that was -- I mean, I haven't seen anything relative to these additional updated invoices. I don't have a way to agree or not agree on what you said.**
Q And when was the last time you asked for invoices from either Securus or its counsel? Was it before the November 20th report?
**A Definitely before the November. I'm trying to recall if -- I don't think we asked for them prior to December, because we were, you know, rebutting SHI's affirmative position. And they didn't produce an expert report, so I was going off of what the pleadings were and what the spreadsheet was at that point in time that they had introduced.**
**So I had the invoices relative to those**

142

**spreadsheets, so I didn't necessarily have the need to ask unless there happened to be a consolidated one, which is the same issue we were facing before.**
Q The question I asked was when was the last time you asked for invoices from either Securus or its counsel? Was it before the November 20th report?
**A And again, I think -- I think that was the last time that I asked for specific invoices. But obviously I saw the spreadsheet with additional invoices on them. I reconciled them, but I don't -- I don't know that I have asked for underlying invoices.**
MR. ALIBHAI: Give me five minutes.
MR. IRROBALI: Sure.
(Recess, 1:58 to 2:02.)
MR. ALIBHAI: Reserve the rest of my questions, pass the witness.
MR. IRROBALI: We reserve for time of trial.
THE WITNESS: I would like to read.
(Deposition adjourned at 2:02 p.m.)

143

CERTIFICATE OF SHORTHAND REPORTER

I, Susan S. Klinger, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; that reading and signing was not discussed; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise in its outcome.

IN WITNESS WHEREOF, I have herunto set my hand on the 13th of April, 2024.

Susan S. Klinger

Susan S. Klinger, RMR-CRR, CSR
Texas CSR 6531, Exp: 10/23/25
California CSR 14487, Exp: 11/30/24